# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- x

In re                                                )    Case No. 08-13555 (SCC)
                                                     )
Lehman Brothers Holdings Inc., et al.,               )    Chapter 11
                                                     )
                        Debtors.                     )    Jointly Administered
                                                     )
----------------------------------------------------------- x

## ORDER ESTIMATING ALLOWED CLAIM
## PURSUANT TO RMBS SETTLEMENT AGREEMENT

This Court having previously entered an *Order Approving RMBS Settlement Agreement*

*And Including Certain Proposed Findings Of Fact And Conclusions Of Law* [Docket No. 55706]

(the "9019 Order"), which granted the *Motion of Lehman Brothers Holdings Inc. Pursuant to*

*Fed. R. Bankr. P. 9019 and 11 U.S.C. § 105(a) for Entry of Order (A) Approving RMBS*

*Settlement Agreement, (B) Making Certain Required Findings Regarding Decision of RMBS*

*Trustees and LBHI Debtors to Enter into RMBS Settlement Agreement, (C) Scheduling*

*Estimation Proceeding to Determine RMBS Claims and Approving Related Procedures*

*Regarding Conduct of Hearing, and (D) Granting Related Relief* [Docket No. 55232],[1] made by

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan Administrator

under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and*

*Its Affiliated Debtors* (the "Plan"), on behalf of itself and the other affiliated debtors in the

above-captioned cases (collectively, the "LBHI Debtors"); and this Court having found in the

9019 Order that it had jurisdiction over the Motion, and any objections to the Motion or RMBS

Settlement Agreement having been resolved, overruled, or waived by the 9019 Order; and this

---

[1]    Capitalized terms not defined herein have the same meanings ascribed to them in the Motion or the RMBS
Settlement Agreement, as appropriate.

CONFIDENTIAL                                                                    LBHI-OMNI_7689501

Court, having conducted an Estimation Proceeding pursuant to the 9019 Order in accordance

with Exhibit G to the RMBS Settlement Agreement, as modified by the parties or the Court,

during which the RMBS Trustees and the Plan Administrator presented evidence and argument

regarding the value of the RMBS Claims; it is hereby:

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.     For the reasons stated in the bench decision dictated on the record on March 8,

2018, the transcript of which is attached hereto as Exhibit A, the Allowed Claim shall be

estimated and allowed at $2,375,114,115.67, as such amount may be adjusted pursuant to, and in

accordance with, Section 3.02 of the RMBS Settlement Agreement to reflect any Excluded

Trusts.

2.     The allocation and distribution of the Allowed Claim shall be conducted in

accordance with the terms of the RMBS Settlement Agreement.

3.     The terms and conditions of this Order shall be immediately effective and

enforceable upon entry of this Order.

4.     The Plan Administrator is authorized to take all action necessary or appropriate to

give effect to the relief granted in this Order.

5.     This Court shall retain jurisdiction with respect to all matters arising from or

related to the implementation of this Order.

Dated: March 15, 2018
       New York, New York

/S/ Shelley C. Chapman
THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

2

Exhibit A

  LBHI-OMNI_7689503

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11       BENCH DECISION REGARDING ESTIMATION OF RMBS CLAIMS

12              PURSUANT TO RMBS SETTLEMENT AGREEMENT

13

14            As read into the record March 8, 2018

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL                                              LBHI-OMNI_7689504

1

2   Sui generis:  From the Latin.  Of its own kind or class;

3   unique or peculiar.  Black's Law Dictionary (10th ed. 2014).

4          Before the Court is the request of Lehman Brothers

5   Holdings Inc. ("Lehman" or the "Plan Administrator") to

6   estimate and allow some seventy-two thousand five hundred

7   breach of contract claims asserted by trustees (the

8   "Trustees") acting on behalf of some 225 trusts that issued

9   Residential Mortgage Backed Securities ("RMBS").  The trusts

10  are issuers of certificates that are collateralized by pools

11  of residential mortgage loans in securitizations that were

12  sponsored by Lehman and/or certain of its affiliates.  The

13  Court assumes familiarity with the nature of RMBS put-back

14  litigation generally and with the lengthy history of this

15  RMBS litigation in particular.  Nonetheless, a bit of

16  history is in order to establish the context of this

17  Decision and, in particular, to explain why this particular

18  RMBS put-back litigation is sui generis – decidedly the only

19  one of its own kind.

20          In the heady years leading up to the financial

21  crisis of 2008, certain of the Lehman debtors, like many

22  other sophisticated financial institutions, created and

23  enjoyed a robust market in which they (i) acquired

24  residential mortgage loans either originated or purchased by

25  their subsidiaries or affiliates and (ii) securitized such

CONFIDENTIAL                                             LBHI-OMNI_7689505

1    loans.  Securitization of the loans entailed the

2    establishment of a trust or other special purpose vehicle to

3    acquire the loans, hold the loans, and issue securities

4    supported by proceeds of the loans.  In connection with such

5    securitizations, Lehman, or one of its affiliates, as

6    sponsor, made certain representations and warranties

7    regarding the quality and nature of the loans and/or the

8    documents included in the applicable loan file.  Each

9    trust's Governing Agreements typically provide that the

10   applicable trustee may seek repurchase of a loan by the

11   sponsor in the event there occur breaches of such

12   representations or warranties.  In order to assert a

13   repurchase claim, the Governing Agreements generally require

14   a trustee to establish that: (i) a breach of a

15   representation and warranty exists; (ii) the breach

16   adversely and materially affects the value of the related

17   mortgage loan; and (iii) prompt notice of the breach was

18   provided to the sponsor.

19           Suffice to say that things did not exactly go as

20   planned in the world of RMBS.  When the sub-prime housing

21   market collapsed beginning in 2007, RMBS securitizations

22   plummeted headlong into the sinkhole created by the

23   collapse, and threatened to pull the entire United States

24   economy into the abyss as well.

25           On September 15, 2008, Lehman and certain of its

CONFIDENTIAL                                                    LBHI-OMNI_7689506

```
 1   affiliates filed for bankruptcy in the largest chapter 11
 2   filing in U.S. history.  Approximately one year after the
 3   bankruptcy filing, and pursuant to a court-established bar
 4   date, certain RMBS trustees representing approximately 400
 5   trusts, including the Trustees herein, filed proofs of
 6   claims asserting approximately $37 billion in repurchase
 7   claims premised on allegations that certain of the Lehman
 8   Debtors, as sponsors: (i) breached various representations
 9   and warranties in the Governing Agreements regarding the
10   quality and characteristics of hundreds of thousands of
11   mortgage loans; and (ii) provided deficient mortgage loan
12   files.  The proofs of claim asserted broad claims relating
13   to approximately 1.8 million mortgage loans in the
14   aggregate.  However, the claims themselves only specifically
15   identified approximately 4,700 mortgage loans with alleged
16   breaches entitling the Trustees to damages of approximately
17   $209 million — a miniscule portion of the alleged $37
18   billion in claims.  The claims did not provide documentation
19   supporting the $37 billion number in alleged liability, as
20   was required by Lehman's bar date order and the underlying
21   Governing Agreements.
22            Treating the claims like any other claims asserted
23   against the bankruptcy estate, Lehman filed an omnibus
24   objection to the RMBS Claims on the basis that the Trustees
25   had violated the bar date order by, among other things, not
```

CONFIDENTIAL                                                    LBHI-OMNI_7689507

1  providing sufficient supporting documentation to allow the

2  Plan Administrator to assess liability, and it sought "loan-

3  level" proof of the asserted breaches and damages.  Lehman's

4  objection was filed almost seven years ago, on March 14,

5  2011.  Little, if any, such proof was forthcoming; indeed,

6  the Trustees were admonished by then presiding Judge James

7  Peck and told they would indeed be "put to their proof" in

8  order to have their claims ultimately allowed.  (See June

9  30, 2011 Hr'g Tr. at 71:8-19 [Dkt. No. 18251]).

10           In 2012, the parties informed the Court that they

11  had agreed to a $5 billion reserve for the RMBS Claims and

12  that they had also agreed to mediate the dispute regarding

13  the allowed amount of the claims.  The mediation failed.

14           Between September 2012 and March 2014, unbeknownst

15  to the Plan Administrator or the Court, the Trustees

16  embarked on a statistical "sampling" exercise to create a

17  random sample of 5,000 of the so-called Covered Loans (a

18  subset of the total universe of loans comprising the RMBS

19  Claims) that would be "re-underwritten" to produce a

20  statistically significant estimate of overall breach rates.

21  This sampling analysis was presented to the Court as the

22  basis for the Trustees' August 2014 motion to (i) increase

23  the reserve for the RMBS Claims to $12.143 billion and (ii)

24  permit the Trustees to use statistical sampling to estimate

25  and allow their claims without conducting a loan-by-loan

CONFIDENTIAL                                                        LBHI-OMNI_7689508

Page 6

1   review.

2        The Plan Administrator opposed the Trustees'

3   motion, and filed a cross-motion [Dkt. No. 46526] (the

4   "Cross-Motion") to establish a loan-level review process for

5   the RMBS Claims (the "Protocol").  The Trustees, in turn,

6   vigorously opposed the Cross-Motion.  After a full-day

7   evidentiary hearing on December 10, 2014, the Court denied

8   the Trustees' motion to increase the reserve for the RMBS

9   Claims and granted Lehman's Cross-Motion to establish the

10  Protocol.

11       While acknowledging that statistical sampling had

12  indeed been used successfully in many RMBS litigations

13  around the country, the Court concluded that the Trustees'

14  purported "sampling" methodology was deeply flawed; as such,

15  it could not provide a basis for setting reserves on the

16  Trustees' claims, nor could the proffered methodology

17  provide a basis for allowance or estimation of the claims.

18  And, while not ruling out the possibility that sampling

19  could indeed be utilized at some later point in the

20  resolution of the RMBS Claims, the Court concluded that the

21  only viable alternative at that time was for the parties to

22  embark upon the Protocol and, through its highly rigorous

23  multi-step process, pare down the universe of claims that

24  had been asserted.  On December 29, 2014, the Court entered

25  an order (the "Protocol Order") approving the multi-step

CONFIDENTIAL                                                    LBHI-OMNI_7689509

1   Protocol to reconcile the RMBS Claims on a loan-by-loan

2   basis.

3           And so the Protocol commenced.  Faced with the

4   daunting task of reviewing hundreds of thousands of loan

5   files in the 16-month time period allocated to Steps 0-1 of

6   the Protocol before the Protocol's Claims Cut-Off Date of

7   March 31, 2016, the Trustees set about assembling small

8   armies of loan review firms and re-underwriting personnel.

9   Specifically, the Trustees' firms reviewed approximately

10  171,000 loan files and, after finding alleged breaches in

11  approximately 94,000 of such files, submitted them in the

12  form of claim files for the Plan Administrator to review in

13  Protocol Step 2.  At the same time, upon receipt of the

14  claim files from the Trustees, the Plan Administrator

15  similarly embarked on the grueling task of reviewing such

16  files and approving or rejecting the claims asserted.

17          What happened next is of particular significance

18  here today.  Following another mediation in January 2015 and

19  after extensive negotiations, the Plan Administrator and

20  certain large financial institutions who represented the

21  Trusts' largest group of certificateholders (the

22  "Institutional Investors") entered into a settlement in

23  October 2015 pursuant to which the RMBS Claims would be

24  settled for a total allowed claim of $2.44 billion (the

25  "Institutional Investors Settlement").  The Institutional

CONFIDENTIAL                                              LBHI-OMNI_7689510

1    Investors have successfully negotiated numerous other

2    massive RMBS settlements; moreover, all of these prior

3    settlements were achieved at certificateholder recovery

4    levels substantially lower than that being sought by the

5    Trustees herein.  Among the Institutional Investors are some

6    of the most sophisticated and profitable firms on Wall

7    Street, including Goldman Sachs Asset Management, MetLife,

8    BlackRock, Invesco, Western Asset Management Company, and

9    PIMCO.  The Trustees, for reasons that remain undisclosed,

10   declined to support the Institutional Investors Settlement;

11   the only insight into the Trustees' decision appears to be

12   (i) information contained in expert reports prepared for the

13   Trustees that have not been disclosed to the Plan

14   Administrator and have not been admitted into evidence in

15   the Estimation Proceeding and (ii) conclusory statements

16   that the settlement would fail to garner enough support and

17   be accepted by a sufficient number of Trusts.  The Plan

18   Administrator ultimately withdrew the Institutional

19   Investors Settlement, and the parties continued on under the

20   Protocol.

21        Although the objective of the Protocol had been to

22   narrow the underlying pool of disputed loans in order to

23   pave the way for resolution of the ultimate allowed claim on

24   each loan file either through business-to-business

25   negotiation, mediation, or, as a last resort, an evidentiary

CONFIDENTIAL                                                    LBHI-OMNI_7689511

1    hearing before the Court, Steps 2 and 3 of the Protocol did

2    not succeed in reducing the number of loans at issue

3    substantially below 94,000.  After over two years of work

4    under the Protocol and with the parties being only halfway

5    through its 5-step process, it was obvious to all that the

6    Protocol had failed to achieve its objective.

7              Notwithstanding the failures of both the Protocol

8    and the Institutional Investors Settlement, the Plan

9    Administrator and the Institutional Investors continued to

10   work toward a framework for resolving the RMBS Claims.  On

11   March 17, 2017, the Plan Administrator and the Institutional

12   Investors entered into a modified settlement agreement (the

13   "RMBS Settlement Agreement") that was presented (i) to the

14   Trustees for their consideration and acceptance and (ii) to

15   the Court as a settlement for which approval was sought

16   pursuant to Bankruptcy Rule 9019.  Pursuant to the RMBS

17   Settlement Agreement, the Plan Administrator agreed to seek

18   allowance, through an estimation proceeding before the Court

19   (the "Estimation Proceeding"), of the RMBS Claims known as

20   the "Covered Loan Claims" at $2.416 billion (or at a

21   slightly different amount depending on the number of Trusts

22   that accepted the settlement).  Although the Trusts

23   asserting the RMBS Claims largely accepted the settlement, a

24   small number of Trusts opted out or collapsed, lowering the

25   agreed-upon proposed estimation amount to $2.38 billion.  On

CONFIDENTIAL                                                      LBHI-OMNI_7689512

1   July 6, 2017, the Court entered an order approving the RMBS

2   Settlement Agreement, paving the way for the Estimation

3   Proceeding.

4           The purpose of the Estimation Proceeding at the

5   heart of the RMBS Settlement Agreement is "for the Court to

6   estimate the allowed claim amount that would have resulted

7   from the completion of the Protocol, and specifically to

8   consider whether the Trustees have shown that they are

9   entitled, under the Protocol, to an allowed claim greater

10  than $2.38 billion."  (Lehman PreTrial Br. at 3.)  Thus, the

11  Plan Administrator seeks estimation of the RMBS Claims in

12  the amount of $2.38 billion (the "Lehman Proposed Claim

13  Amount"), as an allowed class 7 general unsecured claim in

14  these cases, and the Trustees have the right under the RMBS

15  Settlement Agreement to seek estimation of the claims in a

16  higher amount.  If the Court estimates the claims at $2

17  billion or more, all parties to the settlement (including,

18  upon their acceptance of the settlement, the Trustees) waive

19  their rights to appeal the Court's decision.

20          Moreover, the RMBS Settlement Agreement

21  specifically does not require the Court to issue findings of

22  fact and conclusions of law if the Court estimates the

23  claims at $2 billion or more.  Given the complexity of the

24  issues presented, the magnitude of the dispute, and the

25  enormous effort expended by the parties, a thorough detailed

CONFIDENTIAL                                                    LBHI-OMNI_7689513

1    decision is in order.  Although it was originally

2    contemplated that the Estimation Proceeding would conclude

3    in early January of 2018, the occurrence of certain events

4    beyond the parties' control resulted in the delay of the

5    conclusion of the proceeding until mid-February.  The tight

6    timeframe in which a decision is required precludes the

7    preparation of a more formal memorandum decision replete

8    with detailed citations to the voluminous trial record.

9    Nonetheless, the parties should be assured that the Court

10   has reviewed and re-reviewed the record extensively in the

11   preparation of this bench decision.

12        Given this backdrop and history, this has been a

13   peculiar RMBS trial, the only one of its own kind.  Among

14   the additional unique features of this RMBS trial is what

15   has and what has not been introduced into evidence.

16   Pursuant to Exhibit G to the RMBS Settlement Agreement, the

17   parties agreed specifically to permit the introduction into

18   evidence of (i) the Institutional Investors Settlement and

19   (ii) materials concerning other settlement agreements in

20   disputes involving RMBS Claims.  Notably, however, despite

21   the introduction into evidence of millions of pages of loan

22   files, there has been limited loan-level proof for the vast

23   majority of loans at issue.  While certain so-called

24   "exemplar" loans were introduced into evidence and were the

25   subject of detailed testimony, no sampling methodology was

CONFIDENTIAL                                                    LBHI-OMNI_7689514

1    employed or adduced at trial.  Moreover, not only have the

2    loans and the loan files themselves been on trial but the

3    processes by which each of the parties reviewed the loan

4    files and breach claims have also been put on trial.  As a

5    result, the trial was dominated by testimony from each

6    side's expert witnesses.

7            Accordingly, the decision that the Court is about

8    to render, after some 22 days of trial, will bear little

9    resemblance to the canon of RMBS decisions rendered by

10   various courts in this District and across the country, all

11   of which the Court has considered with a great deal of care.

12           I.    BACKGROUND

13           A.    The Governing Agreements

14           The parties' respective loan review processes

15   during the Protocol were dictated by their interpretations

16   of the Governing Agreements, which include, among others,

17   Trust Agreements, Assignment and Assumption Agreements,

18   Indentures, Mortgage Loan Sale and Assignment Agreements

19   ("MLSAAs"), and other agreements governing or related to the

20   Trusts.

21           In order to assert a claim against a Lehman

22   sponsor under the Governing Agreements, the agreements

23   specifically require the Trustees to prove for each mortgage

24   loan: (1) a breach of a representation and warranty under

25   the applicable MLSAA; (2) that the breach materially and

CONFIDENTIAL                                        LBHI-OMNI_7689515

1  adversely affects the value of the mortgage loan; and (3)

2  that prompt notice of the breach was provided to Lehman.

3  See Cross-Motion at ¶ 43 (citing to Ex. E (SASCO 2005-1

4  MLSAA) at § 1.04(d)).

5      Lehman or one of its affiliates, as the sponsor

6  and seller of the loans, made numerous representations and

7  warranties under the MLSAAs for the benefit of investors in

8  the trust certificates.  The most frequently asserted

9  borrower breaches of reps and warranties asserted here are

10  based on the so-called "no default" and "no untrue

11  statement" reps and warranties, including breaches for

12  misrepresentation of income, debt, and occupancy.

13      Under the "no default" rep and warranty under the

14  MLSAA, Lehman promises that "[t]here is no default, . . .

15  breach, violation or event of acceleration existing under

16  the Mortgage or the Mortgage Note and no event which, with

17  the passage of time . . . ., would constitute a default."  See

18  Trustees' Pre-Trial Brief, p. 10 (citing LXS 2006-15 MLSAA §

19  1.04(c)(vii)).  While the No Default Representation does not

20  mention borrower misstatements, the underlying deed of trust

21  typically provides that "[a] Borrower shall be in default

22  if, during the Loan application process, Borrower . . . gave

23  materially false, misleading, or inaccurate information or

24  statements to Lender (or failed to provide Lender with

25  material information) . . . ."  Id. at p. 10 (citing TRX

CONFIDENTIAL                                                LBHI-OMNI_7689516

1    362, Deed of Trust at 7).

2            The "no untrue statement" rep and warranty under

3    the MLSAA states, in pertinent part, that "[t]he documents,

4    instruments and agreements submitted for loan underwriting

5    were not falsified and contain no untrue statement of

6    material fact or omit to state a material fact required to

7    be stated therein or necessary to make the information and

8    statements therein not misleading.  To the best of Seller's

9    knowledge, no fraud was committed in connection with the

10   origination of the Mortgage Loan."  (Lehman Post-Trial Brief

11   p. 16 n.98 (citing SASCO 2006-S3 MLSAA at § 1.04(c)(v) (TRX

12   232)).)

13           Other breaches asserted by the Trustees during the

14   Protocol and not based on the previously discussed breaches

15   of reps and warranties were based on, among other things,

16   (i) breaches of representations required by the applicable

17   underwriting guidelines, (ii) breaches of regulatory

18   requirements, and (iii) breaches of other mortgage covenants

19   which required that certain documents be in the loan file at

20   origination or otherwise.  Such asserted breaches include,

21   among others, failure to provide a final HUD-1, failure to

22   provide a final TIL, failure to provide a right of

23   rescission, and failure to obtain a qualified appraisal.

24           In order to assert a valid claim, the Trustees

25   must demonstrate the existence of a breach pursuant to the

CONFIDENTIAL                                                    LBHI-OMNI_7689517

1    Governing Agreements and also must prove that the breach has

2    a material and adverse effect on the value of the related

3    mortgage loan (or, in a few of the at-issue MLSAAs, the

4    "interests of the Depositor").  The parties refer to this

5    requirement as "AMA" or "MAE," as the context requires, (and

6    the Court will use the two terms interchangeably) but they

7    disagree on the meaning of this requirement and the timing

8    for determining whether it has been met for a particular

9    loan.  Specifically, the MLSSAs state, in pertinent part:

10             Upon discovery by either the Bank or the Depositor

11   of a breach of any of the foregoing representations and

12   warranties that adversely and materially affects the value

13   of the related Mortgage Loan, that does not also constitute

14   a breach of a representation or warranty of a Transferor in

15   the related Transfer Agreement, the party discovering such

16   breach shall give prompt written notice to the other party.

17             See Ex. 7 to Lehman Pretrial Brief at § 1.04(b)

18   (MLSAA, dated Feb. 1, 2003).

19             After a party demonstrates the existence of a

20   breach that materially and adversely affects the value of

21   the related mortgage loan, the MLSAAs provide specific

22   remedies pursuant to the so-called "repurchase provisions"

23   of the MLSAAs governing each Trust.  The MLSAAs contain

24   substantially similar language, which sets forth specific

25   procedures to cure a breach, stating, in pertinent part:

CONFIDENTIAL                                          LBHI-OMNI_7689518

Page 16

1          Within 60 days of the discovery of any such

2     breach, Lehman . . . shall either (a) cure such breach in

3     all material respects, (b) repurchase such Mortgage Loan or

4     any property acquired in respect thereof from the Depositor

5     at the applicable Purchase Price or (c) within the two year

6     period following the Closing Date, substitute a Qualifying

7     Substitute Mortgage Loan for the affected Mortgage Loan.

8          See Ex. 7 to Lehman Pretrial Brief at § 1.04(b)

9     (MLSAA, dated Feb. 1, 2003).  The Governing Agreements

10    provide that any loans subject to repurchase must be

11    repurchased at the "Purchase Price," which is generally

12    defined as follows:

13          With respect to the repurchase of a Mortgage Loan

14    pursuant to this Agreement, an amount equal to the sum of

15    (a) 100% of the unpaid principal balance of such Mortgage

16    Loan, (b) accrued interest thereon at the Mortgage Rate,

17    from the date as to which interest was last paid to (but not

18    including) the Due Date immediately preceding the related

19    Distribution Date, (c) any costs and damages incurred by the

20    Trust Fund with respect to such Mortgage Loan in connection

21    with any violation of any federal, state or local predatory

22    or abusive lending laws or other similar laws and (d) any

23    unreimbursed Servicing Advances with respect to such

24    Mortgage Loan.

25          Cross-Motion at ¶ 83 (citing to Ex. E (SASCO 2005-

CONFIDENTIAL                                        LBHI-OMNI_7689519

 1    1 MLSAA) at § 1.01}.

 2              B.    The Protocol

 3              The Protocol Order established the process by

 4    which the Trustees would collect, review, and present loan-

 5    level proof from which the parties — or the Court, if

 6    necessary — could reconcile the RMBS Claims and determine an

 7    allowed amount for such claims.

 8              The steps of the Protocol were as follows:

 9              Step 0: The Trustees were required to collect loan

10    files from the servicers.

11              Step 1: By March 31, 2016, the Trustees were

12    required to submit claim files to the Plan Administrator.

13    Under the Protocol, an RMBS claim package was required to

14    include: (i) the mortgage loan file; (ii) a statement

15    describing either (a) the specific alleged defect and the

16    representation or warranty violated or (b) the specific

17    document allegedly missing; (iii) a statement of how the

18    breach or defect entitles the Trustee to a claim under the

19    applicable Governing Agreements and applicable law; (iv) a

20    calculation of the purchase price; and (v) a statement

21    describing any notice of breach given to the Lehman Debtors.

22              Step 2: Review of claim files by the Plan

23    Administrator.   The Plan Administrator reviewed the claim

24    files and determined whether the Trustees proved a material

25    breach.   If it determined that a material breach was proven,

CONFIDENTIAL                                              LBHI-OMNI_7689520

1    the Plan Administrator approved the file and then either

2    approved or recalculated the purchase price.  If the file

3    was not approved, the Plan Administrator prepared a

4    statement explaining the basis for rejection of the claim.

5            Step 3: Non-binding negotiation procedure for

6    rejected claims and disputed approved claims.  During this

7    step, the parties could negotiate regarding disputed claims

8    in an effort to arrive at a mutually acceptable allowed

9    claim.  The Parties did not complete this step of the

10   Protocol.

11           Step 4:  Non-binding dispute resolution procedure

12   to resolve claim file disputes.  During this step, the Plan

13   Administrator was to submit disputed claims remaining after

14   Step 3 for resolution by one or more neutral claims

15   facilitators.  The Parties did not reach this step of the

16   Protocol.

17           Step 5: Court review and approval of claim

18   amounts.  In this final step, agreed claim amounts were to

19   be approved by the Court and disputed claims were to remain

20   subject to objection by the Plan Administrator and allowance

21   by the Court on a loan-by-loan basis.  The Parties did not

22   reach this step of the Protocol.

23           C.   The Trustees' Protocol Process

24           The Trustees' loan review process under the

25   Protocol was led by Mr. James Aronoff and Mr. Edmond Esses

CONFIDENTIAL                                                    LBHI-OMNI_7689521

1    of Duff & Phelps ("D&P"); it was comprised of five stages:

2    the Completeness Review; the Initial Loan Review; the Second

3    Level Review; and two quality control reviews, referred to

4    by D&P as QC1 and QC2.  The first three stages of the review

5    process were conducted by one of five forensic review firms

6    hired by D&P (the "Loan Review Firms"), while QC1 and QC2

7    were conducted by D&P.  The Loan Review Firms were

8    DigitalRisk, The Oakleaf Group, CrossCheck Compliance,

9    EdgeMac, and Opus Business Services Group.

10         During the "Completeness Review," the Trustees

11   collected loan files from the servicers.  Once the Trustees

12   received the loan files, the Loan Review Firms endeavored to

13   ensure that the loan files were complete.  Each loan file

14   was examined to determine whether it contained six

15   origination documents that the Trustees determined were key

16   to the review and provided an "indicia of completeness:" (i)

17   the loan application, (ii) the origination credit report,

18   (iii) the appraisal, (iv) the mortgage, (v) the note, and

19   (vi) the HUD-1 (collectively, the "Trustee Critical

20   Documents").

21         Next, in the "Initial Loan Review" of a loan file,

22   a loan reviewer from one of the Loan Review Firms conducted

23   what the Trustees characterize as a complete "re-

24   underwriting" of each loan.  In the "Second Level Review," a

25   second loan reviewer purportedly conducted an independent

CONFIDENTIAL                                                         LBHI-OMNI_7689522

 1    re-underwriting of any loans with material breaches

 2    identified in the Initial Loan Review; loans that were not

 3    found to have a breach in the Initial Loan Review were not

 4    reviewed in the Second Level Review.  In addition to

 5    utilizing documents typically found in the loan files, such

 6    as tax returns, Form W-2s, bankruptcy filings, credit

 7    reports, and hardship letters, the Loan Review Firms often

 8    utilized data and reports produced by third-party sources

 9    such as credit bureaus (that is, Equifax, Experian, and

10    TransUnion); the Bureau of Labor Statistics ("BLS Data");

11    the Mortgage Electronic Registration System ("MERS");

12    DataVerify; LexisNexis; Accurint; and Salary.com.  In

13    addition, the Loan Review Firms sometimes conducted a

14    verification of employment ("VOE"), generally done via a

15    telephone call, email, or fax, to a borrower's former

16    employer to inquire about the borrower's salary or

17    employment as of the date of origination of the loan.  The

18    third-party data and VOEs were often obtained by the Loan

19    Review Firms during their Protocol loan review process.

20         For each breach claim asserted after the

21    completion of the loan review process, the Loan Review Firms

22    identified the loan, the alleged breach finding, the

23    representation and warranty relied upon, and the evidence

24    supporting the alleged breach; the firms compiled such

25    information in a "Claims Tracking Spreadsheet" to which the

CONFIDENTIAL                                                   LBHI-OMNI_7689523

1    Plan Administrator would eventually add its response.  The

2    Loan Review Firms also assembled a "Claim Package"

3    consisting of all the documents upon which the Trustees

4    relied to demonstrate the existence of the claimed breach.

5         After the Loan Review Firms conducted two levels

6    of review, the Claim Package for any loan determined to have

7    a breach was passed on to D&P for the two additional rounds

8    of so-called "quality control," QC1 and QC2.  Breach claims

9    based on "Missing Documents," however, were not transmitted

10   to D&P for QC1 or QC2 review; such claims were not further

11   reviewed beyond the Second Level Review.  In QC1, a D&P

12   employee was instructed to check the accuracy of the breach

13   narrative in the Claims Tracking Spreadsheet against the

14   evidence in the Claim Package; unless D&P found an

15   inconsistency, there was no D&P review of the full loan file

16   during QC1.

17        At the QC2 level, Mr. Aronoff's team at D&P

18   repeated the review conducted in QC1; in addition, the QC2

19   reviewer was tasked with (i) confirming that the breach

20   finding was connected to one or more representations and

21   warranties in the applicable MLSAA, (ii) addressing any

22   questions raised during QC1, and (iii) analyzing the breach

23   claim for AMA and making a final determination on the claims

24   for submission to the Plan Administrator.  Mr. Aronoff's QC2

25   team concluded that a defect had a material and adverse

CONFIDENTIAL                                                    LBHI-OMNI_7689524

1   effect on the value of a loan if it met one of the following

2   four criteria: (1) the defect increases the likelihood of

3   default with respect to the loan, thereby increasing the

4   credit risk associated with such loan; a breach causing an

5   increase in credit risk is material and adverse to the value

6   of the loan; (2) the defect increases the potential loss

7   severity with respect to the loan, thereby increasing the

8   credit risk associated with such loan; a breach causing an

9   increase in credit risk is material and adverse to the value

10  of the loan; (3) the defect increases the potential loss

11  severity and the likelihood of default with respect to the

12  loan, thereby increasing the credit risk associated with

13  such loan; a breach causing an increase in credit risk is

14  material and adverse to the value of the loan; and (4)

15  pursuant to the related governing documents, the defect is

16  material and adverse to the value of the loan (i.e., a

17  "Deemed AMA").  See TRDX-173.

18        All breach claims that cleared every step of the

19  Trustees' loan review process progressed to Step 2 of the

20  Protocol in which they were submitted to the Plan

21  Administrator for review.  In submitting their breach

22  claims, the Trustees provided the Plan Administrator with

23  the Claims Tracking Spreadsheet, the Claim Package, the

24  entire loan file as received from the servicer, and the

25  "data tape" containing loan-specific information to

CONFIDENTIAL                                                    LBHI-OMNI_7689525

1    calculate the purchase price for each loan.

2            D.   The Plan Administrator's Protocol Process

3            The Plan Administrator's Protocol team consisted

4    of (i) Lehman personnel who had experience with repurchase

5    claims and operations management; (ii) Recovco Mortgage

6    Management ("Recovco"), a loan review firm that reviewed

7    individual claims; and (iii) Rollin Braswell Fisher LLC

8    ("RBF"), attorneys for the Plan Administrator.  The Plan

9    Administrator's loan review process was overseen by Mr.

10   Zachary Trumpp.

11           In reviewing the breach claims submitted by the

12   Trustees, the Plan Administrator's team utilized a multi-

13   step review process.  The Plan Administrator's position is

14   that, for the Trustees to meet their burden, they first were

15   required to demonstrate the existence of a loan defect

16   ("Threshold Fact") that constituted a breach of at least one

17   representation and warranty in the applicable Governing

18   Agreements for that Trust.  During its review of each breach

19   claim submitted by the Trustees, the Plan Administrator and

20   its team reviewed not only the Claim Package but also the

21   entire loan file in order to assess whether the Trustees had

22   established a Threshold Fact sufficient to support a claim

23   of breach on a loan file.  The majority of the Trustees'

24   claims were rejected at the Threshold Fact level review

25   stage.

CONFIDENTIAL                                      LBHI-OMNI_7689526

1         If the Plan Administrator confirmed the existence

2    of a Threshold Fact supporting the Trustees' asserted breach

3    claim, the Plan Administrator next examined whether such

4    defect constituted a breach of the applicable representation

5    and warranty under the Governing Agreements.  For instance,

6    if the Trustees relied on the "no untrue statement"

7    representation and such representation required that a

8    misstatement must be a "material fact," then the Plan

9    Administrator would determine whether the Threshold Fact was

10   material.

11        If the Plan Administrator determined there was a

12   breach of a representation and warranty, it progressed to an

13   evaluation of whether the breach was one that "adversely and

14   materially affects" the value of the loan.  The Plan

15   Administrator's team conducted two levels of AMA review.

16   First, Recovco would review the file; if a loan file was

17   complicated or if Recovco disagreed with the Trustees, it

18   would elevate the loan file to RBF, who would then reopen

19   the loan file and conduct a review process.  If all three

20   components — the Threshold Fact, a breach of a rep and

21   warranty, and AMA — were present, then the loan file was

22   given a "pass" by the Plan Administrator and reviewed for a

23   determination of damages.  Mr. Trumpp testified at trial

24   that, as of the time the Protocol was halted, the Plan

25   Administrator had "passed" approximately 1,260 loans under

CONFIDENTIAL                                                        LBHI-OMNI_7689527

1    the Protocol.

2            The Plan Administrator provided the Trustees with

3    a formal response to each loan file detailing in 250 words

4    or less its reasoning for accepting or rejecting claims on a

5    loan file.  Such response was input into the Claims Tracking

6    Spreadsheet.

7            E.   The "On-Hold" Loans

8            During Step 2 of the Protocol, the Plan

9    Administrator placed over 30,000 loan files "on hold"

10   following its determination that each such loan file was

11   missing one or more of the following documents deemed to be

12   "critical" to the Plan Administrator's review (collectively,

13   the "PA Critical Documents"): (i) servicing notes, which are

14   routinely compiled by the loan servicer and contain

15   communications between the servicer and the borrower,

16   including potential reasons for a borrower's default; (ii)

17   payment history, which provides information on loan payments

18   made by borrowers and how such payments are allocated to

19   outstanding principal and interest; (iii) loss

20   certifications, which provide a detailed calculation of the

21   unpaid losses on a loan; and (iv) corporate expense logs,

22   which record costs associated with servicing the loan and

23   costs incident to the foreclosure process, including the

24   dates such costs were incurred.  The Plan Administrator

25   asserts that, when PA Critical Documents were missing from a

CONFIDENTIAL                                              LBHI-OMNI_7689528

1  file, it made numerous requests for such information from

2  the Trustees.  In most cases, the Trustees did not obtain

3  the requested documents and, as a result, the Plan

4  Administrator never received them.  During the Protocol, by

5  an agreement among all parties, the Plan Administrator put

6  aside all loan files missing one or more of the PA Critical

7  Documents (Dkt. No. 53161; TRX-854, pp. 5-6) and it never

8  reviewed such loan files unless it received the missing

9  documents.  The Plan Administrator argues that breach claims

10  asserted on the "on hold" loans should be valued at zero.

11  The Trustees disagree, and assert that such claims should be

12  allowed in the full amount asserted.  At trial, the number

13  of "on-hold" loans was reduced to approximately 24,000 loan

14  files as a result of collapsed trusts or withdrawn claims.

15          F.    The Withdrawn Claims

16          During the Protocol, the Trustees asserted that a

17  total of approximately 94,000 loan files contained material

18  breaches.  Subsequent to the termination of the Protocol and

19  in connection with the Estimation Proceeding, the number of

20  at-issue loan files was reduced to approximately 91,000 as a

21  result of loans that had been paid in full, trusts that had

22  terminated, and the parties' reconsideration of certain

23  claims submitted during the Protocol.  However, on June 1,

24  2017, the Trustees submitted the Expert Report of James

25  Aronoff, which offered opinions on approximately 76,044

CONFIDENTIAL                                                        LBHI-OMNI_7689529

1    loans files.  Throughout June and July of 2017, the Plan

2    Administrator repeatedly requested that the Trustees provide

3    information on the basis for their withdrawal from the

4    Estimation Proceeding of approximately 72,088 breach claims

5    (the "Withdrawn Claims"), which included the withdrawal of

6    15,107 disputed mortgage loan files in their entirety.  The

7    Trustees refused to provide any such information, asserting

8    that the rationale surrounding their decision to withdraw

9    certain loans from the Estimation Proceeding is protected by

10   attorney-client privilege and as attorney work product.  The

11   Trustees have steadfastly maintained this position

12   notwithstanding the Plan Administrator's assertion that the

13   withdrawal of some 40% of the Trustees' breach claims

14   profoundly undermines the integrity and validity of the

15   Trustees' loan review process.

16           On July 27, 2017, the Plan Administrator submitted

17   the Rebuttal Expert Report of Charles Grice, who opined that

18   the Trustees' selection of the Withdrawn Claims appeared to

19   have been done at random; particularly in the category of

20   "Missing Document" claims asserted by the Trustees, certain

21   Missing Document claims were withdrawn while others were

22   not.  As such, Mr. Grice argued that the loans and claims

23   that had been withdrawn tended to confirm the Plan

24   Administrator's position that the Trustees' loan review

25   process was flawed.  In his subsequent reply report, Mr.

CONFIDENTIAL                                    LBHI-OMNI_7689530

1    Aronoff did not respond to Mr. Grice's opinion on the

2    Withdrawn Claims.

3          The Trustees did comment on the Withdrawn Claims

4    in footnote 7 of the Trustees' Pre-Trial Brief, stating that

5    they withdrew the Withdrawn Claims to make the Estimation

6    Proceeding more "focused and manageable."  However, none of

7    the Trustees' witnesses provided any additional explanation

8    or insight into the Withdrawn Claims.

9          II.   SUMMARY OF THE PARTIES' POSITIONS

10         A.   The Plan Administrator

11         The Plan Administrator asserts that the Trustees

12   have failed to meet their evidentiary burden to support an

13   estimated allowed claim in an amount greater than $2.38

14   billion, much less the allowed claim of $11.4 billion sought

15   by the Trustees.  The Plan Administrator argues that the

16   Trustees engaged in a fundamentally flawed loan review

17   process, resulting in claims that were inappropriately

18   framed and inadequately supported.  Because the Trustees'

19   loan review process suffered from multiple defects, the Plan

20   Administrator maintains that the Trustees cannot carry their

21   burden of proof by relying on an "exemplar loan" approach at

22   trial.

23         Specifically, the Plan Administrator asserts,

24   metaphorically, that "every loan is a snowflake" — that is,

25   that every loan and every loan file is unique.  Thus, in

CONFIDENTIAL                                          LBHI-OMNI_7689531

1    order to prove breaches of representations and warranties

2    under the Governing Agreements, the Trustees have the burden

3    to show, on a loan-by-loan basis, a Threshold Fact that

4    constitutes a breach of a representation and warranty in the

5    applicable MLSAA.  Instead of making reliable and accurate

6    determinations of Threshold Facts, the Loan Review Firms,

7    argues the Plan Administrator, (i) relied on evidence

8    insufficient in quality and/or quantity, (ii) ignored

9    contradictory evidence, (iii) drew unsupported and

10   conclusory inferences, and/or (iv) failed to weigh all of

11   the relevant evidence when making their breach

12   determinations.  The Trustees' claims were often based on

13   inconclusive evidence that was given more weight than the

14   borrower's statements in the loan application itself.  In

15   contrast, the Plan Administrator contends that its own

16   review process was reliable and that its responses to the

17   Trustees' asserted breach claims were reasonable.

18            The Plan Administrator criticizes the Trustees'

19   determination of AMA by breach type and further asserts that

20   the Trustees did not prove AMA for each material breach

21   asserted as they conflated the question of whether a

22   misrepresentation was "material" with the separate

23   determination of whether the breach, if proven, adversely

24   and materially affects the value of the loan.  By failing to

25   analyze AMA with respect to each specific loan and instead

CONFIDENTIAL                                                LBHI-OMNI_7689532

1    matching a breach type to one of four types of AMA recitals,

2    the Trustees effectively write the AMA requirement out of

3    the Governing Agreements and render meaningless the

4    requirement that AMA be assessed at the time of notice of

5    the breach.  Further, the Plan Administrator disagrees with

6    the Trustees' "risk of loss" analysis of AMA, asserting

7    instead that, in order to demonstrate AMA, the Trustees must

8    show actual loss in value on the loan at issue rather than a

9    material increase in the risk of loss that has yet to

10   actualize.  Even assuming the Trustees' standard is the

11   correct one, the Plan Administrator points out that the

12   Trustees made no effort to quantify a baseline risk of loss

13   on any loan to determine whether the alleged breach had

14   significantly increased it.

15        In support of its proposed estimated claim amount

16   of $2.38 billion, and pursuant to Exhibit G of the RMBS

17   Settlement Agreement, the Plan Administrator has highlighted

18   that the Institutional Investors, who represent nearly 24%

19   of all beneficial certificateholders and comprise some of

20   the biggest names on Wall Street, had previously agreed to a

21   settlement of the Covered Loan Claims for an allowed claim

22   proportionately equal to $2.38 billion, which settlement the

23   Institutional Investors presumably believed to be fair and

24   reasonable.  Additionally, the Plan Administrator has

25   presented evidence of comparable settlements in large-scale

CONFIDENTIAL                                                    LBHI-OMNI_7689533

1    RMBS matters that involved (i) a number of the same

2    Institutional Investors and (ii) similar claims, legal

3    issues, and macro-economic context; the Plan Administrator

4    argues that its proposed estimated claim amount of $2.38

5    billion is consistent with the range of such settlements,

6    and is in fact at the high end of their recovery ratios.

7    The Plan Administrator thus submits that the Institutional

8    Investor Settlement and these comparable settlements lend

9    further support to the reasonableness of Lehman's proposed

10   allowed claim amount.

11              B.    The Trustees

12              The Trustees characterize their claims as

13   "straightforward breaches of contract" for which they seek

14   damages of approximately $11.4 billion.  They argue that

15   Lehman made sweepingly broad representations and warranties

16   in the Governing Agreements which were both standard in the

17   RMBS market and critical to investors.  Specifically, Lehman

18   represented and warranted, as to each mortgage loan it

19   securitized, that (i) the documents submitted for loan

20   underwriting "contain no untrue statement of material fact

21   or omit to state a material fact;" (ii) the borrower did not

22   give "materially false, misleading or inaccurate statements

23   to Lender" or "fail[] to provide Lender with material

24   information;" (iii) there was no default under the mortgage;

25   and (iv) the borrower's ratio of debt to income ("DTI") did

CONFIDENTIAL                                                    LBHI-OMNI_7689534

1    not exceed a critical threshold.  The Trustees submit that

2    they have proven widespread breaches of these reps and

3    warranties by providing Lehman evidence of breaches that

4    they assert went largely unrebutted during the Protocol.

5         At trial, the Trustees sought to demonstrate that

6    (i) the breach claims they asserted were the result of a

7    reliable process conducted in accordance with industry

8    standards and in a manner approved by other courts, (ii) the

9    evidence types used by the Loan Review Firms are routinely

10   relied on in the industry, and (iii) the standard they used

11   to determine the existence of AMA is the same standard used

12   in the industry and confirmed by courts.

13        The Trustees maintain that the burden of proof

14   applicable to their breach of contract claims is

15   "preponderance of the evidence" – whether a given fact is

16   more likely to be true than not true – and that they have

17   met that burden as to each and every claim they asserted.

18   They criticize Lehman's review of their breach claims as

19   being both overly dismissive of the Trustees' evidence and

20   overly optimistic about a borrower's honesty in applying for

21   a loan and his or her ability to fulfill obligations under a

22   mortgage.  The Trustees maintain that Lehman relies on a

23   presumption of accuracy in the loan applications for which

24   there is no basis and that its breach-level defenses rely

25   heavily on speculation; indeed, the Trustees argue that

CONFIDENTIAL                                                      LBHI-OMNI_7689535

Page 33

1    Lehman failed even to attempt to refute the Trustees' proof

2    for the majority of loans submitted into the Protocol beyond

3    asserting generic challenges to the types of evidence that

4    the Trustees put forward.

5              With respect to the materiality of alleged

6    breaches, the Trustees assert that if a misstatement or

7    omission relates to any information about income, debt, or

8    occupancy, then the "materiality" requirement is satisfied.

9    The Plan Administrator, by contrast, argues that the

10   question is not whether the category of information

11   misstated may be material, but rather, whether, in context,

12   the magnitude of the misrepresentation was material to the

13   credit decision at origination of the loan.

14             The Trustees' position is that a breach materially

15   and adversely affects the value of a loan if it increase the

16   risk of loss on that loan or decreases the price that a

17   purchaser would be willing to pay for it.  Moreover, the

18   Trustees assert that because each of the breaches identified

19   by the Trustees during the Protocol increased the risk of

20   loss on the subject loan, every such breach materially and

21   adversely affected the value of the subject loan, thus

22   satisfying the AMA requirement.  The Trustees assert that

23   (i) the term "materially affects" in the Governing

24   Agreements means that the breach at issue would have altered

25   the price that a willing purchaser would pay for the loan or

Veritext Legal Solutions
212-267-6868                 www.veritext.com                 516-608-2400

CONFIDENTIAL                                                              LBHI-OMNI_7689536

1    otherwise changed the risk of loss on a loan; and (ii) the

2    term "adversely affects" means that the impact would be

3    detrimental to the financial interests of the

4    certificateholders by either lowering the price or

5    increasing the risk of the security.  The Trustees submit

6    that they need not show the claimed breach caused an actual

7    loss on a loan because the Governing Agreements do not

8    require that loss causation be demonstrated to assert a

9    repurchase claim based on a breach of reps and warranties.

10   In other words, in sum and substance, and according to their

11   expert, Mr. Aronoff, the Trustees' interpretation of the

12   Governing Agreements and applicable law is that every

13   material breach has an adverse material effect on the value

14   of the subject loan.

15          Notwithstanding the loan-by-loan review conducted

16   during the Protocol and acknowledging that, at trial, they

17   were not relieved of their loan-level burden of proof, the

18   Trustees maintained that it would be impossible to

19   demonstrate breaches on a loan-by-loan basis during the

20   Estimation Proceeding.  Instead, the Trustee sought to build

21   up to their aggregate claim by bucketing allegedly breaching

22   loans based on "breach type" and presenting exemplar loans

23   for each of the most significant breach categories.  The

24   vast majority of the Trustees' claims fell into one of four

25   buckets that they deemed the "Big Four" – borrower breaches

CONFIDENTIAL                                                      LBHI-OMNI_7689537

1   of income, debt, occupancy, and DTI.  Some 54,792 of the

2   Covered Loans and approximately $9.1 billion of the

3   Trustees' claims can be attributed to one of the Big Four

4   breaches.  The Trustees' intention was to provide the Court

5   with the ability to extrapolate from the exemplar loans to

6   the breach categories and then to the greater pool of

7   Covered Loans based upon what the Trustees assert was a

8   rigorous, multi-stage Protocol process.  Significantly, the

9   Trustees did not rely on any statistical sampling

10  methodology to establish the amount of their claim.

11          The Trustees state that the express purpose of the

12  Estimation Proceeding is to value the RMBS Claims as if the

13  parties had adjudicated these claims in their entirety.  Had

14  the Trustees' claims proceeded to a full trial, the

15  Trustees' burden would have been to show that an alleged

16  breach "more likely than not" is valid, and they assert that

17  they have submitted evidence that "provides a sound basis

18  for the Court to make judgments concerning the probable

19  outcome of a trial on the merits of the different breach

20  claims and types of evidence."  (Trustees' Post-Trial Brief,

21  p. 2).  Their position is that the most reliable approach to

22  estimate the RMBS Claims is not to look at settlements in

23  other cases but rather to look only at the evidence of

24  breaches presented in this case.

25          III.  APPLICABLE LAW

CONFIDENTIAL                                      LBHI-OMNI_7689538

1          A.    Estimation

2                Section 502(c)(1) of the Bankruptcy Code provides

3    that "[t]here shall be estimated for purpose of allowance

4    under this section . . . any contingent or unliquidated

5    claim, the fixing or liquidation of which, as the case may

6    be, would unduly delay the administration of the case."  The

7    Bankruptcy Code provides no definitive guidance on how to

8    estimate a claim.  Without a specific methodology prescribed

9    in section 502(c), a court's authority to estimate claims is

10   only limited by "the legal rules that may govern the

11   ultimate value of the claim" and "those general principles

12   which should inform all decisions made pursuant to the

13   [Bankruptcy] Code."  In re Chemtura Corp., 448 B.R. 635,

14   648-49 (Bankr. S.D.N.Y. 2011).  Bankruptcy courts have broad

15   discretion in estimating claims, "so long as the procedure

16   is consistent with the fundamental policy of Chapter 11 that

17   a reorganization must be accomplished quickly and

18   efficiently."  In re Adelphia Commc'ns Corp., 368 B.R. 140,

19   278 (Bankr. S.D.N.Y. 2007) (citation omitted).  Of

20   particular note here is that Exhibit G to the RMBS

21   Settlement Agreement sets forth the parameters of the

22   evidence to be considered by the Court during the Estimation

23   Proceeding; pursuant to Exhibit G, the parties agreed that

24   the specified evidence is admissible, but left it to the

25   Court to determine the weight to be afforded the evidence as

CONFIDENTIAL                                        LBHI-OMNI_7689539

1    presented at trial.

2              B.    Burden of Proof

3              The Trustees' claims for breach of the MLSAAs are

4    governed by New York law.  See, e.g., Ex. 2 to Lehman

5    Pretrial Brief, MLSAA, dated Dec. 1, 2002, at § 2.04.  Under

6    New York law, the Trustees bear the burden of proving each

7    element of their claims by a fair preponderance of the

8    credible evidence, including the amount, if any, of damages.

9    PPX Enters., Inc. v. Fredericks, 94 F. Supp. 2d 477, 483

10   (S.D.N.Y. 2000).  See also U.S. Bank, Nat'l Ass'n v. UBS

11   Real Estate Sec. Inc., 205 F. Supp. 3d 386, 411-12 (S.D.N.Y.

12   2016) ("MARM III").  The Trustees bear this burden with

13   respect to each alleged breach asserted for each loan as to

14   which they seek relief.  MARM III, 205 F. Supp. 3d at 412

15   (citation omitted).  In considering a claim of breach for a

16   loan, the Court must consider the "total mix" of evidence as

17   to that loan.  Id. at 477 ("The Court has considered the

18   totality of the evidence relating to a loan in making

19   findings on any specific issue relating to that loan. The

20   evidence most directly applicable to the claimed breach has

21   not been considered in isolation but in conjunction with the

22   totality of the evidence concerning the loan.").  The

23   factfinder's "role is to separate what 'could have happened'

24   from 'what the preponderance of the evidence shows most

25   likely did happen.'"  Reddy v. CFTC, 191 F.3d 109, 118 (2d

CONFIDENTIAL                                                    LBHI-OMNI_7689540

1    Cir. 1999).

2            C.    RMBS Litigation Case Law – An Overview

3            In the wake of the collapse of the U.S. subprime

4    real estate market in 2008, dozens if not hundreds of

5    parties initiated RMBS litigation from which a substantial

6    body of case law has developed, and continues to develop.

7    Recently, the United States District Court for the Southern

8    District of New York issued a decision in Deutsche Bank

9    Nat'l Tr. Co. v. Morgan Stanley Mortg. Capital Holdings LLC,

10   No. 14-cv-03020 (KBF), 2018 WL 583116, 2018 U.S. Dist. LEXIS

11   12591 (S.D.N.Y. Jan. 25, 2018), in which the court

12   acknowledged that a "large and growing body of law" has

13   developed around RMBS litigation, and that

14            [u]nsurprisingly, given the fact-intensive nature

15   of some issues and the lack of controlling precedent on

16   others, that body of law contains disagreements large and

17   small.  It is impossible (and unnecessary) to reconcile

18   every case, and reasonable minds can certainly differ on

19   what the law should be for cases like this.

20            Id. at *10.  So too here, particularly given the

21   sui generis nature of this case.  Even though this case is

22   distinguishable from the cases that have preceded it in

23   significant ways, a number of RBMS decisions have

24   nonetheless aided the Court in assessing the provisions in

25   the Governing Agreements.  The following is a brief and by

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

CONFIDENTIAL                                                    LBHI-OMNI_7689541

1   no means exhaustive summary of some of those decisions.

2               1.   Timing of the AMA Determination

3               In MARM III, a decision heavily cited by each side

4   in the instant case, US Bank, as trustee for three trusts

5   (the "MARM Trusts"), sued UBS, the sponsor, for breaches of

6   reps and warranties following UBS's refusal to repurchase

7   purportedly defective loans in the MARM Trusts.  Judge

8   Castel looked closely at the AMA provisions under the

9   documents governing the securitization of the RMBS into the

10  MARM Trusts and engaged in a detailed loan-by-loan analysis

11  of some 20 loan files, making specific findings on each with

12  respect to the existence of a breach.

13              The documents governing the MARM Trusts contained

14  repurchase provisions which are substantially similar to the

15  repurchase provisions contained in the Governing Agreements

16  in this case.  The repurchase provisions stated that UBS was

17  obligated to repurchase a loan only upon showing the

18  existence of a material breach that "materially and

19  adversely affects" the interest of the MARM Trust

20  certificateholders.  MARM III, 205 F. Supp. 3d. at 464.

21  Interpreting the unambiguous present-tense use of the word

22  "affects" and construing such language in the context of the

23  contract as a whole, the court held that AMA is measured as

24  of the date the repurchase demand is made, not the date that

25  the representations and warranties were made, which was

CONFIDENTIAL                                              LBHI-OMNI_7689542

1   generally the "closing date" of the transaction.  As Judge

2   Castel explained,

3           it is reasonable for the parties to bargain for a

4   limitation on the representations and warranties such that

5   the repurchase obligation is triggered only where a material

6   breach at the time of contracting continues to have a

7   material adverse effect at the time the breach is noticed or

8   discovered and a remedy is sought.  To conclude otherwise

9   would give the Trusts a unilateral ability to put back loans

10  that, after many years of performance, may have had breaches

11  even if those breaches no longer affect the

12  Certificateholders' interests.

13          Id. at 466.  Judge Castel quite clearly

14  contemplates the existence of breaches which would not have

15  an AMA impact on the subject loans.  He goes on to elaborate

16  that

17          [a] breach at the time of origination or at the

18  Closing Date may have an effect that carries on

19  indefinitely, including up to the time of discovery or

20  notice, but that need not always be the case.  An

21  intentional misrepresentation of income by a borrower, if

22  known, would have resulted in the loan never having been

23  approved, funded or sold; this is an effect that continues

24  to the time of discovery or notice.  In contrast, a failure

25  of an underwriter to obtain a verification of one of two

CONFIDENTIAL                                                   LBHI-OMNI_7689543

1   jobs held by a borrower would be a breach of the Guideline

2   Warranty but would have no continuing effect if, for

3   example, the verification would have confirmed employment.

4          Id. at 466-67.

5          Providing further guidance, Judge Castel clarified

6   that the materiality requirement contained in individual

7   representations and warranties should be analyzed separately

8   from AMA.  If a warranty was breached — for example, if a

9   borrower provided materially untrue information —then in

10  order for a repurchase obligation to apply, the trustees

11  must also prove that such breach "materially and adversely

12  affects" the interests of the certificateholders.  Id. at

13  467.

14         As will be discussed hereinafter, Judge Castel

15  also provided extensive guidance in MARM III on a number of

16  other critical issues, including the types of evidence

17  admissible to prove breaches; the importance of considering,

18  on a properly weighted-basis, all evidence in a loan file;

19  and the limitations on the ability to equate the existence

20  of a breach of a representation and warranty with the

21  existence of AMA at the time of a repurchase demand.

22         2.   Loss Causation and Proof of an Adverse

23  Material Effect

24

25         Under New York law, a plaintiff can only recover

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

CONFIDENTIAL                                          LBHI-OMNI_7689544

1   damages for a breach of contract if the breach "directly and

2   proximately caused" the damage.  Nat'l Mkt. Share, Inc. v.

3   Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004).

4   Damages must be "traceable to the breach, not remote or the

5   result of other intervening causes."  Id. at 526 (citations

6   omitted).

7           Notwithstanding this fundamental principal of

8   contract law, several RMBS decisions involving monoline

9   insurance companies have held that, in order to mandate loan

10  repurchase pursuant to applicable contracts, plaintiffs need

11  not show that the alleged breaches caused the loans to

12  default, but only that the breaches materially increased the

13  plaintiffs' risk of loss.  In Assured Guar. Mun. Corp. v.

14  Flagstar Bank, FSB, Judge Rakoff observed that "causation is

15  ordinarily an essential element of damages in a breach of

16  contract action" but that "'causation' is far from a self-

17  defining term, and raises all sorts of questions, such as

18  whether the causation must be direct or indirect,

19  transactional, proximate, risk-related, or whatever."  892

20  F. Supp. 2d 596, 601 (S.D.N.Y. 2012) ("Flagstar").  In

21  Flagstar, Assured Guaranty Municipal Corporation

22  ("Assured"), a financial guarantee insurer, brought an

23  action against Flagstar Bank, FSB, an issuer of securities

24  backed by home equity loans, alleging that the underlying

25  loans were either materially fraudulent or the product of

CONFIDENTIAL                                              LBHI-OMNI_7689545

1   material underwriting defects.  Because the Flagstar

2   governing documents did not mention "cause," "loss," or

3   "default" with respect to the defendants' repurchase

4   obligations, and the court observed that sophisticated

5   parties such as Flagstar and Assured would have expressed

6   their intent in the written contracts, the court

7   "conclude[d] that the contracts did not require the

8   plaintiffs to show that the breaches caused the loans to

9   default, but only that the breaches 'materially increased'

10  the plaintiff insurer's risk of loss." Id. (citations

11  omitted).

12          The Flagstar ruling relied heavily on the opinion

13  of Judge Crotty in Syncora Guarantee Inc. v. EMC Mortg.

14  Corp., 874 F. Supp. 2d 328 (S.D.N.Y. 2012), another RMBS

15  case involving a monoline insurer.  Syncora, a monoline

16  insurer that issued policies covering certain RMBS

17  securitizations, brought suit against EMC Mortgage

18  Corporation, the sponsor of such securitizations, for

19  breaches of representations and warranties under the

20  applicable insurance and indemnity agreement.  In Syncora,

21  the court held that Syncora could establish a material

22  breach of the insurance and indemnity agreement by proving

23  that the alleged breach increased the insurer's risk of loss

24  on the policy, irrespective of whether the breach actually

25  caused the underlying loan to default.  Id. at 339.

CONFIDENTIAL                                                      LBHI-OMNI_7689546

1          The courts in both Flagstar and Syncora relied on

2     the protections afforded to New York insurers under New York

3     insurance law, which defines warranty as "any provision of

4     an insurance contract which has the effect of requiring . .

5     . the existence of a fact which tends to diminish, or the

6     non-existence of a fact which tends to increase, the risk of

7     the occurrence of any loss, damage, or injury within the

8     coverage of the contract."  Flagstar, 892 F. Supp. 2d at 602

9     (citing N.Y. Ins. L. § 3106(a)); see also Syncora, 874 F.

10    Supp. 2d at 339 (citing MBIA Ins. Corp. v. Countrywide Home

11    Loans, Inc., 936 N.Y.S.2d 513, 521-22 (Sup. Ct. N.Y. Cnty

12    2012)).

13          Outside of the insurance context, the prevailing

14    standard applied by courts in this District is that a non-

15    monoline RMBS plaintiff must prove only that a breach

16    substantially increased the risk of loss to

17    certificateholders, not that the breach caused an actual

18    diminution in loan value.  In MARM III, for example, the

19    court rejected the notion that the AMA provision of the

20    governing documents required the plaintiff trustee to prove

21    that the breach caused an actual loss or default, or that

22    any actual loss suffered was caused by the breach; rather,

23    the court held that AMA is established when a breach

24    increases the risk of loss to the certificateholders.  205

25    F. Supp. 3d at 467-68.  However, despite the foregoing, the

CONFIDENTIAL                                              LBHI-OMNI_7689547

1  MARM III court held that proof of increased risk of loss was

2  only one of the ways (among several discussed) that a

3  plaintiff could demonstrate that a breach materially and

4  adversely affected the interests of certificateholders.  In

5  analyzing twenty different loan files in its decision, the

6  court rarely focused on risk of loss.  Instead, the court

7  examined whether, for example, absent an alleged breach

8  discovered at the time of origination, the loan would have

9  been funded at all, or if funded, would have contained

10 different terms.

11             Notably, Judge Castel declined to accept the

12 entirety of the analysis and conclusions of the MARM Trusts'

13 expert, Mr. Ira H. Holt, who testified that every material

14 breach had a material and adverse effect on

15 certificateholders' interests unless compensating factors

16 showed otherwise.  Mr. Holt only examined the materiality of

17 the breaches asserted and did not appear to have performed a

18 separate analysis of whether a breach materially increased

19 the risk of loss to the lender or certificateholders or

20 affected the interests of the certificateholders at the time

21 the cure or repurchase obligation was triggered.  The court

22 stated that it

23             accepts Holt's conclusion that proven borrower

24 deceit materially and adversely affects the interests of the

25 Certificateholders.  But in other instances, the Court has

CONFIDENTIAL                                              LBHI-OMNI_7689548

1    examined the nature of the breach in the context of the

2    total mix of information to determine whether Holt's opinion

3    that the breach materially and adversely affected the

4    interests of the Certificateholders should be accepted.

5           Id. at 475.  The MARM III court conducted its own

6    analysis by examining each alleged breach to determine

7    whether it was in fact a breach and, if so, whether it

8    materially and adversely affected the interests of the

9    certificateholders.  Notably, after examining 20 of the over

10   9,000 loan files at issue and providing a detailed analysis

11   as to those 20, Judge Castel stated that he would be turning

12   the remaining files over to a Lead Master for the timely

13   entry of findings of fact and conclusions of law relating to

14   all loans not covered by his decision.  MARM III did not

15   address or award damages.

16           As in MARM III, other non-monoline cases in this

17   District have held that demonstrating increased risk of loss

18   is sufficient to trigger AMA repurchase conditions and that

19   a showing of actual financial loss is not required.  See,

20   e.g., Wells Fargo Bank, N.A. v. JP Morgan Chase Bank, N.A.,

21   2014 WL 1259630 at *4 (S.D.N.Y. Mar. 27, 2014) (concluding

22   that "nothing in the contract's language suggests that an

23   actual financial loss must precede a repurchase demand.  A

24   growing consensus among New York courts holds that [AMA]

25   repurchase conditions are triggered when the plaintiff's

CONFIDENTIAL                                                    LBHI-OMNI_7689549

1     risk of loss increases and not just when that risk

2     actualizes."); Homeward Residential, Inc. v. Sand Canyon

3     Corp., 298 F.R.D. 116, 131 (S.D.N.Y. 2014) (finding that the

4     plaintiff did not have to prove that a particular loan

5     defaulted in order to prove that a breach "materially and

6     adversely affects the value" of the mortgage loans at

7     issue); Wells Fargo Bank, N.A. v. Bank of Am., N.A., No. 10

8     Civ. 9584, 2013 U.S. Dist. LEXIS 44955, 2013 WL 1285289, at

9     *10 (S.D.N.Y. Mar. 28, 2013) ("In keeping with other courts'

10     approaches, the [c]ourt declines to equate ['material

11     adverse effect'] with causing the loan to default.").

12     3. Sampling

13     Although there was no use of statistical sampling

14     at trial, it is worth reviewing what courts in this District

15     have observed about its use in RMBS cases. Such cases shed

16     light on the potential availability of a practical solution

17     to the problem of proof in large scale RMBS trials, as well

18     as the problems with such an approach.

19     Recently, in Deutsche Bank Nat'l Tr. Co. v. Morgan

20     Stanley Mortg. Capital Holdings LLC, Judge Forrest engaged

21     in a thorough analysis of statistical sampling and the

22     propriety of its use in RMBS litigation. 2018 WL 583116,

23     2018 U.S. Dist. LEXIS 12591 (S.D.N.Y. Jan. 25, 2018)

24     ("Deutsche Bank"). As the court stated:

25     Sampling is a statistical means of "estimat[ing],

CONFIDENTIAL     LBHI-OMNI_7689550

1   to specified levels of accuracy, the characteristics of a

2   'population' . . . by observing those characteristics in a

3   relatively small segment, or sample of the population."

4   Properly done, statistical sampling is not guesswork—it is a

5   scientific method of making accurate inferences (to varying

6   degrees of statistical certainty depending on the

7   methodology employed) about a large population based on

8   careful analysis of a representative subset of that

9   population. As the Supreme Court has noted, statistical

10   sampling "is a means to establish or defend against

11   liability," and "is used in various substantive realms of

12   the law."  Additionally, "[i]n many cases, a representative

13   sample is the only practicable means to collect and present

14   relevant data establishing a defendant's liability." (all

15   citations omitted).

16       Id. at *8.  Citing to Flagstar and Syncora among

17   other RMBS cases, the court stated that "[c]ourts applying

18   New York law have repeatedly approved the use of statistical

19   sampling [as] a means of proving liability and damages in

20   RMBS cases" (Id. (collecting cases)) and reasoned that

21   "proper statistical sampling is not a shot in the dark—it is

22   a well-established and scientifically sound method of

23   inferring (to varying degrees of certainty) how many

24   individual loans in the pool contain material breaches."

25   Id. at *15.  While concluding that statistical sampling was

CONFIDENTIAL                                    LBHI-OMNI_7689551

1   appropriate in the Deutsche Bank case, the court noted that

2   other courts in the Southern District of New York have

3   disagreed with its use, reasoning that statistical sampling

4   does not supply adequate or relevant proof regarding non-

5   sample loans.  Id. at *9 (citing Mastr Adjustable Rate

6   Mortgages Tr. 2006-OA2 v. UBS Real Estate Sec. Inc., 2015

7   U.S. Dist. LEXIS 24988, 2015 WL 764665, at *10-11 (S.D.N.Y.

8   2015) ("MARM II"); Homeward Residential, Inc. v. Sand Canyon

9   Corp., 2017 U.S. Dist. LEXIS 187265, 2017 WL 5256760, at *7

10  (S.D.N.Y. 2017) ("Homeward")).  See also Royal Park

11  Investments SA/NV v. HSBC Bank USA, Nat. Ass'n, (Case 1:15-

12  cv-02144-LGS-SN) [Dkt. No. 314] (February 23, 2018).

13          In Homeward, Judge Torres analyzed the repurchase

14  provisions and the definition of "purchase price" in the

15  agreements governing the RMBS trusts therein, and determined

16  that the plaintiff's request to use statistical sampling "to

17  'prove' that a loan is in breach without actually

18  identifying the specific loan (and [the] specific breach)"

19  was at odds with the "sophisticated remedial scheme" set

20  forth under the governing agreements which were targeted to

21  a specific underlying loan, not a group or category of

22  loans.  Homeward, 2017 WL 5256760, at *7.

23          In MARM II, Judge Castel rejected the MARM Trusts'

24  use of statistical sampling to prove the trusts' theory of

25  "pervasive breach" – that UBS, as the sponsor, had effective

CONFIDENTIAL                                        LBHI-OMNI_7689552

1   notice of widespread breaches throughout the loan pools even

2   though, as of the conclusion of the statute of limitations

3   period, UBS had only been provided loan-by-loan notice that

4   21% of the mortgage loans were allegedly in breach.  Judge

5   Castel reasoned that statistical sampling did not supply

6   adequate or relevant proof regarding non-sample loans where

7   (i) due to the requirement in the governing agreements that

8   AMA must be demonstrated, not all breaches would have

9   triggered a cure or repurchase obligation and (ii) the

10  defined terms utilized in the repurchase remedies set forth

11  in the governing agreements were loan-specific.  Id. at *11.

12          In the most recent RMBS decision issued by the

13  District Court for the Southern District of New York, Royal

14  Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n, the

15  plaintiff certificateholders requested permission to re-

16  underwrite a sample of loans to (i) prove that the

17  defendant, HSBC, as trustee of the trusts that issued the

18  RMBS certificates, had constructive notice of pervasive

19  breaches in the loan portfolios and (ii) measure damages.

20  (Case 1:15-cv-02144-LGS-SN) [Dkt. No. 314] (February 23,

21  2018).)  The defendant trustee opposed the plaintiffs'

22  request to use sampling.  Finding that the plaintiffs must

23  prove that HSBC breached its contractual obligations on a

24  loan-by-loan basis, Judge Schofield rejected the use of

25  sampling, observing that "unavoidable fact that a sampling

CONFIDENTIAL                                                    LBHI-OMNI_7689553

1   is just that, and by definition cannot provide loan specific

2   information as to any loan outside the sample." Id. at 9.

3   She continued:

4           Plaintiffs argue that sampling would enable

5   "Plaintiffs' damages experts [to] use the extrapolated

6   breach rate together with loan values and the trust's

7   waterfall structure as components for calculating damages."

8   But . . . "to successfully enforce repurchase of a specific

9   loan after a defined EOD has occurred, HSBC would have

10  needed to locate the individual breaching loans themselves

11  rather than determine trust-wide breach rates." Sampling

12  cannot prove damages for the same reason it cannot prove

13  liability; it cannot identify the specific breaching loans

14  outside the sample based on the existence and rate of

15  defective loans within the sample.

16          Id.

17          Thus, as Judge Forrest observed, reasonable minds

18  can and do disagree on the use of statistical sampling in

19  RMBS litigation.  Fortunately, as statistical sampling was

20  not utilized in the Estimation Proceeding, the Court need

21  not decide whether its use would have been appropriate here.

22  One thing is clear from all of these decisions though —

23  loan-by-loan proof is required, either directly or through a

24  sound extrapolation methodology.

25          D.   The MLSAAs are Rejected Executory Contracts

CONFIDENTIAL                                                   LBHI-OMNI_7689554

1    and Thus the Trustees' Claims are Prepetition Breach Claims

2            Notwithstanding the canon of case law that has

3    developed in the realm of RMBS litigation, none of these

4    decisions dispositively addresses the challenge presented in

5    this case: how to estimate, under section 502(c), tens of

6    thousands of breach claims for which the Trustees seek

7    damages, pursuant to the repurchase provisions of the

8    MLSAAs, which are rejected executory contracts under a

9    confirmed plan of reorganization.  Prior to Lehman's

10   bankruptcy filing on September 15, 2008, the Trustees failed

11   to provide the contractually required notice of their

12   repurchase claims or otherwise to seek Lehman's repurchase,

13   replacement, or cure on the underlying loans.  Now,

14   enforcement is impossible of course; Lehman no longer has

15   the ability to respond to a repurchase claim in any of the

16   three standard ways prescribed under the Governing

17   Agreements: cure, replace, or repurchase.  Consequently,

18   this is not a standard repurchase case akin to those cited

19   by the parties, nor is it a monoline insurance put-back

20   case.  Indeed, the Trustees' expert, Mr. Aronoff, recognized

21   that this is not a "straight-up putback case," rendering him

22   unable to provide "any insight as to the appropriate remedy,

23   the amount of that remedy, or anything else of that kind . .

24   . ."  (Dec. 18, 2017 Hr'g Tr. at 2806:20-2807:13).

25           The lens through which the Plan Administrator

CONFIDENTIAL                                              LBHI-OMNI_7689555

1    views the Trustees' claims is contract rejection, i.e., the

2    Trustees have a contract rejection claim arising from

3    Lehman's rejection of certain of the Governing Agreements as

4    executory contracts under section 365 of the Code.  The

5    Court does not disagree.  "If the contract is executory and

6    the debtor rejects it, the non-debtor party is left with a

7    pre-petition unsecured claim for breach of contract."  In re

8    Hawker Beechcraft, Inc., 486 B.R. 264, 277 (Bankr. S.D.N.Y.

9    2013).  As counsel for the Plan Administrator conceded, the

10    notional amount of damages incident to MLSAAs rejected in

11    bankruptcy should not differ from the amount of damages

12    which would be awarded pursuant to the MLSAAs outside of

13    bankruptcy.  The sole distinction is that the damage amount

14    here will constitute the allowed amount of the Trustees'

15    claims, and the Trustees, on behalf of their

16    certificateholders, will receive from Lehman the

17    distribution to which such allowed unsecured claims are

18    entitled under the confirmed plan.  The happenstance that

19    these are bankruptcy claims does not provide a basis for

20    applying concepts of loss causation that would not be

21    applicable were these claims adjudicated in a non-bankruptcy

22    forum, nor, on the other hand, does it provide a basis for

23    allowing the claims in a larger amount to compensate for the

24    fact that the claims will be paid in discounted bankruptcy

25    dollars.

CONFIDENTIAL                                                          LBHI-OMNI_7689556

1          IV.   THE TRIAL

2                Over the course of some 22 days of trial, the

3     Court heard extensive testimony from two fact witnesses, ten

4     expert witnesses, and one witness who provided both fact and

5     expert testimony.

6                The Court heard live testimony from the following

7     witnesses in the Plan Administrator's case in chief: (i) Mr.

8     Zachary Trumpp, a Senior Vice President and manager of

9     claims for the Plan Administrator who was chiefly

10    responsible for managing the review of the Trustees' claims

11    and the related valuation of damages pursuant to the

12    Protocol; (ii) Professor Daniel R. Fischel, a professor at

13    the University of Chicago Law School and the President of

14    Compass Lexicon, who testified as an expert witness

15    regarding comparable RMBS settlements and the relevance of

16    the Institutional Investors Settlement to the Plan

17    Administrator's proposed allowed amount for the Trustees'

18    claim; and (iii) Mr. Charles Grice, an expert witness who

19    testified regarding his independent assessment of the Plan

20    Administrator's review of the breach claims submitted by the

21    Trustees during the Protocol.

22                In the Plan Administrator's rebuttal case, the

23    Court heard the testimony of Dr. Bradford Cornell, an expert

24    witness who testified regarding damages and valuation.  The

25    Court also (i) viewed designated video deposition testimony

CONFIDENTIAL                                                      LBHI-OMNI_7689557

1  and reviewed designations from the expert reports of Mr.

2  Daniel I. Castro, Jr., an expert witness who was tendered as

3  the Plan Administrator's AMA expert on the valuation of

4  mortgage loans and the impact of certain breaches on the

5  value of a loan; (ii) reviewed deposition designations from

6  the deposition of Mr. Fiachra O'Driscoll, who was designated

7  but not tendered by the Trustees as an expert witness

8  regarding the materiality of the Trustees' breach claims and

9  the meaning of applicable contract provisions within the

10  securitization industry; and (iii) reviewed deposition

11  designations from the deposition of Mr. John Burnett, who

12  was designated but not tendered by the Trustees as an expert

13  witness regarding servicing industry custom and practices.

14        The Court heard live testimony from the following

15  witnesses in the Trustees' case in chief: (a) Mr. Edmond

16  Esses, the Head of Investigations at Duff & Phelps who

17  served as the Trustees' Project Manager under the Protocol

18  and testified regarding the Trustees' loan review process;

19  (b) Mr. James H. Aronoff, a principal at Baker Tilly who

20  testified as both a fact witness regarding the Trustees'

21  loan review process and as an expert witness regarding (i)

22  the validity and materiality of the breach claims submitted

23  by the Trustees and (ii) the validity and integrity of the

24  Trustees' loan review process; (c) Mr. J.F. Morrow, an

25  expert who testified regarding the validity and materiality

CONFIDENTIAL                                                    LBHI-OMNI_7689558

1   of the breach claims submitted by the Trustees based on his

2   review of a sample of such claims; in lieu of live cross-

3   examination and re-direct examination of Mr. Morrow, the

4   parties submitted deposition designations and designations

5   of Mr. Morrow's rebuttal expert report; (d) Dr. G. William

6   Schwert, an expert witness who testified regarding the

7   methodology he used to select the loans reviewed by Mr.

8   Morrow; (e) Dr. Karl N. Snow, an expert witness who

9   testified regarding the net purchase price associated with

10  the Trustees' breach claims; (f) Dr. Richard W. Ellson, an

11  expert witness who testified regarding the value of non-

12  liquidated loans subject to the Trustees' breach claims and

13  whose valuation was utilized by Dr. Snow; (g) Hon. Robert S.

14  Smith (Ret.), an expert witness who testified in rebuttal to

15  Professor Fischel's opinions regarding comparable RMBS

16  settlements and the Institutional Investors Settlement; and

17  (h) Mr. James K. Finkel, an expert witness who also

18  testified in rebuttal to Professor Fischel's opinions.

19          In addition, pursuant to Exhibit G to the RMBS

20  Settlement Agreement, millions of pages of documentary

21  evidence, including the parties' Claims Tracking

22  Spreadsheets, as well as the voluminous loan files and other

23  documents exchanged by the parties during the Protocol, were

24  admitted into the trial record.  The parties also utilized

25  dozens of demonstrative exhibits in support of witness

CONFIDENTIAL                                                LBHI-OMNI_7689559

1    testimony, filed pre-trial and post-trial memoranda of law,

2    and presented three days of opening and closing arguments.

3              Summaries of the testimony of the witnesses

4    follow.

5              A.    The Plan Administrator's Case in Chief and

6    Rebuttal Case

7              1.    Mr. Zachary Trumpp

8              Mr. Trumpp is a Senior Vice President and manager

9    of claims for the Plan Administrator.  He has worked for the

10   Lehman estate since 2009.  He manages all residential

11   mortgage-related claims asserted against Lehman and has

12   borne primary responsibility for carrying out the Plan

13   Administrator's process of evaluating RMBS Claims submitted

14   by the Trustees under the Protocol.  From 1999 to 2008, Mr.

15   Trumpp was an employee of Aurora Loan Services, LLC

16   ("Aurora"), a Lehman subsidiary involved in mortgage loan

17   origination and servicing.  While at Aurora, he established

18   and led a department that conducted due diligence on

19   potentially breaching loans, issued repurchase demands, and

20   litigated repurchase claims.

21             Mr. Trumpp's testimony over the course of three

22   days included a discussion of the evidentiary standards the

23   Plan Administrator applied to its review of the Trustees'

24   claims during Step 2 of the Protocol.  Mr. Trumpp testified

25   at length to the Plan Administrator's documentary

CONFIDENTIAL                                          LBHI-OMNI_7689560

1   requirements when carrying out its review of the Trustees'

2   submissions.  Specifically, he described the four PA

3   Critical Documents and the reasons the Plan Administrator

4   required the presence of such documents in the loan file

5   before it could conduct its review; without the PA Critical

6   Documents, such loans were placed "on hold" by the Plan

7   Administrator and not reviewed until the documents were

8   provided to the Plan Administrator.

9           Mr. Trumpp also testified to the process the Plan

10  Administrator followed when evaluating the Trustees' claims.

11  He described the three-step process as follows: (i) Lehman

12  examined the file for the existence of a Threshold Fact or

13  defect, (ii) if a Threshold Fact was found, Lehman analyzed

14  whether such defect was a breach of a rep and warranty, and

15  (iii) if the first two steps had been satisfied, Lehman

16  conducted an AMA analysis.

17          In describing the Plan Administrator's approach,

18  Mr. Trumpp emphasized that Lehman did not assert all

19  possible defenses to the Trustees' claims during the Plan

20  Administrator's Step 2 review; rather, his goal was to make

21  "fair assessments."  Mr. Trumpp testified that Lehman

22  examined the Trustees' Claim Package as well as the evidence

23  in the loan file (beyond what the Trustees themselves

24  referenced) to determine whether there was evidence

25  sufficient to demonstrate a Threshold Fact or whether the

CONFIDENTIAL                                                    LBHI-OMNI_7689561

1    evidence supplied was inconclusive.  Mr. Trumpp emphasized

2    that the Plan Administrator eschewed any "bright-line

3    rule[s]" when conducting this holistic evaluation of each of

4    the Trustees' claims.  Mr. Trumpp testified that when

5    determining whether the AMA standard had been met, the Plan

6    Administrator considered a variety of "compensating factors"

7    such as macroeconomic conditions at the time of alleged

8    breach; the state of the job market; life events affecting

9    the borrower's ability to pay; and the performance history

10   of the loan.  He expressed his view that not all losses and

11   not all defaults arose out of breaches of representations

12   and warranties, and that he believes the Trustees ignored

13   this inquiry in making their claims submissions.

14           In discussing the Trustees' claims, Mr. Trumpp

15   criticized, among other things, (i) the Trustees' use of

16   "boilerplate" AMA assertions for the "materiality basis" of

17   alleged breach claims, (ii) the Trustees' citation to

18   incorrect guidelines in their breach claims, (iii) the

19   Trustees' assertion of claims of misrepresentation of debt

20   where the debt in question was incurred post-origination of

21   the subject loan, and (iv) the Trustees' assertion of claims

22   that overlooked contradictory evidence that the Plan

23   Administrator found in the loan file.  He was also surprised

24   by certain types of claims the Trustees asserted, such as

25   breach claims (a) based on missing documentation, (b)

CONFIDENTIAL                                                    LBHI-OMNI_7689562

1    related to regulatory requirements, and (c) on active loans

2    that were still performing over a decade post-securitization

3    – all claims that would, in his view, typically not be

4    pursued in RMBS put-back litigation.

5            On cross-examination, the Trustees sought to

6    establish that Mr. Trumpp had applied more stringent

7    evidentiary and documentary standards in the instant case

8    than he had applied when seeking recovery on put-back claims

9    on behalf of Lehman.  Specifically, the Trustees adduced

10   evidence relating to litigation between 2009 and 2012 in

11   which Lehman and Aurora had written demand letters relying

12   on what the Trustees characterize as sparse evidence of the

13   type now rejected by the Plan Administrator for lack of

14   sufficiency and accuracy.

15           On redirect examination, Mr. Trumpp explained

16   that, in the cases emphasized by the Trustees, such demand

17   letters and the piece of evidence attached thereto merely

18   served the purpose of "opening a dialogue" on a subject

19   loan.  He testified that when repurchase claims were

20   actually litigated, the evidence on which Lehman relied was

21   more considerable, often including multiple types of

22   evidence obtained through extensive discovery, which may

23   have included deposition testimony obtained pursuant to

24   Federal Rule of Civil Procedure 30(b)(6).  In Mr. Trumpp's

25   view, the Trustees did not support their claims nearly as

CONFIDENTIAL                                                                   LBHI-OMNI_7689563

1    thoroughly in the Estimation Proceeding.  He testified that,

2    of the approximately 70,000 claims of breach asserted in the

3    Trustees' major breach categories, approximately 48,000 of

4    such breach claims were supported by only one type of

5    evidence.  Finally, Mr. Trumpp distinguished prior cases

6    highlighted by the Trustees during cross-examination on the

7    grounds that (i) they involved the repurchase of whole

8    loans, not securitized loans and (ii) the applicable

9    agreements contained repurchase provisions different from

10   those in the MLSAAs here.

11           Mr. Trumpp's testimony was generally credible and

12   supported the Plan Administrator's assertions that its

13   review of the Trustees' claims was detailed-oriented and

14   thorough.

15           2.    Professor Daniel R. Fischel

16           Professor Fischel is a Professor at the University

17   of Chicago Law School and is also the president of Compass

18   Lexicon, a consulting firm that specializes in the

19   application of economics to a variety of legal and

20   regulatory issues.  Through his many years of research,

21   teaching, and consulting, Professor Fischel has amassed

22   extensive experience analyzing lawsuits and settlements

23   involving alleged breaches of representations and warranties

24   in connection with the sale, servicing, and documentation of

25   loans in RMBS trusts.

CONFIDENTIAL                                                    LBHI-OMNI_7689564

1          Professor Fischel analyzed the reasonableness of

2     the Plan Administrator's proposed allowed claim amount of

3     $2.38 billion and the Trustees' proposed allowed claim

4     amount of approximately $11.6 billion.  In his analysis,

5     Professor Fischel compared the parties' proposed allowed

6     claim amounts to (a) the amount of the Institutional

7     Investors Settlement and (b) the recovery ratios for five

8     comparable large global RMBS settlements referred to as the

9     "Comparable Settlements."  From such comparisons, Professor

10    Fischel drew two primary conclusions: (i) the Institutional

11    Investors Settlement supports estimating the Covered Loan

12    Claims at $2.38 billion and (ii) a $2.38 billion allowed

13    claim reflects a recovery ratio that falls at the higher end

14    of the range of Comparable Settlements, while the $11.4

15    billion claim now asserted by the Trustees is far above that

16    range.

17         Professor Fischel testified that, in his

18    experience analyzing large RMBS settlements, it is routine

19    to compare a proposed settlement to settlements in

20    comparable cases to assess reasonableness.  Here, Professor

21    Fischel chose cases with characteristics similar to this

22    proceeding: RMBS cases involving put-back claims for alleged

23    breaches of representations and warranties in connection

24    with loans originated in the years leading up to the housing

25    crisis, and which involved a large number of trusts.  He

CONFIDENTIAL                                                                                   LBHI-OMNI_7689565

Page 63

1    recognized that an exact comparison of the settlements would

2    be difficult but opined that he could reach certain

3    conclusions based on the Recovery Ratios.

4              Professor Fischel calculated a "Recovery Ratio"

5    for the claims asserted in each of the Comparable

6    Settlements.  The Recovery Ratio for each of the Comparable

7    Settlements and for the instant case is the ratio of (i) the

8    consideration (both cash and non-cash consideration) and/or

9    allowed claim received by the plaintiffs releasing their

10   RMBS claims to (ii) the expected lifetime losses on such

11   claims.  Professor Fischel found that the Recovery Ratios

12   for the Comparable Settlements ranged from 6.9% to 17.1%.

13   (Expert Report of Daniel R. Fischel, pp. 29-30; P.A. Ex.

14   778).  The Recovery Ratio for Lehman's proposed $2.38

15   billion allowed claim amount is 11.2% and is therefore well

16   within the range of Comparable Settlements, and even at the

17   high end of such range.  The Recovery Ratio for the

18   Trustees' proposed $11.4 billion claim, by contrast, is 55%,

19   more than three times as high as the largest Comparable

20   Settlement Recovery Ratio and more than four times Lehman's

21   proposed allowed claim amount.

22             Professor Fischel examined illustrative factors

23   relating to the size of settlement payments and found that

24   certain factors tend to increase the size of a settlement

25   (such as the availability of prejudgment interest), while

CONFIDENTIAL                                              LBHI-OMNI_7689566

1   other factors tend to reduce it (such as a legal or

2   practical impediment to the plaintiff's claim).  He

3   evaluated nine principal factors: (i) the nature of the

4   claims being released; (ii) non-cash considerations; (iii)

5   practical impediments to the plaintiff's pursuit of claims

6   such as the monetary cost of litigation or delayed recovery

7   caused by litigation; (iv) legal impediments to the

8   plaintiffs' pursuit of claims, such as a statute of

9   limitations; (v) the ability of the potential defendant to

10  pay a cash judgment; (vi) the differences in governing legal

11  issues and standards; (vii) the differences in the

12  underlying loans; (viii) the time period of the settlement;

13  and (ix) incentives of the defendant to settle that go

14  beyond avoiding costs of litigation, such as reputation.

15  With the exception of the seventh factor, the difference in

16  the underlying loans, the results of which were deemed

17  inconclusive, all of the evaluation factors used by

18  Professor Fischel were qualitative and not quantitative.

19  Professor Fischel testified that many of the factors that

20  tend to increase the size of a settlement payment are not

21  present in this case.

22          On cross-examination, the Trustees successfully

23  demonstrated that a number of the aforementioned factors

24  that Professor Fischel believed would decrease settlement

25  amounts were applicable to the Comparable Settlements but

CONFIDENTIAL                                                      LBHI-OMNI_7689567

1    not applicable to this case.  For instance, Professor

2    Fischel admitted that a number of the Comparable Settlements

3    related to claims that were subject to the assertion of

4    statute of limitation defenses, another factor which also

5    tends to lower settlement amounts.  Professor Fischel

6    acknowledged that many of the Comparable Settlements

7    occurred pre-litigation and the Trustees elicited evidence

8    suggesting that settlement amounts are more likely to

9    increase as litigation advances.  In the comparable case of

10    Citigroup, Professor Fischel was shown evidence that certain

11    trusts elected to opt-out of the Citigroup global settlement

12    and to pursue litigation; after the lawsuit of the opt-out

13    trusts progressed through the discovery stage, those opt-out

14    trusts received a substantially higher settlement amount

15    than the trusts that accepted Citigroup's global settlement

16    offer.  Professor Fischel admitted that pre-litigation

17    settlements could result in lower settlement amounts because

18    the parties desire to avoid litigation costs.

19           Professor Fischel also pointed to the sale of

20    certain "collapsed trusts" as support for his assertion that

21    the Covered Loan Claims should be estimated at $2.38

22    billion.  He explained that the Governing Agreements allow

23    the master servicer to exercise a "clean-up call option"

24    when the outstanding principal balance of the remaining

25    mortgage loans in the Trusts drops below a specified amount.

CONFIDENTIAL    LBHI-OMNI_7689568

1    Prior to the Estimation Proceeding, the master servicer

2    hired an independent appraiser for certain collapsed trusts.

3    The Trustees for the collapsed trusts had the right to

4    object to the selection of the appraiser but did not do so.

5    For each of six collapsed trusts, the independent appraiser

6    determined that the value of the trusts' claims was either

7    equal to or substantially less than the Plan Administrator's

8    requested allowed claim amount at the Estimation Proceeding

9    (based on what would have been the collapsed trusts'

10   allocable share of that amount).  The applicable Trustees

11   sold the trusts' claims using those values.  Professor

12   Fischel appears to have incorrectly assumed that the

13   Trustees had a right to object to the purchase price for

14   those claims and, building on that incorrect premise,

15   further opined that Lehman's purchase price calculations

16   must be acceptable to the Trustees.  On cross-examination,

17   Professor Fischel was unable to confirm (i) whether the

18   appraiser had independently assessed the merits of the

19   claims at issue or simply accepted Lehman's figures, or (ii)

20   that the Trustees had any authority under the governing

21   documents to reject the appraisal, which undermined his

22   conclusions on this narrow point.

23          Other than eliciting Professor Fischel's general

24   acknowledgment that the Comparable Settlements were achieved

25   prior to full litigation of the claims in those cases and

CONFIDENTIAL                                                    LBHI-OMNI_7689569

1  that, in certain cases, there may have been statute of

2  limitation defenses asserted, the Trustees failed to

3  meaningfully challenge the comparability of the Comparable

4  Settlements to the RMBS Settlement.

5          3.   Mr. Charles Grice

6          Mr. Charles Grice, an expert in mortgage loan

7  underwriting and breach review processes, testified at trial

8  regarding his independent assessment of the Plan

9  Administrator's review of the breach claims submitted by the

10 Trustees.

11         Mr. Grice described his qualifications in the

12 areas of economics and banking at some length.  He is

13 currently employed by CRI Compliance LLC where he has done

14 extensive consulting work for mortgage loan companies in

15 connection with their underwriting and quality control

16 processes.  Serving his clients in this capacity, Mr. Grice

17 has reviewed thousands of loan files.  Mr. Grice's mortgage

18 consulting work focuses on three areas in particular: (i)

19 loan origination; (ii) assisting companies in purchasing

20 loans for inclusion in securitization pools; and (iii)

21 repurchase demands/breach demands.

22         Mr. Grice testified that his opinions were limited

23 to the existence of Threshold Facts that allegedly give rise

24 to a breach and that he was not offering any opinion on AMA

25 issues.  More specifically, he examined 1879 of the

CONFIDENTIAL                                    LBHI-OMNI_7689570

1   Trustees' breach claims asserted on 1879 loan files, as

2   reflected in his June 1, 2017 expert report.  He reviewed

3   one breach claim per loan file (even if the Trustees had

4   asserted multiple claims as to that loan file) to determine

5   whether the loan file had been correctly assessed by the

6   Plan Administrator.  Above all, Mr. Grice was seeking to

7   ascertain if there was consistency to the way evidence in

8   the loan file was evaluated by the Plan Administrator, and

9   whether reasonable and stable results were generated.   In

10  addition, Mr. Grice responded to the expert reports of

11  Messrs. Aronoff and Morrow, reviewing some 600 loans that

12  included multiple breach claims.

13         The essence of Mr. Grice's opinion is that every

14  loan file and every borrower is unique, and that in order to

15  conduct a loan review properly, one must consider everything

16  about the borrower.  Mr. Grice identified numerous

17  challenges presented by the loan files in this proceeding.

18  First, he believes that a loan file is generally an

19  incomplete depiction of the borrower.  He also noted the

20  inherent difficulty in completing the standard loan

21  application form inasmuch as interpretations of its terms

22  may differ from borrower to borrower.  The standard

23  application contains no definitions or instructions on how

24  to complete it.  Moreover, Mr. Grice pointed out, credibly,

25  that loan files degrade over time and that this presents a

CONFIDENTIAL                                                          LBHI-OMNI_7689571

1   particular challenge in reviewing loans that were originated

2   as long ago as the subject loans, most of which were

3   originated between 2002 and 2008 and are "older than

4   average."  In his words, "there is a challenge created by

5   the passage of time" and "stuff goes missing in files.  The

6   more auditors, the more examiners, the more loans are

7   subjected to inspection, investigation, photocopying,

8   shipping, things come out of files."  (Dec. 5, 2017 Hr'g Tr.

9   at 1394:12-24).  He testified that this is particularly true

10  for liquidated loans, loans that have been paid off through

11  foreclosure or otherwise.  Mr. Grice vehemently disagrees

12  with the assertion of Mr. Morrow, one of the Trustees'

13  experts, that if it is not in the loan file, it did not

14  happen or exist at origination.

15          Mr. Grice opined that the Plan Administrator's

16  breach review process was both well-constructed and well-

17  implemented; in contrast, he found fundamental and

18  significant deficiencies in the Trustees' breach analysis.

19  In addition, Mr. Grice opined that Mr. Aronoff is not

20  independent with respect to his opinion regarding the

21  quality of the Trustees' Protocol process, because he, Mr.

22  Aronoff, was himself the architect and overseer of the

23  process.  In Mr. Grice's opinion, Mr. Aronoff is not in a

24  position to opine on the robust nature of a process that he

25  himself supervised.

CONFIDENTIAL                                          LBHI-OMNI_7689572

1           Mr. Grice reviewed the various types of evidence

2      cited by the Trustees in support of their breach claims,

3      including origination credit reports; tax returns; BLS Data;

4      audit credit reports; data from various third party

5      aggregators such as Dataverify, Accurint, LexisNexis;

6      bankruptcy documents; and VOEs.  While he acknowledged that

7      such evidence was generally used by re-underwriters in

8      reviewing loan files, Mr. Grice highlighted numerous ways in

9      which he believed such data was, at best, unreliable, and,

10     at worst, of little or no probative value when used as

11     evidence for the purpose of establishing a breach claim.

12     During his testimony, Mr. Grice pointed out that the

13     accuracy of such evidence depends considerably on whether

14     the particular database product is used correctly, and he

15     noted that disclaimers are present in certain of the

16     products (such as BLS Data and data collected by the third-

17     party aggregators) which specifically caution against using

18     the product's data for any use other than the intended use.

19     Mr. Grice also emphasized his view that the Loan Review

20     Firms "placed a premium" on documents they collected during

21     the Protocol "at the expense of documents collected at

22     origination, such as the [loan] application."  (Dec. 5, 2017

23     Hr'g Tr. at 1475:14-20).

24           During his testimony, Mr. Grice reviewed various

25     loan files and gave compelling examples of ways in which,

CONFIDENTIAL                                   LBHI-OMNI_7689573

1    despite what a particular piece of data appeared to suggest

2    regarding an income or debt breach, other evidence in the

3    file contradicted or called into question reliance on that

4    one piece of data to support a claim of breach, particularly

5    if that piece of data itself was unreliable.  For example,

6    for the loan ending in 8407, the Trustees asserted a

7    misrepresentation of income claim based on BLS Data which

8    ostensibly indicated the borrower's income was much lower

9    than the income stated on his loan application.  Mr. Grice

10   demonstrated that, while the BLS Data used by the Trustees

11   was for a "sales representative in a construction trade,"

12   the evidence in the loan file indicated that the borrower

13   was in fact the president of a construction firm.  Mr. Grice

14   also used this example to point out that using BLS Data as

15   an income verification tool (i.e., not its intended use) can

16   lead to extremely misleading results.  He concluded that

17   reliance on such data by the Trustees, particularly as the

18   sole source of evidence of a breach claim, reflects flaws in

19   the architecture of the Trustees' claims review process.

20          Mr. Grice also testified regarding what he termed

21   "fundamental and significant deficiencies in the Trustees'

22   breach analysis."  Those included, in his opinion, the

23   Trustees' (i) failure to give appropriate weight to

24   information reflected in the loan application, including

25   crediting what he viewed as less reliable information over

CONFIDENTIAL                                                    LBHI-OMNI_7689574

Page 72

1   information in the application itself; (ii) failure to

2   include inconsistent or contradictory evidence from the loan

3   file in the Claim Package submitted to the Plan

4   Administrator in support of the breach claim; (iii) failure

5   to consider the materiality of the breach in the context of

6   the origination credit decision; and (iv) failure to submit

7   reliable evidence in support of breach claims, as previously

8   discussed.

9           Finally, Mr. Grice's direct testimony thoroughly,

10  and quite credibly, criticized the Trustees' claims of

11  breach based on missing documents.  Mr. Grice noted that, in

12  his experience, it was atypical to see such a large number

13  of asserted breaches based on missing documents.  Here, he

14  understood that, in reviewing the missing document claims

15  asserted by the Trustees, the Plan Administrator frequently

16  found that the allegedly missing document was, in fact, (i)

17  actually in the file, (ii) missing but had what he referred

18  to as a "footprint" in the file, (iii) located in part, or

19  (iv) not a document that was required to be in the loan file

20  in the first place.  With respect to the fourth category,

21  Mr. Grice opined that many of the Trustees' claims of breach

22  based on the failure to provide a final TIL form or based on

23  a missing HUD-1 form were without merit because (a) the

24  requirement to maintain such forms for a certain period of

25  time (if such a requirement had even existed for that

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

CONFIDENTIAL                                                    LBHI-OMNI_7689575

1    particular loan) had since elapsed or (b) contrary to the

2    Trustees' assertions, such forms were not required to be

3    signed or stamped.  Additionally, Mr. Grice noted that, not

4    only were many of the Withdrawn Claims based on missing

5    documents, but there appeared to be no principled

6    distinction between the missing document claims that were

7    withdrawn and those that were not.  Simply put, Mr. Grice

8    was not able to arrive at any understanding of the basis for

9    the Trustees' withdrawal of approximately forty percent of

10   their breach claims prior to the Estimation Proceeding.

11         On cross-examination, Mr. Grice was shown several

12   loan files he had reviewed and as to which he agreed with

13   the Plan Administrator's determination to "fail" a breach

14   claim asserted by the Trustees.  After examining the

15   evidence again, Mr. Grice was forced to concede that, upon

16   further consideration, he would be inclined to change his

17   conclusion on at least one of the files he was shown.

18         Overall, while Mr. Grice gave thoughtful and

19   thorough testimony, his approach to the review of breach

20   claims was aggressive.  He often applied too high a standard

21   in his analysis of whether a Threshold Fact had been

22   established.  Notwithstanding that, Mr. Grice was willing to

23   reconsider or retract some of his prior determinations, but

24   these concessions did not change his overall conclusions

25   that (i) the Plan Administrator's process was well-run and

CONFIDENTIAL                                                    LBHI-OMNI_7689576

1   (ii) the Trustees did not meet their burden to prove their

2   breach claims.

3           4.   Dr. Bradford Cornell

4           Dr. Cornell is a Senior Consultant at Compass

5   Lexicon, an international consulting firm.  He was tendered

6   as the Plan Administrator's expert in structured finance and

7   valuation.  Through his work as a professor at CalTech, as a

8   consultant, and as reflected in his research and writing,

9   Dr. Cornell demonstrated extensive knowledge of structured

10  finance and the valuation of complex structured products,

11  such as RMBS, in a variety of contexts, including RMBS

12  litigation.

13          The Plan Administrator asked Dr. Cornell to

14  perform an independent economic analysis to estimate the

15  aggregate claim value of the Covered Loan Claims using the

16  Trustees' Purchase Price calculations, which included both

17  post-petition interest and post-rejection interest.  Dr.

18  Cornell was instructed to assume that the Purchase Price

19  proffered by the Trustees was the correct measure of

20  damages, and he made clear that he was offering no opinion

21  on the appropriate measure of damages.  Per the assumptions

22  given to him by the Plan Administrator, Dr. Cornell also

23  offered no opinion on the valuation of the non-liquidated

24  loans or the On-Hold Loans.  Dr. Cornell's work (like Dr.

25  Snow's) was limited to the performance of certain

CONFIDENTIAL                                    LBHI-OMNI_7689577

1   mathematical calculations.

2           Dr. Cornell looked at the 1,263 loans which, as of

3   September 28, 2017, the Plan Administrator had determined to

4   "pass;" Dr. Cornell deems such claims "Compensable Claims."

5   Using the Purchase Prices calculated by the Trustees' expert

6   Dr. Snow, Dr. Cornell calculated a claim amount of $301.8

7   million for these Compensable Claims.  Since such a claim

8   amount for the Compensable Claims assumes that the Trustees

9   would fail to succeed on 100% of the Covered Loan Claims in

10  dispute (the "Disputed Claims"), the Plan Administrator

11  asked Dr. Cornell to illustrate how often the Trustees would

12  need to succeed on the Disputed Claims in order to achieve

13  an aggregate claim amount of approximately $2.38 billion.

14          Dr. Cornell constructed four illustrative

15  scenarios: (a) all Disputed Claims; (b) the Disputed Claims

16  excluding the non-liquidated loans; (c) the Disputed Claims

17  excluding the On-Hold Loans; and (d) the Disputed Claims

18  excluding both the non-liquidated loans and the On-Hold

19  Loans.  For each of these four scenarios, Dr. Cornell then

20  calculated the amount of the Disputed Claims assuming

21  certain success rates (the "Presumed Success Rates")

22  provided by the Plan Administrator to Dr. Cornell.  The

23  Presumed Success Rates included success rates for each of

24  Mr. Aronoff's 12 breach claim categories, and were further

25  bifurcated based upon the likelihood that the Trustees could

CONFIDENTIAL                                                      LBHI-OMNI_7689578

1    prove (a) the existence of a material breach and (b) that

2    such breach has an adverse material effect on the loan.  The

3    Presumed Success Rates ranged from 1% to 20%.  Dr. Cornell

4    did not provide any opinion on the accuracy or likelihood of

5    the Presumed Success Rates; there was no testimony on how

6    the Presumed Success Rates were selected.  In his

7    calculations, Dr. Cornell also assumed that there was no

8    correlation between the success rates of multiple breach

9    claims on the same loan and, therefore, he treated each

10   breach claim as a "fresh bite at the apple."  He explained

11   that such an assumption was favorable to the Trustees

12   because it statistically increased the Trustees' likelihood

13   of success on a loan with multiple breach claims.

14           In each of the four illustrative scenarios, Dr.

15   Cornell calculated the Trustees' aggregate claim amount for

16   the Compensable Claims and the Disputed Claims assuming that

17   the Trustees succeed in proving the Disputed Claims at rates

18   of (a) 100%; (b) the Presumed Success Rates; and (c) 0%.  A

19   matrix presenting all of Dr. Cornell's calculations was

20   provided to the Court in PA Exhibit 987.  By way of example,

21   for all Compensable Claims and all Disputed Claims excluding

22   the non-liquidated loans, Dr. Cornell calculated the

23   aggregate claim value to be (i) $8,875,425,539, assuming a

24   100% success rate on the Disputed Claims; (ii)

25   $1,836,173,758, assuming the Presumed Success Rates on the

CONFIDENTIAL                                                    LBHI-OMNI_7689579

1   Disputed Claims; and (iii) $278,053,636, assuming a 0%

2   success rate on the Disputed Claims.

3          Dr. Cornell was also asked to opine on certain

4   opinions offered by Dr. Karl Snow, the Trustees' purchase

5   price expert.  With respect to the calculation of accrued

6   interest, Dr. Cornell stated that he agreed with Dr. Snow's

7   calculations and that he would have taken the same approach

8   as Dr. Snow.  Dr. Cornell offered no opinion as to the legal

9   question of whether such interest may be included as a

10  component of the Trustees' allowed claim.

11          5.   Mr. Daniel I. Castro

12          Mr. Castro is the founder and president of Robust

13  Advisors, Inc., an independent consulting company that

14  focuses on structured finance products and markets,

15  including RMBS; he has over 33 years of experience in the

16  mortgage finance industry.  Through designated portions of

17  his expert reports and designated portions of his video

18  deposition testimony, Mr. Castro was tendered as the Plan

19  Administrator's expert on the valuation of mortgage loans

20  and the adverse and material effect of breaches on the value

21  of a mortgage loan.  Specifically, the Plan Administrator

22  elicited testimony from Mr. Castro on the approaches taken

23  by the parties during the Protocol in determining whether an

24  alleged breach satisfied the AMA standard.

25          Mr. Castro reviewed a sample of 380 alleged

CONFIDENTIAL                                          LBHI-OMNI_7689580

1     breaches and agreed with the Plan Administrator that the

2     Trustees had failed to meet their burden to establish AMA on

3     378 of them.  In large measure, because he agreed almost

4     entirely with the Plan Administrator's breach

5     determinations, Mr. Castro concluded that the Plan

6     Administrator's AMA review process was reliable and was more

7     likely than the Trustees' process to lead to an assessment

8     of AMA that was consistent with industry standards.  On the

9     other hand, Mr. Castro stated that (i) the Trustees'

10    position that the mere presence of a material breach

11    standing alone proves AMA is contrary to industry custom and

12    practice and (ii) the Trustees had conflated the question of

13    whether there was a material breach with the question of

14    whether such breach resulted in AMA.

15          Mr. Castro also opined that the Trustees' position

16    with respect to the non-liquidated loans contradicts

17    industry custom and practice.  In his experience, repurchase

18    claims (and, therefore, AMA determinations) are not

19    typically made on performing loans because investors value a

20    mortgage loan's ability to produce cash flows either through

21    periodic mortgage and interest payments or through

22    prepayment or liquidation.  Instead, Mr. Castro stated that

23    an investor would determine the existence of AMA based on

24    whether a breach either (i) led to an actual default,

25    delinquency, or other significant loss on a particular

CONFIDENTIAL                                                          LBHI-OMNI_7689581

1    mortgage loan; or (ii) impeded the servicer's ability to

2    enforce the terms of the mortgage loan in default.  A breach

3    that did not lead to an actual loss or affect foreclosure

4    rights in the event of a default was not typically

5    considered to be "material and adverse" and did not result

6    in repurchase.

7           Mr. Castro further explained that, over time, as a

8    mortgage loan becomes more seasoned, it becomes increasingly

9    less likely that any error or defect at origination will

10   have any bearing on the likelihood of there being a default

11   on such loan.  He stated that, as a loan ages, industry

12   participants view its actual performance to be a better

13   indicator of future performance than errors at origination.

14   The Trustees cast some doubt on Mr. Castro's opinion on this

15   point by introducing evidence of a study published by Fitch

16   Ratings which found that certain loan attributes that are

17   predictive of default at origination retain their relevance

18   to default behavior over time.  See TRX-1232, p. 31.  Mr.

19   Castro dogmatically refused to acknowledge that certain

20   defects and loan modifications on non-liquidated loans could

21   increase an investor's risk of loss on such loan.  His

22   testimony on this issue was not particularly thoughtful or

23   credible.

24          Lastly, Mr. Castro disagreed with the Trustees'

25   assertion that a breach has an adverse material effect on a

CONFIDENTIAL                                                LBHI-OMNI_7689582

1    mortgage loan if such breach increased the risk of loss on

2    such loan.  Although he stated that use of a "risk of loss"

3    standard is inconsistent with RMBS industry practice, Mr.

4    Castro nonetheless offered guidance on how AMA should be

5    evaluated if one were to utilize this standard.  In doing

6    so, Mr. Castro criticized the Trustees for (i) overlooking

7    numerous factors that contribute to the diminution in value

8    of a loan, such as macro and micro economic factors, and

9    (ii) not establishing a baseline risk of loss against which

10   to measure the loss allegedly caused by the breach.  Mr.

11   Castro outlined a methodology for measuring risk of loss but

12   his opinion on this point cannot be afforded any significant

13   weight because he could not cogently or credibly explain the

14   basis for his opinion during his deposition.

15            6.    Mr. Fiachra T. O'Driscoll

16            Mr. O'Driscoll was the Trustees' designated expert

17   witness regarding the materiality of the Trustees' breach

18   claims and the meaning of certain contract provisions as a

19   matter of custom and practice in the securitization

20   industry.  Although Mr. O'Driscoll prepared expert reports

21   and provided deposition testimony, he was not called as a

22   witness by the Trustees and did not testify at trial.  As

23   part of its rebuttal case, the Plan Administrator submitted

24   into evidence designations of Mr. O'Driscoll's deposition

25   testimony; in response, the Trustees submitted counter-

CONFIDENTIAL                                                    LBHI-OMNI_7689583

1   designations.

2          At his deposition, Mr. O'Driscoll testified that

3   it is possible to quantify the risk of loss on a particular

4   loan using models that consider various factors including,

5   for example, macro-economic scenarios.  Although models can

6   be used to measure risk of loss and he himself had helped

7   develop such models, Mr. O'Driscoll stated that, in his

8   experience in the securitization industry, he had never

9   used, nor had it been suggested to him that he use, a model

10  to assess the materiality of a breach in the RMBS repurchase

11  context.  (O'Driscoll Depo. Tr. 291:8-15.)

12         Mr. O'Driscoll acknowledged that the value of a

13  loan and the risk of loss on a loan may be affected by a

14  number of factors which are not loan-specific, such as

15  supply and demand, interest rates, and economic market

16  conditions.  However, Mr. O'Driscoll also opined that (i)

17  market conditions do not affect whether a breach

18  significantly increases the risk of loss associated with a

19  loan and (ii) in his experience, proof of loss causation was

20  never a requirement for a put-back.  In Mr. O'Driscoll's

21  words, "no originator that [he] ever had any dealings with

22  ever objected to a buy-back on the grounds of loss

23  causation."  (O'Driscoll Depo. Tr. 133:17-19.)

24         7.   Mr. John Burnett

25         Mr. Burnett was the Trustees' expert witness

CONFIDENTIAL                                                    LBHI-OMNI_7689584

1  regarding servicing industry custom and practice.  Although

2  Mr. Burnett prepared an expert report and provided

3  deposition testimony, he was not called as a witness by the

4  Trustees and he did not testify at trial.  As part of its

5  rebuttal case, the Plan Administrator submitted designations

6  of Mr. Burnett's deposition testimony; in response, the

7  Trustees submitted counter-designations.

8           At his deposition, Mr. Burnett testified that

9  there are a multitude of reasons that could cause a borrower

10  to stop making payments on a loan, including personal

11  circumstances like a death in the family or various macro-

12  economic events.  Mr. Burnett agreed with Mr. Castro that a

13  servicer would not typically undertake to investigate

14  performing loans for breaches of representations and

15  warranties.  He noted, however, that the servicer could

16  potentially notice "red-flags" in a loan file in the context

17  of standard mortgage servicing which could cause the

18  repurchase department of the servicer to investigate, and

19  ultimately demand repurchase of, such loan.  Mr. Burnett

20  clarified that his opinion was based solely on his

21  experience in the industry and not based on his

22  interpretation of applicable law.

23           B.    The Trustees' Case in Chief

24           1.    Mr. Edmond Esses

25           Mr. Esses is the Head of Investigations at D&P and

CONFIDENTIAL                                                    LBHI-OMNI_7689585

1   served as the Trustees' Project Manager for the Protocol.

2   Mr. Esses was responsible for developing and overseeing the

3   systems, processes, and personnel necessary to implement the

4   Protocol for the Trustees.  He worked under the supervision

5   of Mr. James Aronoff until Mr. Aronoff left D&P in December

6   2015.

7           Mr. Esses testified extensively about the

8   Trustees' five-step loan review process under the Protocol.

9   Mr. Esses' testimony, although detailed, was not

10  consistently credible.  For example, on direct examination,

11  Mr. Esses testified that D&P had a series of "written

12  guidance that [they] provided to each of the [Loan Review

13  Firms] to ensure there was a consistent playing field across

14  the five review firms."  (Dec. 11, 2017 Hr'g Tr. 1845:18-

15  22).  No evidence of the written guidance described by Mr.

16  Esses was admitted into the record during the Estimation

17  Proceeding.

18          Mr. Esses also testified that verbal guidance had

19  been given to the Loan Review Firms, but his testimony

20  lacked clarity on this topic.  In describing his oversight

21  of the project, Mr. Esses explained that D&P held a "kick-

22  off" call with each Loan Review Firm during which D&P set

23  certain parameters (e.g., that a borrower's salary should be

24  compared against the 90th percentile of salaries reported by

25  BLS) and variances (e.g., that only income variances above

CONFIDENTIAL                                                    LBHI-OMNI_7689586

1    5% of stated income should be reported).  Mr. Esses also

2    testified that D&P held weekly telephone calls with the Loan

3    Review Firms to provide "real-time feedback."  At the same

4    time, Mr. Esses testified that he did not provide any

5    instructions to the Loan Review Firms on the mechanics of

6    how to conduct a forensic loan review.  Instead, the Loan

7    Review Firms were permitted to use their discretion and

8    experience to review each loan file.  In Mr. Esses' opinion,

9    the Loan Review Firms were all well qualified and understood

10   accepted industry practices, so D&P did not need to give

11   them specific instructions.  Mr. Esses' testimony on this

12   subject was not particularly concrete.  Notably, the

13   Trustees did not present any testimony by any personnel

14   employed by the Loan Review Firms who had reviewed the loan

15   files at issue in this proceeding.

16          With respect to the "on-hold" loans, Mr. Esses

17   testified that, while the Trustees had issued subpoenas to

18   certain of the servicers in order to obtain Trustee Critical

19   Documents not present in the loan files, the Trustees never

20   issued subpoenas to attempt to obtain any of the PA Critical

21   Documents not present in the files.  Mr. Esses conceded that

22   the Trustees did not ask the Court for any assistance in

23   obtaining such documents from the servicers, stating his

24   mistaken assumption that the Court "could have spoken up" if

25   it felt it was necessary to get involved after hearing the

CONFIDENTIAL                                                        LBHI-OMNI_7689587

Page 85

1  Trustees' status updates at court conferences.  (Dec. 12,

2  2017 Hr'g Tr. 2061-2064).

3          Notwithstanding his apparent misunderstanding of

4  the Court's role, Mr. Esses explained that, in attempting to

5  obtain the PA Critical Documents, D&P was at times told that

6  (i) the servicer had in fact provided one of the four PA

7  Critical Documents but in a different form than the PA

8  expected and/or (ii) the servicer did not have any PA

9  Critical Documents.  In such case, the Trustees ended the

10 inquiry there.  Mr. Esses testified that Lehman could have

11 directly contacted the servicer (often, Aurora) instead of

12 using the Trustees as a "conduit" for obtaining the PA

13 Critical Documents, and Lehman did not do so.  He

14 acknowledged his understanding that the Plan Administrator

15 sought the PA Critical Documents in order to audit the

16 servicers' loss calculations.

17         Moreover, during his testimony, Mr. Esses

18 confirmed his understanding that (i) before placing loans

19 "on hold," the Trustees were warned by Lehman that if the PA

20 Critical Documents were not obtained for each loan at issue,

21 Lehman did not intend to review such loan files until the

22 documents were received and (ii) as a result of Lehman's

23 position, the Trustees agreed to place all loans missing PA

24 Critical Documents "on hold" until the Trustees obtained the

25 missing documents and that claims related to such loans

CONFIDENTIAL                                    LBHI-OMNI_7689588

1  would not be expunged but would be resolved "at a later

2  time."

3        On cross-examination, Mr. Esses' testimony

4  revealed myriad flaws in the Trustees' Protocol process,

5  including the following: (i) Mr. Esses, as Project Manager,

6  never personally reviewed a loan file except to understand

7  the process; (ii) while the Loan Review Firms conducted two

8  independent reviews of each loan file, D&P itself never

9  reviewed the loan file during QC1 or QC2; (iii) in QC1, D&P

10  only checked the accuracy of the breach narrative against

11  the evidence in the Claim Package and did not look at the

12  loan file itself for evidence that might contradict the Loan

13  Review Firms' findings; (iv) when the Trustees asserted

14  missing document claims, they did not check the loan files

15  or any other source for the missing documents — in fact,

16  missing document claims were not reviewed at all in QC1 or

17  QC2; (v) the Trustees took no depositions, obtained no

18  public records, got no records custodian affidavits, issued

19  no records subpoenas, conducted no field reviews, and

20  conducted no interviews of anyone involved in loan

21  originations as support for their breach claims; and (vi)

22  the Trustees generally did not consult the underlying

23  underwriting guidelines or the product profiles to determine

24  whether a breach met the AMA standard for a claim (and when

25  they did, they apparently sometimes looked at the wrong

CONFIDENTIAL                                   LBHI-OMNI_7689589

1    guidelines).  Mr. Esses also admitted that, with respect to

2    the loan files themselves, he did not know what the

3    originators' practices were in handling hard copy loan

4    files, when or by whom the files were scanned, or whether

5    any documents went missing from the files between the time

6    of the closing of the loan and the review by the Loan Review

7    Firms.  He testified that it was not part of the Trustees'

8    process to make sure that the contents of the loan file

9    being reviewed were the same as the contents in the file

10   that was on the closing table; the Trustees assumed for

11   purposes of their review that the loan file under review was

12   identical to the loan file at closing.

13           To arrive at a purchase price for each allegedly

14   breaching loan, Mr. Esses testified that the Trustees simply

15   transcribed the "realized loss" amounts directly from the

16   master servicer data tapes onto the Claims Tracking

17   Spreadsheet; the Trustees did not independently audit the

18   components (such as fees and accrued interest) used by the

19   master servicer to calculate the realized loss.  Because the

20   numbers were provided by the master servicer, who in many

21   instances was Aurora, and because the same numbers were

22   reported to investors in the servicers' remittance reports,

23   Mr. Esses asserted his belief that such numbers were

24   reliable.  However, Mr. Esses admitted that the Trustees did

25   not attempt to disaggregate which portions of the losses

CONFIDENTIAL                                                    LBHI-OMNI_7689590

1   were attributable to Lehman and which were not, although he

2   conceded that it was possible that losses to the Trusts

3   could be caused by things completely unrelated to any

4   conduct of Lehman.  During his cross-examination, Mr. Esses

5   also confirmed that the Trustees did not utilize a model to

6   measure the risk of loss in connection with any loan, e.g.,

7   by setting a baseline and then quantifying an increase in

8   the risk of loss.

9            2.   Mr. James H. Aronoff

10           Mr. Aronoff, currently a Principal at Baker Tilly,

11  has more than thirty years of experience in the structured

12  finance industry, focusing on RMBS in particular.  He was a

13  managing director at Duff & Phelps at the time of

14  implementation of the Protocol, left the firm in December

15  2015 during the Protocol, and was re-hired by the Trustees

16  in May 2016 to continue to work on the Protocol, which had

17  continued in his absence.  Mr. Aronoff was tendered by the

18  Trustees as an expert in loan origination, underwriting, and

19  securitization; factors affecting the value of mortgage

20  loans; the industry understanding of reps and warranties and

21  AMA language; and methods and evidence customarily used in

22  repurchase reviews.

23           Over the course of five days of the trial, Mr.

24  Aronoff gave extensive testimony in support of the Trustees'

25  case.  He testified in two different capacities.  As the

CONFIDENTIAL                                                              LBHI-OMNI_7689591

Page 89

1    principal architect and "boss" of the Trustees' loan review

2    process during the Protocol, Mr. Aronoff described in detail

3    (i) the Trustees' loan review process, (ii) the Trustees'

4    Protocol review of approximately 171,000 loan files for

5    breach and their assertion of breach claims on 94,566 loan

6    files, (iii) the types of evidence relied upon by the

7    Trustees to assert their breach claims, and (iv) the major

8    categories of breach claims asserted by the Trustees.  In

9    addition to this fact testimony, Mr. Aronoff offered his

10   expert opinion that the process he had designed,

11   implemented, and overseen as its "boss" was thorough and

12   rigorous.  His overall opinion is that, because the

13   Trustees' loan-level review was conducted by experienced

14   professionals in a manner consistent with the way in which

15   such loan reviews are conducted in the industry and in

16   reliance on types of evidence customarily used in put-back

17   cases, the Trustees' breach findings presented in his report

18   are (i) valid, (ii) material, and (iii) material and adverse

19   to the interests of certificateholders.

20            Mr. Aronoff's Fact Testimony

21            In describing the Protocol process, although he

22   first attempted to suggest otherwise, Mr. Aronoff eventually

23   conceded that his team provided no written guidance to the

24   Loan Review Firms for their loan-by-loan review; rather, he

25   stated, rather cavalierly, that because each of the firms

CONFIDENTIAL                                          LBHI-OMNI_7689592

1    that was retained was engaged in loan review as their

2    primary business, there was not "much discussion or concern"

3    about telling them how to conduct the review.  (Dec. 13,

4    2017 Hr'g Tr. at 2341:20-2342:4).  Mr. Aronoff and his team

5    gave the firms guidance by telephone during the review

6    process as questions arose.  Regarding the types of evidence

7    used by the loan review firms to support breach claims, a

8    subject about which he gave detailed testimony, Mr. Aronoff

9    opined that many of the types of evidence were "customary

10   sources" widely used in the industry and deemed to be

11   reliable.

12          While Mr. Aronoff designed and oversaw the

13   Trustees' loan review process, he testified that (i) he did

14   not know how the loans that were sent to each of the Loan

15   Review Firms were selected; (ii) he had no role in deciding

16   what documents would be requested from the servicers and did

17   not know whether origination or servicing files were

18   requested from any source other than the servicers; (iii) he

19   did not believe there is a requirement that an additional

20   layer of independent quality control is required to vet the

21   results of a forensic loan review; (iv) he did not know how

22   many claims were filtered out at each step of the Trustees'

23   loan review or at what level of review a breach finding may

24   have been rejected; (v) his QC team did not assess whether

25   the loan file contained any information inconsistent with

CONFIDENTIAL                                              LBHI-OMNI_7689593

1    the breach claim because the QC reviewers did not look at

2    the loan file itself; (vi) his QC team could not verify

3    whether a missing document was actually in the loan file

4    because missing document claims were not reviewed by the QC

5    teams; and (vii) he himself did not review any loan file in

6    its entirety.  Not a single one.

7         During his direct examination, Mr. Aronoff

8    described the major breach finding categories asserted by

9    the Trustees and the reps and warranties "mapped" to each

10   category.  He began by providing background information

11   regarding loan securitization and the loan-level reps and

12   warranties made by a sponsor to investors purchasing trust

13   certificates.  In Mr. Aronoff's words, such reps and

14   warranties enable the sponsor to market the certificates to

15   investors at the price associated with the represented

16   quality of the loans, and they allocate the risk of non-

17   performance of materially breaching loans to the sponsor.

18        Mr. Aronoff testified that his interpretation and

19   understanding of the word "material" (as such term was used

20   in the context of identifying breaches) was based on what

21   was material to the credit risk of the loan in the

22   origination process vis-à-vis the investor; his statements

23   regarding materiality focused solely on credit risk rather

24   than on the potential effect a breach may have on the value

25   of the loan.  When questioned on this issue, Mr. Aronoff

CONFIDENTIAL                                                LBHI-OMNI_7689594

1  testified that, in his view, materiality, as such term is

2  used both with respect to the materiality of breaches and in

3  the AMA requirement, relates to credit risk (which he also

4  described as "risk of loss") on a loan.  If the defect that

5  is the basis for the breach finding increases the risk of

6  loss to the investor, the breach is material, and every

7  material breach materially and adversely affects the value

8  of the underlying loan by increasing the credit risk vis-a-

9  vis the investor.  Thus, he believes that the AMA

10  requirement is satisfied for each and every of the 72,500

11  loans for which the Trustees asserted a material breach.

12       Mr. Aronoff testified that the Trustees made their

13  breach determinations on a loan-by-loan basis but described

14  how, in his expert report, he grouped similar types of

15  breaches into categories (based on similar evidentiary bases

16  and on similar reps across loan pools).  He opined that this

17  grouping, by breach type enabled him to illustrate that,

18  because a certain breach type "will always have the same

19  effect with respect to an investor" it will therefore

20  "always, absent specific circumstances, have the same [AMA]

21  with respect to that type of breach finding." (Dec. 13, 2017

22  Hr'g Tr. at 2313:18-2314:7).  He testified that the reason

23  that a loan defaults is irrelevant to his loan analysis.

24  Accordingly, in submitting breach claims to the Plan

25  Administrator, Mr. Aronoff and his team tied the alleged

CONFIDENTIAL                                                        LBHI-OMNI_7689595

1    breach type to one of four "boilerplate" explanations of how

2    the alleged breach may affect loan performance or loss

3    severity.  When asked at trial, Mr. Aronoff did not provide

4    a single example of a loan as to which the Trustees asserted

5    a material breach which he found did not have an adverse

6    material effect on the value of the loan to investors;

7    instead, his testimony demonstrated that, once a material

8    breach was discovered, the Trustees concluded that the AMA

9    requirement was met without any additional analysis being

10    conducted.  In other words, every material breach was

11    effectively "deemed" to satisfy the AMA requirement.

12          On cross-examination, Mr. Aronoff remained

13    steadfast in his view that 100 percent of the loans

14    presented by the Trustees in the Estimation Proceeding

15    contain a material breach which has an AMA on the value of

16    the loan to certificateholders (assuming that the Threshold

17    Fact that forms the basis for the breach is accurate).  He

18    eventually conceded that, for several dozen loans in which a

19    mistake was made in the Trustees' process with respect to

20    identification of the Threshold Fact that was the basis for

21    the breach, such breach findings were no longer valid.

22          Mr. Aronoff's Expert Testimony

23          Mr. Aronoff disagreed with any suggestion that, by

24    virtue of his role in designing and implementing the

25    Trustees' loan review process, he was not in a position to

CONFIDENTIAL          LBHI-OMNI_7689596

1    give credible testimony about, in sum and substance, what a

2    superlative job he had done.  His views on that topic were

3    crystal clear.  With the exception of his acknowledgement of

4    a few of the "errors" that were pointed out to him during

5    cross-examination, Mr. Aronoff steadfastly held to his

6    opinion that every single one of the breach claims submitted

7    by the Trustees was valid.  Since the Trustees elected not

8    to question Mr. Aronoff about the Withdrawn Claims, which

9    reduced the loan pool at issue in the Estimation Proceeding

10   from over 91,000 to approximately 72,500 loans, there was no

11   opportunity for the Plan Administrator to question Mr.

12   Aronoff about why such "valid" claims were not presented at

13   trial.

14          During his direct testimony, Mr. Aronoff was shown

15   a handful of exemplar loans that Mr. Grice had reviewed.

16   While Mr. Grice had concluded that, for each of the loans,

17   the Trustees had failed to put forth evidence sufficient to

18   support a claim of breach, Mr. Aronoff disagreed with all of

19   Mr. Grice's conclusions.  When shown exemplar loans as to

20   which the Trustees had asserted claims for misrepresentation

21   of income, Mr. Aronoff emphasized several times that his

22   objective in reviewing loans and asserting income breach

23   claims was not to determine a borrower's actual income but

24   rather to determine whether it was more likely than not that

25   the income stated by the borrower on his or her loan

CONFIDENTIAL                                                        LBHI-OMNI_7689597

1    application had been misrepresented.  Mr. Aronoff's

2    testimony regarding several different exemplar loans

3    revealed that, at times, certain assumptions had been made

4    by the Loan Review Firms when concluding that a material

5    breach had occurred.  Moreover, a material breach finding

6    was often predicated on one single type or piece of evidence

7    with no secondary confirmatory source.  On cross-

8    examination, Mr. Aronoff was shown a number of exemplar loan

9    files which revealed the subjective nature of the Trustees'

10   loan review and, at times, the reviewers' disregard of

11   contradictory evidence.

12            Mr. Aronoff's Expert Report

13            On cross-examination, Mr. Aronoff was shown

14   Exhibits 4-13 to his expert report, which exhibits purported

15   (i) to summarize the claims asserted by the Trustees in each

16   of their twelve major breach categories and (ii) to

17   demonstrate, through such summaries, the validity of each

18   breach type and Mr. Aronoff's conclusion that each breach

19   type met the Trustees' "materiality standard."  When

20   confronted with such exhibits, which Mr. Aronoff conceded he

21   did not prepare, Mr. Aronoff was unable to explain the

22   source of the data included.  He subsequently admitted that

23   the information came from a database (later identified as

24   "TeamConnect") that had not been provided to the Plan

25   Administrator; notwithstanding, he testified (but could not

CONFIDENTIAL                                                     LBHI-OMNI_7689598

1  confirm) that the data he used in his report should match

2  loan data from the Claims Tracking Spreadsheet used by the

3  parties.  However, during his examination, Mr. Aronoff was

4  presented with myriad examples of data included in the

5  exhibits that was inconsistent with data in the Claims

6  Tracking Spreadsheet.  He had no explanation for these

7  errors, instead simply stating that, even if the "values

8  were wrong, the conclusion doesn't change." (Dec. 18, 2017

9  Hr'g Tr. 2700:23-24).

10         Mr. Aronoff's testimony also revealed that the

11  exhibits to his report may not be reliable because certain

12  data reflected in the exhibits was not accurately presented.

13  For example, Exhibit 4 to Mr. Aronoff's report, entitled

14  "Misrepresentation of Income Breach Findings," purported to

15  depict an enormous "Monthly Percentage Difference" between

16  (i) a borrower's monthly income as represented on the loan

17  application and (ii) the borrower's "actual" monthly income

18  by listing these figures for each loan as to which the

19  Trustees asserted a misrepresentation of income breach

20  claim.  As such, two columns on Exhibit 4 were entitled

21  "Represented Monthly Income" and "Actual Monthly Income."

22  When questioned on the meaning of such terms at trial, Mr.

23  Aronoff testified that "Represented Monthly Income" may mean

24  different things depending on the loan, such as (i) income

25  from one job alone or (ii) income from multiple sources.  He

CONFIDENTIAL                                                    LBHI-OMNI_7689599

1    also conceded that the information contained in the "Actual

2    Monthly Income" column was at times subjectively selected by

3    the Trustees' loan reviewers from information in the loan

4    file, with no consistent methodology employed.  Admitting

5    that perhaps the Trustees should not have used the term

6    "Actual Income," Mr. Aronoff testified that the Trustees'

7    objective was not to establish what a borrower's actual

8    origination income was but instead to establish that, more

9    likely than not, the income listed on the loan application

10   had been misstated.  He explained that, oftentimes, the

11   number used as "actual income" was simply a number the

12   Trustees felt comfortable using to recalculate DTI and to

13   assert a breach of "Excessive DTI."

14           In addition, Mr. Aronoff's testimony illustrated

15   that the "summaries" presented in his expert report were

16   not, in fact, accurate summaries of underlying objective

17   data.  Indeed, the information purportedly summarized

18   therein does not lend itself to being presented in summary

19   form in the manner utilized by the Trustees.  For example,

20   Exhibit 4 contained a column entitled "Evidence Type" which

21   listed the type of evidence relied upon by the Trustees to

22   assert their claim of breach for a particular loan.

23   Regarding this column, Mr. Aronoff acknowledged that (i) the

24   type of evidence listed did not always match the evidence

25   type actually relied upon by the Trustees in the Claims

CONFIDENTIAL                                                    LBHI-OMNI_7689600

1   Tracking Spreadsheet and (ii) at times, the type of evidence

2   listed meant different things depending on the loan — for

3   example, "tax return" may mean one tax return or multiple

4   tax returns, from the year of origination, or from a year

5   after origination.  Mr. Aronoff admitted that, to ascertain

6   this information, one would have to look at each loan file

7   itself in order to understand the Trustees' claims as to

8   such loan.  When questioned further regarding this issue,

9   Mr. Aronoff's response appeared to imply that the Plan

10  Administrator should have known to go beyond the evidence

11  listed by the Trustees in order to figure out the true basis

12  for the claim.

13          Despite the fact that, upon close scrutiny, the

14  exhibits to his report suffered from numerous flaws and

15  inconsistencies, as well as discrepancies in information

16  when compared with the Claims Tracking Spreadsheet, Mr.

17  Aronoff refused to concede any errors whatsoever or concede

18  that any such errors would skew or change his opinions.

19          3.   Dr. G. William Schwert

20          Dr. Schwert is a professor of finance, economics,

21  and statistics at the University of Rochester; he was

22  tendered as the Trustees' expert in statistics.  Dr.

23  Schwert's assignment in this case was (i) to draw a

24  statistically significant random sample of loans from the

25  76,044 mortgage loans reviewed by Mr. Aronoff (the "Aronoff

CONFIDENTIAL                                                    LBHI-OMNI_7689601

1    Loan Population"), which sample was to be analyzed by Mr.

2    Morrow; (ii) to calculate how often Mr. Morrow agreed with

3    Mr. Aronoff; and (iii) to evaluate whether or not the

4    subsets of loans reviewed by Mr. Grice and Mr. Castro were

5    representative of the Aronoff Loan Population.

6            Using a method known as a "simple random

7    sampling," Dr. Schwert drew a sample of 600 mortgage loans

8    from the Aronoff Loan Population (the "600 Sample Loans").

9    Dr. Schwert evaluated the 600 Sample Loans and determined

10   that the sample was representative of 11 of the 12 most

11   prevalent types of Breach Findings in Mr. Aronoff's report.

12   Because the 600 Sample Loans were representative of the

13   larger loan population, Dr. Schwert concluded that the

14   sample could be used to extrapolate to conclusions regarding

15   the entire Aronoff Loan Population.  The 600 Sample Loans

16   were then reviewed by Mr. Morrow, who found the presence of

17   a breach in 556 of the 600 Sample Loans.  Using the results

18   of Mr. Morrow's review, Dr. Schwert calculated an "Agree

19   Rate" of 92.7% for the 600 Sample Loans; extrapolating from

20   the Agree Rate to the greater Aronoff Loan Population, Dr.

21   Schwert determined that Mr. Morrow would have agreed with

22   Mr. Aronoff's findings on 68,819 loan files in the Aronoff

23   Loan Population.

24           At trial, Dr. Schwert addressed the opinions of

25   the Plan Administrator's expert statistician Dr. Justin

CONFIDENTIAL                                                           LBHI-OMNI_7689602

1   McCrary.  Although the Plan Administrator admitted his

2   expert report into evidence, Dr. McCrary ultimately did not

3   testify at trial.  Among other criticisms, Dr. McCrary

4   disapproved of Dr. Schwert's use of simple random sampling

5   rather than stratified sampling, which Dr. McCrary argued

6   would have yielded more precise and controlled estimates.

7   Defending his position, Dr. Schwert argued that Dr.

8   McCrary's positions were purely theoretical and that Dr.

9   McCrary did not review the Aronoff Loan Population to draw a

10  more precise sample, nor did he demonstrate that the 600

11  Sample Loans were not statistically representative of the

12  Aronoff Loan Population.

13          Dr. Schwert's work provides scant support for the

14  Trustees' claims.  Most notably, Dr. Schwert was not asked

15  to draw a representative sample of the entire pool of 94,566

16  allegedly breaching loans submitted by the Trustees through

17  the Protocol prior to the reduction of the loan pool by the

18  Withdrawn Claims.  Dr. Schwert testified that he had no

19  information about the Trustees' claim submission process nor

20  did he design a sample specifically to test the reliability

21  of the Trustees' process for submitting claims through the

22  Protocol.  Further, Dr. Schwert tested the

23  representativeness of the 600 Sample Loans against Mr.

24  Aronoff's breach categories but did nothing to determine

25  whether Mr. Aronoff had properly sorted the loans into the

CONFIDENTIAL                                           LBHI-OMNI_7689603

1    correct breach categories.  He did not sample the loans by

2    the type of evidence used to support an alleged breach and

3    he did not know whether the evidence types were

4    proportionately represented in the 600 Sample Loans.

5            With respect to the Agree Rate, Dr. Schwert's

6    calculation was purely mathematical; he engaged in no

7    qualitative analysis of Mr. Morrow's conclusions.  In fact,

8    Dr. Schwert did not even consider whether Mr. Aronoff and

9    Mr. Morrow agreed on the type of breach or whether they

10   relied on the same evidence to determine that a loan file

11   contained a material breach.

12           Dr. Schwert testified that the subsets of mortgage

13   loans used by Mr. Grice and Mr. Castro to criticize Mr.

14   Aronoff were not representative samples of Mr. Aronoff's top

15   12 Breach Finding categories; he therefore concluded that it

16   was impossible to extrapolate from their subsets to the

17   larger Aronoff Loan Population.  On cross-examination, Dr.

18   Schwert conceded that the subset of loans reviewed by Mr.

19   Grice and Mr. Castro included more loans from the Trustees'

20   "big four" breach categories than he would have expected if

21   they had reviewed a representative sample of the Aronoff

22   Loan Population.  Dr. Schwert also admitted that he did not

23   examine whether the samples used by Mr. Grice and Mr. Castro

24   were representative of the larger population of loans that

25   the Trustees initially submitted to the Protocol, nor did he

CONFIDENTIAL                                                    LBHI-OMNI_7689604

1   consider the purposes for which Mr. Grice and Mr. Castro

2   chose their samples.

3          4.   Mr. J. F. Morrow

4          Mr. Morrow was the Trustees' mortgage loan

5   origination and underwriting expert.  His credentials were

6   impressive.  He has over 50 years of experience in all

7   aspects of the loan industry including underwriting, re-

8   underwriting, and selling pools of loans; reviewing loan

9   portfolios; buying, selling, and pricing mortgage loans;

10   evaluating the effects of breached representations and

11   warranties on loans; and repurchasing loans.  Mr. Morrow has

12   also had extensive experience serving as an expert witness;

13   he has previously worked alongside Dr. Cornell on behalf of

14   Aurora and Lehman in other "put-back" cases.

15          Mr. Morrow was asked to conduct an independent

16   review of the 600 Sample Loans identified by Dr. Schwert to

17   assess the reliability of Mr. Aronoff's breach findings.

18   Mr. Morrow assembled a support team from Investors

19   Consulting Group ("ICG") to assist him with his review.  He

20   did not give ICG formal instructions, relying instead on

21   ICG's experience and knowledge of market standards for re-

22   underwriting loans.  Mr. Morrow and his ICG team completed

23   what he characterized as a re-underwriting of each of the

24   600 Sample Loans to determine whether a breach existed and,

25   if it did, to determine whether such breach met the AMA

CONFIDENTIAL                                                    LBHI-OMNI_7689605

1    standard.  To ensure consistency between his loan

2    determinations and those of ICG personnel, Mr. Morrow chose

3    15 of the 600 Sample Loans to "calibrate" the review

4    process.  Mr. Morrow did not elaborate on how the 15 sample

5    loans were chosen or whether the sample was statistically

6    significant; he testified that he and ICG arrived at

7    conclusions on the 15 sample loans that were consistent with

8    one another.

9         Mr. Morrow agreed with Mr. Aronoff on 831 of 897

10   of Mr. Aronoff's breach findings, yielding an Agree Rate of

11   92.6%.  He also agreed that 556 of the 600 Sample loans

12   contained one or more breach findings, yielding an Agree

13   Rate of 92.7%.  Mr. Morrow stated that he disagreed with Mr.

14   Aronoff on 14 loan files only because he located a document

15   that Mr. Aronoff had claimed was missing from the file.

16        Mr. Morrow further concluded that each of the 831

17   breach findings met the AMA standard.  He confirmed his view

18   that a breach materially and adversely affects a loan if the

19   breach "significantly increases the loan's risk of loss," as

20   measured at the time of origination of the loan; he does not

21   believe the performance of the loan is relevant to the AMA

22   determination.  Additionally, Mr. Morrow stated that the

23   determination of whether a representation or warranty has

24   been breached and whether that breach is material is

25   entirely independent of whether a loan is in default or why.

CONFIDENTIAL                                      LBHI-OMNI_7689606

1    Mr. Morrow's approach was consistent with that of Mr.

2    Aronoff, and based on an Agree Rate of almost 93%, Mr.

3    Morrow opined that the Trustees' review process was reliable

4    and was performed according to mortgage lending and

5    securitization industry standards.

6         Although Mr. Morrow and Mr. Aronoff agreed on

7    nearly 93% of the 600 Sample Loans, the significance of this

8    result is undermined by the fact that Mr. Morrow's review

9    was not conducted on a blind basis.  First, Mr. Morrow and

10   his team were aware that all 600 Sample Loans were loans

11   that the Trustees assert have breaches.  Further, Mr. Morrow

12   relied on the Claim Package compiled by the Loan Review

13   Firms; Mr. Morrow and his team did not review the entire

14   loan file unless they disagreed with the asserted

15   conclusions.  In fact, Mr. Morrow testified that his team

16   would cease their review of a sample loan once they found

17   one piece of evidence corroborating a breach and that they

18   did not look for contradictory evidence in the loan file or

19   otherwise.  And even though Mr. Morrow and ICG regularly

20   used third-party data to support a breach finding, they

21   merely relied on evidence already in the Claim File and did

22   not independently gather or verify such third-party data.

23   Mr. Morrow's review of the 600 Sample Loans would have been

24   more persuasive had he worked on a pool of sample loans

25   containing both allegedly breaching and non-breaching loans,

CONFIDENTIAL                                                    LBHI-OMNI_7689607

1   without knowing the "right" answer in advance.

2          Mr. Morrow was also asked to critique Mr. Grice's

3   opinion that the Trustees' review process was deficient and

4   produced unreliable results.  Mr. Morrow opined that Mr.

5   Grice's review was not done according to industry standards.

6   In his view, Mr. Grice sought to contradict Mr. Aronoff

7   using hypothetical scenarios and conjecture.  As Mr. Morrow

8   explained, "speculation has nothing to do with re-

9   underwriting."  His observations in this regard are sound.

10         Throughout his testimony, Mr. Morrow often

11  justified his opinions and rebutted criticism by citing to

12  "industry standards."  For example, he explained that ICG

13  did not attempt to contact the borrower or the originator

14  because such a procedure was not typically employed in the

15  industry — "the loan file stands alone."  Mr. Morrow

16  defended his use of BLS Data as standard even though his

17  testimony revealed that BLS categories can be too broad or

18  vague.  Characterizing tax returns as "gospel," Mr. Morrow

19  stated that tax returns and W-2s could reasonably be relied

20  upon to re-calculate DTI in lieu of actual income.  With

21  respect to any "missing document claims," Mr. Morrow

22  testified that the industry standard assumption was that "if

23  it isn't in the file, it didn't exist at origination."  As

24  will be discussed in detail hereinafter, the Court is hard-

25  pressed to agree with several of Mr. Morrow's sweeping

CONFIDENTIAL                                                    LBHI-OMNI_7689608

1    conclusions.

2           In lieu of conducting a complete cross-examination

3    of Mr. Morrow, the Plan Administrator submitted designations

4    of Mr. Morrow's deposition testimony.  In response, the

5    Trustees submitted counter-designations of Mr. Morrow's

6    deposition testimony and portions of Mr. Morrow's Rebuttal

7    Expert Report.  During his deposition, Mr. Morrow revealed

8    that he applied an expansive definition of materiality.  In

9    his view, every misstatement or omission is intentional and

10   every intentional misstatement or omission is material.

11   Disagreeing with Judge Castel's decision in MARM III, which

12   he characterized as a departure from industry custom and

13   practice, Mr. Morrow stated that materiality "kicks in" at

14   the time of origination of the loan and, if a breach is

15   material, the effect of such breach continues to exist

16   throughout the life of the loan.  Additionally, Mr. Morrow

17   adamantly expressed his opinion that neither changes to a

18   borrower's circumstances nor the performance of a loan has

19   any bearing on whether or not a breach materially and

20   adversely affects the value of a loan — to him,

21   "compensating factors do not make up for

22   misrepresentations."  Morrow Depo. Tr. 200:12-18.

23          Mr. Morrow's deposition testimony revealed certain

24   shortcomings in his loan review process.  In his opinion, it

25   was not necessary to examine every document in a loan file

CONFIDENTIAL                                      LBHI-OMNI_7689609

1    in order to confirm or deny the existence of certain

2    breaches, such as a misrepresentation of income or debt.  If

3    there was inconsistent information in the loan file, Mr.

4    Morrow believed, incorrectly, that it was Mr. Grice's burden

5    to address it.  Further, even though he acknowledged that

6    underwriting guidelines may determine whether or not a loan

7    had been breached — for instance, underwriting guidelines

8    may dictate whether photographs are required to be included

9    in the appraisal of a subject property — Mr. Morrow admitted

10   that he did not consult the underlying underwriting

11   guidelines unless the MLSAAs contained a representation and

12   warranty related to such guidelines.

13              5.    Dr. Karl N. Snow

14              Dr. Snow was tendered as the Trustees' expert on

15   the calculation of damages.  Dr. Snow has over 25 years of

16   experience working in the areas of finance, economics, and

17   statistical analysis in academia and the private sector.  He

18   has served as a damages expert in several other RMBS

19   litigations including MARM III, In re Residential Capital

20   LLC, and Syncora.  Dr. Snow was retained to calculate the

21   "Purchase Price" for each Covered Loan and to disaggregate

22   the accrued interest component of the Purchase Price for

23   such loans.  Dr. Snow did not review any of the loan files

24   and offered no opinion as to whether the loans provided to

25   him by the Trustees contained valid breach claims.  Dr. Snow

CONFIDENTIAL
LBHI-OMNI_7689610

1    made it clear that he was not offering an opinion on damages

2    generally; rather, his opinion was limited to how damages

3    should be calculated under the Governing Agreements.

4         To determine how to calculate the Purchase Price,

5    Dr. Snow reviewed the Governing Agreements, the Protocol

6    Order, and Lehman's Second Objection to Certain RMBS Trust

7    Claims and Motion to Disallow and Expunge Certain RMBS Trust

8    Claims for Insufficient Documentation [Dkt. No. 53620]. Dr.

9    Snow testified that the definition of Purchase Price was

10   consistent among those documents and those he has reviewed

11   in other RMBS cases in which he has served as an expert.

12   Dr. Snow provided a detailed description of the three

13   components that comprise the Purchase Price: (i) unpaid

14   principal balance, (ii) unpaid accrued interest, and (iii)

15   unreimbursed servicer advances. For each loan, Dr. Snow

16   used information from the Master Servicer's monthly loan-

17   level data tapes (the "Data Tapes"), as supplemented by data

18   from subscription services such as Moody's and Intex where

19   Data Tapes were not available; he also used trustee

20   remittance reports (such data, collectively, the

21   "Performance Data"). He explained that he did not

22   independently verify or calculate any of the numbers in the

23   Performance Data and expressed no opinion as to the accuracy

24   of such data; however, based on his experience, he believes

25   that the Performance Data is highly reliable because it is

CONFIDENTIAL                                                    LBHI-OMNI_7689611

1    subject to a high level of scrutiny inasmuch as it is

2    available to investors and relied upon to determine the

3    amount of distributions they receive.

4            For liquidated loans, Dr. Snow did not calculate

5    the Purchase Price based on the aforementioned formula.

6    Instead, he adopted the realized loss value as reported by

7    the servicer as a surrogate for the Purchase Price; he

8    testified that such methodology was not inconsistent with

9    the Governing Agreements.  Dr. Snow calculated an aggregate

10   Purchase Price of $9,282,204,782 for all liquidated Covered

11   Loans.  For non-liquidated Covered Loans, Dr. Snow

12   calculated the Purchase Price using numbers from the

13   Performance Data, and then subtracted the estimated current

14   value of such loans (as calculated by Dr. Ellson) from the

15   Purchase Price to calculate the "Net Purchase Price."  Dr.

16   Snow calculated an aggregate Net Purchase Price of

17   $5,382,554,290 for all non-liquidated loans as of April

18   2017.  Lehman did not dispute the mathematical accuracy of

19   the calculations he performed based on the instructions he

20   was given by the Trustees.

21           The Trustees also asked Dr. Snow to offer an

22   opinion with respect to Dr. Cornell's views that (i) a

23   reliable Purchase Price on a liquidated loan cannot be

24   calculated without a loss certificate and corporate expense

25   log and (ii) the Purchase Price for non-liquidated loans

CONFIDENTIAL                                                        LBHI-OMNI_7689612

1   should automatically be zero based on Lehman's position that

2   these loans will suffer no losses.  With respect to Dr.

3   Cornell's first contention, Dr. Snow testified that, in his

4   years of experience, he has never reviewed a loss

5   certificate because it has never been necessary to do so.

6   Additionally, Dr. Snow reviewed loss certificates and

7   corporate expense logs for 154 loans at issue here and

8   compared them to the Performance Data on which he relied.

9   He found that the loss certificates and corporate expense

10  logs provided greater detail about the fees and expenses

11  related to a loan but otherwise found no significant

12  difference between these two data sets.  Dr. Snow opined

13  that Performance Data is more accurate than corporate

14  expense logs and loss certificates because the latter two

15  only provide a "snapshot in time."  In his opinion, loss

16  certificates and corporate expense logs, in contrast to

17  Performance Data, do not reflect recoveries received or

18  expenses incurred subsequent to liquidation.  Dr. Snow did

19  not review, nor did he give any opinion about, the need for

20  loan payment history or servicer reports, which documents

21  Lehman has also claimed are necessary to calculate the

22  Purchase Price on a breaching loan.

23          With respect to Dr. Cornell's second opinion that

24  the Purchase Price for non-liquidated loans should be zero,

25  Dr. Snow testified that, in instances in which there have

CONFIDENTIAL                                                    LBHI-OMNI_7689613

1   been loan modifications or if there is unpaid accrued

2   interest, a performing loan could yield a net purchase price

3   even if the market price of such loan was par, and

4   therefore, Dr. Cornell is incorrect.  Dr. Snow clarified

5   that the Purchase Price under the Governing Documents, which

6   measures the historical losses of a loan, is not identical

7   to the market price of a loan, which measures future

8   performance.  He also effectively rebutted the Plan

9   Administrator's argument that the Trustees' calculation of

10  Purchase Price ignores interest payments that

11  certificateholders have received on non-liquidated loans

12  since the unpaid accrued interest for such loans, which is a

13  component of the Purchase Price calculation, would be zero.

14          Lastly, Dr. Snow disaggregated the unpaid accrued

15  interest of the Purchase Price for each loan into the

16  following categories: (i) pre-petition and post-petition

17  accrued and servicer-advanced interest; (ii) pre-rejection

18  and post-rejection accrued and servicer-advanced interest;

19  (iii) borrower accrued interest versus servicer-advanced

20  interest; and (iv) liquidated loans with and without

21  interest included in the Purchase Price.  Dr. Snow testified

22  that the Purchase Price for the majority of liquidated loans

23  did not contain any interest.

24          6.    Dr. Richard Ellson

25          Dr. Ellson was tendered by the Trustees as an

CONFIDENTIAL                                                  LBHI-OMNI_7689614

1    expert on the valuation of mortgage loans.  Through his work

2    as a trader, portfolio manager, and researcher, Dr. Ellson

3    has had extensive experience using and creating prepayment

4    and valuation models for mortgage-backed securities.  At

5    Andrew Davidson & Company ("ADCo"), he was responsible for

6    the development, testing, validation, and marketing of a

7    product known as LoanKinetics.  LoanKinetics was described

8    as a sophisticated statistical and analytical whole loan

9    residential mortgage system designed to provide analysis for

10   residential mortgage loans.  LoanKinetics is not itself a

11   model; rather, it "calls upon" and utilizes proprietary

12   models such as LoanDynamics, credit option adjusted spread

13   models, housing price forecasting models, and term structure

14   models.  Dr. Ellson used LoanKinetics to calculate the

15   estimated market value for 15,739 non-liquidated loans by

16   first forecasting how each loan would perform in the future

17   and then pricing each loan's future cash flow.  He estimated

18   the value of the non-liquidated loans at issue in this

19   proceeding to be $3.018 billion in the aggregate, with an

20   average estimated price of 72% of the current principal

21   balance as reported by the servicer.  The market values

22   calculated by Dr. Ellson were used by Dr. Snow to calculate

23   the Net Purchase Price of the non-liquidated loans.

24       Dr. Ellson testified extensively about the

25   components, architecture, and reliability of LoanKinetics,

CONFIDENTIAL      LBHI-OMNI_7689615

1    and it was evident from his testimony that he had been

2    heavily involved in its sale and marketing.  Dr. Ellson

3    demonstrated that he was familiar with how LoanKinetics

4    worked and that he had worked closely with ADCo's modeling

5    and financial engineering group, which developed the

6    underlying models prior to his employment at ADCo.  However,

7    on cross-examination, he admitted that he was less familiar

8    with, and was not involved with, the testing or validation

9    of the underlying models that LoanKinetics utilizes.  Dr.

10   Ellson confirmed that he relied on ADCo to validate the

11   underlying models; and the Trustees did not present any

12   other testimony regarding the reliability or accuracy of

13   LoanKinetics.

14          In response to the opinion of Mr. Castro that

15   performing non-liquidated loans were inappropriately

16   included in the Trustees' claim, Dr. Ellson stated that most

17   of the non-liquidated loans are "re-performing."  By "re-

18   performing," he means that such loans were not performing

19   under their original terms but rather performing pursuant to

20   modified terms that resulted in, for example, a reduction in

21   principal balance or applicable interest rate.  Dr. Ellson

22   argued that the credit risk associated with re-performing

23   loans is substantially greater than the risk associated with

24   loans that have never been modified.  To highlight this

25   risk, Dr. Ellson testified that, as of the time of his reply

CONFIDENTIAL                                                    LBHI-OMNI_7689616

1     report, 11.13% of the non-liquidated loans at issue here

2     were delinquent; 31.62% of the non-liquidated loans had been

3     delinquent in the last year; 10.51% of the non-liquidated

4     loans were in default; nearly 50% of the non-liquidated

5     loans were sub-prime; and almost 40% of the non-liquidated

6     loans were Alt-A.  Dr. Ellson conceded, however, that he did

7     not know why or under what terms any of the non-liquidated

8     loans had been modified.

9           On cross-examination, the Plan Administrator

10    attempted to establish that LoanKinetics was unreliable, as

11    evidenced by data relating to the 804 non-liquidated loans

12    that liquidated after Dr. Ellson issued his report.  The

13    realized losses on such loans were approximately $94

14    million, whereas Dr. Snow had calculated the Net Purchase

15    Price for such loans to be $144 million, a $50 million

16    difference.  In response to this point, Dr. Ellson

17    testified, unconvincingly, that the 804 non-liquidated loans

18    had been terminated "ad-hoc" and that therefore those loans

19    did not constitute a statistically significant sample that

20    could support the conclusion that LoanKinetics was not

21    reliable or accurate.  He also stated that Lehman was not

22    making an "apples to apples" comparison and that Lehman

23    should have compared estimated losses as predicted by

24    LoanKinetics (rather than the Net Purchase Price of the non-

25    liquidated loans) to actual realized losses.  Dr. Ellson

CONFIDENTIAL        LBHI-OMNI_7689617

1   explained how Lehman should have used the LoanKinetics data

2   to calculate expected losses on liquidated loans, and then

3   compared those values to the actual losses.  Upon making

4   such a comparison, Dr. Ellson found that LoanKinetics

5   actually predicted smaller losses in the event of

6   liquidation than the actual loans suffered on the 804 non-

7   liquidated loans and that the estimated loss predicted by

8   LoanKinetics was 92% accurate.  Dr. Ellson offered no

9   opinion, however, as to why the Net Purchase Price on non-

10  liquidated loans is not equal to the amount of estimated

11  losses for such loans.

12          7.    Hon. Robert S. Smith (Ret.)

13          Over the objection of the Plan Administrator, the

14  Trustees tendered the Honorable Robert S. Smith as an expert

15  on the negotiation and evaluation of litigation settlements.

16  Judge Smith testified that he has negotiated and overseen

17  hundreds of settlements in his long career as a judge on the

18  New York Court of Appeals, as an attorney in private

19  practice, and as a mediator.  Judge Smith was asked to opine

20  solely on Professor Fischel's opinions that (i) the

21  Institutional Investors Settlement supports estimating the

22  Trustees' claims at $2.38 billion and (ii) an allowed claim

23  of $2.38 billion reflects a recovery ratio that falls well

24  within the range of recovery ratios in the Comparable

25  Settlements.  Based on his experience with settlement

CONFIDENTIAL                                                        LBHI-OMNI_7689618

1   negotiations, Judge Smith was of the view that Professor

2   Fischel had no basis for rendering the opinions set forth in

3   his expert report because (a) Professor Fischel overlooked a

4   number of key factors with respect to the Institutional

5   Investors Settlement and (b) Professor Fischel did not

6   perform a quantitative analysis of the facts underlying the

7   Covered Loan Claims to determine whether the Covered Loan

8   Claims have a lower or higher probability of success than

9   the claims settled in the Comparable Settlements.

10          Judge Smith criticized Professor Fischel for

11   making what he characterized as the unfounded assumption

12   that the interests of the Institutional Investors and the

13   Trustees are aligned, and for ignoring the behavior of the

14   Trustees and Lehman.  Although he conceded that the

15   Institutional Investors were the "real parties-in-interest,"

16   Judge Smith views the Trustees as the "real plaintiffs."

17   Judge Smith noted that the Trustees rejected the

18   Institutional Investors Settlement because it was not

19   accepted by a requisite number of Trusts.  Further, since

20   the Institutional Investors Settlement has been replaced

21   with what he believes is a more favorable settlement – i.e.,

22   that Lehman had to "sweeten the deal for the Trusts" – Judge

23   Smith infers from this that the Covered Loan Claims in fact

24   have a higher value than the amount accepted by the

25   Institutional Investors in the Institutional Investors

CONFIDENTIAL                                    LBHI-OMNI_7689619

1    Settlement.

2            Judge Smith opined that the Institutional

3    Investors were uninformed when they entered into the

4    Institutional Investors Settlement because they had not

5    performed a loan-by-loan analysis of their claims as the

6    Trustees have here in connection with the Protocol and the

7    Estimation Proceeding.  He did acknowledge, however, that

8    the Institutional Investors are all large, sophisticated

9    financial institutions that are fully capable of making

10   informed settlement decisions.  In Judge Smith's opinion,

11   the amount a litigant, particularly an uninformed litigant,

12   is willing to accept in a settlement is not predictive of

13   the outcome of a case.  He believes that Professor Fischel

14   improperly likened the amounts of the Comparable Settlements

15   to a determination by this Court of the amount of the

16   Covered Loan Claims after a full trial.  In his experience,

17   he has seen litigants in "good cases" settle for less than

18   50% of the amounts they sought; however, none of the

19   specific examples Judge Smith provided was from an RMBS case

20   nor did Judge Smith disclose sufficient substantive details

21   about those cases to draw thorough comparisons.  Judge Smith

22   testified that he did not deem it relevant that the

23   Institutional Investors were some of the same parties that

24   negotiated the Comparable Settlements or that the parties

25   negotiating the settlement amounts in the Comparable

CONFIDENTIAL                                                        LBHI-OMNI_7689620

1   Settlements had used Recovery Ratios to benchmark the

2   reasonableness of such settlements.

3          With great respect to Judge Smith, his opinions

4   cannot be afforded significant weight.  As a threshold

5   matter, and as urged by the Plan Administrator in objecting

6   to his testimony, the standard for use of expert testimony

7   under Rule 702(a) of the Federal Rules of Evidence requires

8   that an expert witness's "specialized knowledge help the

9   trier of fact understand the evidence or to determine a fact

10  at issue;" as Judge Smith himself acknowledged, the Court is

11  as well-positioned as Judge Smith to draw comparisons

12  between the Institutional Investors Settlement and the

13  Comparable Settlements, on the one hand, and the RMBS

14  Settlement on the other hand.  Moreover, as will be

15  discussed hereinafter, it is untenable to posit that the

16  Institutional Investors and the settling investors in the

17  Comparable Settlements were uninformed and/or ill-advised

18  when settling at the Recovery Ratios reflected in those

19  settlements.

20          8.    Mr. James K. Finkel

21          Mr. Finkel is a Managing Director and National

22  Practice Leader for Financial Crisis Disputes at D&P.  He

23  has worked at a number of large financial institutions at

24  which he gained experience valuing fixed income and complex

25  securitized products.  The Trustees tendered Mr. Finkel as

CONFIDENTIAL                                                      LBHI-OMNI_7689621

1   an expert in financial models; specifically, Mr. Finkel was

2   asked to critique Professor Fischel's calculation of the

3   projected lifetime losses on non-liquidated loans using the

4   same ADCo LoanDynamics Model that Professor Fischel had

5   used.  Although Mr. Finkel had not previously used

6   LoanDynamics prior to his work in this case, he was able to

7   reverse-engineer Professor Fischel's approach with only a

8   0.036% difference.  After correcting what he considered to

9   be certain errors committed by Professor Fischel, Mr. Finkel

10  independently derived projected losses on the non-liquidated

11  loans and calculated total lifetime losses (including

12  historical and projected losses) of $21.115 billion, which

13  is $49.86 million lower than the amount of losses calculated

14  by Professor Fischel.  Mr. Finkel stated that the effect of

15  overstating lifetime losses would result in understated

16  Recovery Ratios; he did not, however, calculate a different

17  Recovery Ratio or state whether such difference was

18  significant.

19         Mr. Finkel was also asked by the Trustees to

20  compare the Recovery Ratio of the Lehman Proposed Claim

21  Amount to the Recovery Ratios in six other RBMS put-back

22  litigation settlements that were concluded between October

23  2015 and September 2016 (the "Finkel Comparable

24  Settlements").  To draw such comparison, Mr. Finkel used the

25  ADCo LDM toolkit with the modifications previously described

CONFIDENTIAL                                                        LBHI-OMNI_7689622

1    and the reported realized losses for the trusts related to

2    the Finkel Comparable Settlements to calculate the Recovery

3    Ratios for those six settlements.  Such Recovery Ratios

4    ranged from 23% to 23.75%, higher than the 11.24% Recovery

5    Ratio of the Lehman Proposed Claim Amount.  Using the

6    Recovery Ratios for the Finkel Comparable Settlements, Mr.

7    Finkel derived benchmark settlement amounts for the Covered

8    Loans that ranged from $2.477 billion to $2.668 billion

9    higher than the Lehman Proposed Claim Amount of $2.38

10   billion.

11              Although Mr. Finkel's calculations were

12   unchallenged, and, indeed, were unremarkable, his

13   conclusions were of limited value.  Mr. Finkel performed no

14   analysis of and presented no rebuttal testimony on the

15   Comparable Settlements and the Recovery Ratios for those

16   settlements.  Mr. Finkel did no qualitative analysis on the

17   Finkel Comparable Settlements.  He offered no opinion on how

18   the Finkel Comparable Settlements did or did not compare to

19   the Comparable Settlements.  On cross-examination, Mr.

20   Finkel admitted that he did not evaluate the similarities

21   between the RMBS Settlement at issue here and the Finkel

22   Comparable Settlements, which were settlements relating to

23   individual RMBS trusts.  In fact, he did very little

24   analysis, if any, of the Finkel Comparable Settlements; he

25   conceded that he did not analyze the default rates, the

CONFIDENTIAL                                                        LBHI-OMNI_7689623

1  types of collateral, the vintage of the loans, who

2  originated the loans, what portion of the settlement amount

3  was allocated to attorneys' fees, or what motivated the

4  settlement in each matter.  Further, Mr. Finkel did not

5  engage in any attempt to review any other comparable

6  settlements and/or compare them to the RMBS Settlement; he

7  only looked at the settlements that were provided to him by

8  counsel to the Trustees.  As was revealed on cross-

9  examination, counsel for the Trustees had carefully curated

10  the Finkel Comparable Settlements.  The Trustees' counsel

11  represented the plaintiffs in each such settlement;

12  significantly, only settlements with higher Recovery Ratios

13  were presented to Mr. Finkel and not, for instance, a

14  settlement in which Trustees' counsel had represented HSBC

15  and which had a Recovery Ratio of 12.7%.  While Mr. Finkel

16  testified truthfully and accurately performed the tasks that

17  he was assigned, his opinions are of little value to the

18  Court.

19          V.    DISCUSSION

20          A. The Trustees Did Not Meet Their Burden of Proof

21  With Respect to the Existence of Over 72,500 Material

22  Breaches

23          Having reviewed at some length the voluminous

24  evidence presented by the parties, the Court must now

25  confront the question it has been asked by the parties to

CONFIDENTIAL                                                    LBHI-OMNI_7689624

1   this Estimation Proceeding.  Have the Trustees demonstrated,

2   by a preponderance of the evidence, that they are entitled

3   to an allowed claim against Lehman in some amount greater

4   than $2.38 billion?  They have not, for a host of reasons.

5   Indeed, any of the shortcomings in the Trustees' proof that

6   the Court is about to identify would in and of itself

7   constitute a sufficient basis for denying the relief

8   requested by the Trustees.  That there are, in the Court's

9   view of the record, multiple flaws, fallacies, and

10  deficiencies in the proof bolsters the ultimate conclusion

11  reached by the Court.

12          Before turning to a detailed discussion of the

13  proof at trial, it is instructive to revisit what the

14  parties set out to demonstrate.  In their pretrial

15  memorandum, the Trustees stated that their "proof, which is

16  unrebutted for all but a tiny fraction of the loans at

17  issue, will demonstrate by a preponderance of the evidence

18  that Lehman breached the representations and warranties and

19  that it did so repeatedly for tens of thousands of loans."

20  (Trustees' Pretrial Brief at 5.)  Even though at trial the

21  Trustees did not present their proof pursuant to any

22  sampling methodology, what the Trustees did present was, in

23  essence, "sampling lite" – the use of so-called exemplar

24  loans (and the so-called unrebutted "proof" in the Claims

25  Tracking Spreadsheet) from which they would ask the Court to

CONFIDENTIAL                                    LBHI-OMNI_7689625

1    extrapolate to an aggregate claim amount.  The Trustees

2    urged that the Court could do so on a breach category by

3    breach category basis because the Court would find that the

4    Trustees' process was extremely reliable.  The Trustees

5    promised a roadmap that the Court could follow to arrive at

6    an allowed claim amount.  As it turned out, the roadmap

7    presented required the Court to take too many shortcuts and

8    to substitute conjecture for proof.

9           1.   The Trustees' Loan Review Process Suffered

10    from Numerous Flaws

11           The Trustees' loan review process suffered from

12    numerous flaws and shortcomings.  Notably, not one single

13    loan reviewer from the five Loan Review Firms employed by

14    the Trustees appeared as a witness at trial to testify

15    regarding the review process; such testimony would have

16    enabled the Court to evaluate and/or compare the processes

17    undertaken by the firms.  Rather, the Court was asked to

18    rely on the general descriptions offered by Mr. Esses and

19    Mr. Aronoff, neither of whom reviewed a single loan file in

20    its entirety, in order to understand the review process

21    undertaken by the Loan Review Firms.  No uniform set of

22    instructions given to the firms, in writing or otherwise,

23    was introduced into evidence.  No rosters of personnel

24    listing qualifications and experience were offered into

25    evidence.  The totality of the proof on this point — the

CONFIDENTIAL        LBHI-OMNI_7689626

1   most fundamental level of proof on which the Trustees built

2   their entire case – was Mr. Esses and Mr. Aronoff assuring

3   the Court that the Loan Review Firms "knew what they were

4   doing" and that what they were doing complied with "industry

5   standards."

6          In MARM III, there was a similar absence of

7   firsthand proof as to the underlying loan review process.

8   Judge Castel noted that the backgrounds and professional

9   experience of the MARM Trusts' individual loan reviewers –

10  several hundred individuals employed by three different

11  companies – were only "vaguely described."  In addition, he

12  observed that "[n]either party endeavored to show the extent

13  to which the hundreds of individuals who worked on the loan

14  review process were the same individuals employed in the

15  process of underwriting subprime loans for other originators

16  or institutions in the years leading up to the collapse of

17  the financial markets in 2008."  While Judge Castel stated

18  that he would place "no weight on this undeveloped issue,"

19  205 F.Supp. 3d at 403-04, this Court is troubled by the lack

20  of foundational evidence on this critical issue.

21         Additionally, in MARM III, as here, testimony was

22  elicited regarding the parties' failure to provide

23  guidelines or parameters to the loan review firms.  Judge

24  Castel noted that UBS's expert testified that, for at least

25  some portion of the loan reviewers, she provided no type of

CONFIDENTIAL                                          LBHI-OMNI_7689627

1    written or oral instruction, instead directing them to "use

2    common sense;" inasmuch as "[t]hese were all experienced

3    either underwriters or reunderwriters[,] I didn't feel that

4    I needed to explain to them how to calculate a DTI or, you

5    know, some of the basic tenets of reunderwriting.  They all

6    had that experience."  Id.  Judge Castel held that, "[t]he

7    Court's findings are informed by the work of [the experts]

8    and their vendors, but that does not mean that the opinions

9    of either are accepted or rejected wholesale."  Id. at 405.

10   So too here.  The Court will give appropriate weight to the

11   evidence in the record regarding the Trustees' process,

12   including the work of the Loan Review Firms.

13          In MARM III, Judge Castel also observed that the

14   loan review process was presented as a "re-underwriting"

15   process; it was not.  Judge Castel noted that "[t]he

16   underwriting process seeks to answer the question of whether

17   an application should be approved and a loan funded. . . . .

18   [The Trusts'] team looked for potential breaches of

19   representations and warranties and recorded them when, in

20   the opinion of the reviewer and [the Trusts' expert],

21   breaches were found. . . . Rather than traditional re-

22   underwriting, these reviews were directed to the existence

23   of potential breaches."  205 F. Supp. 3d at 403.  Such is

24   the case here as well; there was scant evidence of actual

25   re-underwriting by the Loan Review Firms and ample evidence

CONFIDENTIAL
LBHI-OMNI_7689628

1  that the loan reviews were geared towards the discovery of

2  just enough evidence to support the assertion of a breach.

3       Another notable shortcoming of the Trustees'

4  process was a critical disconnect between the work performed

5  by the Loan Review Firms and the so-called "quality control"

6  review performed by D&P, a "QC" process which did little to

7  correct any errors that may have been made by the Loan

8  Review Firms while conducting their review of loan files in

9  search of potential breaches.  Once a Loan Review Firm

10  finished its review of a loan file, it created a "Claim

11  Package" of original and third-party source documents —

12  sometimes only a single document — that it believed

13  supported any breach it had identified.  The entire loan

14  file was never reviewed again for mistakes or inadvertent

15  errors once the Claim Package left the Loan Review Firm and

16  made its way to D&P for two rounds of quality control.  In

17  fact, the quality control process did not include any review

18  by anyone at D&P of the entire loan file.  Thus, if a loan

19  reviewer mistakenly missed a critical document in the loan

20  file, there was nothing in the QC1 or QC2 process conducted

21  by D&P that would have caught the mistake.  In fact, Mr.

22  Esses, the Project Manager for the Trustees' loan review

23  process, admitted at trial that when the Trustees asserted

24  missing document claims, they did not even check their own

25  mortgage files (or any other source) for the missing

CONFIDENTIAL                                                    LBHI-OMNI_7689629

1    document before submitting the claim.  Second, because the

2    D&P QC team only reviewed the Claim Package, if contrary

3    evidence existed in the loan file that was missed by the

4    loan reviewer, the D&P QC team would not have found it.  As

5    Mr. Aronoff himself stated, D&P did not go "poking around in

6    the loan files."  (P.A. Ex 804, October 6, 2017 Aronoff

7    Depo. Tr. at 262:21-22; Dec. 14, 2017 Hr'g Tr. at 20617:24-

8    2618:2).

9         It would, of course, be impractical and

10   unreasonable to suggest that D&P's QC process should have

11   included a search of the entire loan file for every loan.

12   But the QC process D&P employed adds little by way of

13   support for the accuracy of the conclusions reached by the

14   Loan Review Firms in the first instance.  Notwithstanding

15   the "re-underwriting" experience of the Loan Review Firms, a

16   higher level of structure in the process and guidance and

17   oversight by D&P would have been indicative of a more

18   reliable process.

19        The significance of this flaw in the D&P QC

20   process is further amplified by the Trustees' apparent

21   application of the assumption that "if it is not in the loan

22   file now it never was," the stated opinion of the Trustees'

23   expert, Mr. Morrow.  As Lehman's expert Mr. Grice testified,

24   the loan files at issue here were generally old and their

25   quality was poor, creating challenges surrounding the

CONFIDENTIAL                                                    LBHI-OMNI_7689630

1   integrity of the contents of the loan file due to the

2   passage of time.  Even though the loans were originated at

3   least 11 years ago and in some instances more than 15 years

4   ago, the Trustees applied a presumption that a document that

5   is missing now — in 2017 or 2018 — had not been in the loan

6   file at origination.  Further, no proof was presented as to

7   originator or servicer document retention policies,

8   digitization procedures employed by servicers, or any

9   evidence relating to the chain of custody of the loan files.

10  Mr. Esses admitted at trial that he did not know what the

11  originators' practices were in handling hard copy loan

12  files, when or by whom the files were scanned, or whether

13  any documents went missing.  Mr. Esses further testified

14  that it was not part of the Trustees' process to make sure

15  the loan file being looked at by the Loan Review Firms was

16  the same as the loan file that left the closing table;

17  instead, the Trustees assumed for purposes of their review

18  that the file was identical.  Indeed, the Trustees went so

19  far as to ignore the fact that a closing checklist may have

20  reflected the existence of a document at closing; even such

21  evidence seemed to be insufficient to rebut the presumption

22  that a missing document simply never existed.  The apparent

23  failure to "evaluate the total mix of information" in the

24  loan file reflects poorly on the Trustees' loan review

25  process.  See **MARM III**, 205 F. Supp. 3d at 446 (declining to

CONFIDENTIAL                                                    LBHI-OMNI_7689631

1    credit expert opinion that gave controlling or near-

2    controlling weight to one document in the loan file and

3    failed to evaluate the "total mix of information" in the

4    file).

5           The next flaw in the Trustees' loan review process

6    involves infirmities in certain of the data on which they

7    rely for their assertion of breach claims.  Without doubt,

8    virtually all of the types of data cited by the Trustees

9    have been cited approvingly by other courts in the context

10   of put-back litigation and have been relied on to a certain

11   extent by Lehman entities themselves. Nonetheless, the Court

12   finds it exceedingly difficult to accept every type of

13   evidence as to every alleged breach without there being a

14   far more searching and particularized review of each loan,

15   as was directed by Judge Castel in MARM III.  As reflected

16   in Mr. Trumpp's testimony, of the approximately 70,000

17   breach claims asserted in the Trustees' major breach

18   categories, approximately 48,000 of such breach claims were

19   supported by only one type of evidence, e.g., by a

20   bankruptcy document or a MERS report.  And while reliance on

21   one type of evidence is not per se objectionable, the

22   flimsiness of many of these types of evidence when used as

23   support for a breach claim gives great pause.

24          At trial, the Plan Administrator's expert, Mr.

25   Grice, described in detail the limitations surrounding the

CONFIDENTIAL                                                    LBHI-OMNI_7689632

1   use of many of the types of evidence relied upon by the

2   Trustees.  During his cross-examination, Mr. Esses conceded

3   that, both prior to and during the Trustees' loan review, he

4   was familiar with such limitations and with the disclaimers

5   included in a number of the data sources regarding their

6   intended use.  For example, (i) each of the three credit

7   bureaus has issued a disclaimer regarding reliance on the

8   accuracy or completeness of the information in its credit

9   reports and (ii) MERS, Accurint, LexisNexis, and DataVerify

10  have issued terms and conditions stating that any

11  information obtained through them should be independently

12  verified.  The accuracy of such data depends on its use; Mr.

13  Grice noted in his testimony that, while audit credit

14  reports and information from third-party data aggregators

15  may be reliable for some purposes, they are especially

16  unreliable when used for purposes not intended, such as to

17  support misrepresentation of occupancy claims.  The Court

18  agrees with Mr. Grice that the question of reliability is

19  tied to context; evidence may be reliable or sufficient in

20  one context but not in another.

21          For example, BLS Data, if used correctly, may be

22  reliable as a highly generalized benchmark of the earnings

23  of someone employed in a particular job category in a

24  particular geographic area.  But the evidence revealed that

25  the Loan Review Firms did not always correctly match the

CONFIDENTIAL                                                    LBHI-OMNI_7689633

1   actual job of a borrower with the correct BLS category.  The

2   Plan Administrator presented numerous examples during the

3   trial of the foibles of BLS Data generally and as applied by

4   the Trustees during the loan review process.  The Plan

5   Administrator presented evidence with respect to the

6   limitations of BLS Data in that (i) it does not measure

7   certain categories of compensation such as overtime,

8   bonuses, or benefits and (ii) it is only conducted as a

9   survey every three years.  Notwithstanding, for many loans,

10  the Trustees relied on BLS Data as the sole source of

11  evidence of an alleged breach.

12          Another questionable type of evidence is a so-

13  called audit verification known as a VOE.  Audit VOEs, which

14  were conducted by the Loan Review Firms by telephone, fax,

15  or email some 10 to 15 years after origination, were shown

16  through several examples to suffer from numerous flaws.  Mr.

17  Esses testified that he was unaware of any standard script

18  of questions for the Loan Review Firms to utilize to verify

19  job title, employer, or salary as compared to how the

20  information was reflected in the loan application; there was

21  no standard form to be filled out for the verification; and

22  the VOE results were often relied on more heavily than the

23  borrower's statements in the loan application itself.

24          Another category of evidence relied upon by the

25  Trustees which courts have concluded "must be treated with

CONFIDENTIAL                                                    LBHI-OMNI_7689634

1   caution and cannot be accepted at face value" is bankruptcy

2   filings.  See MARM III, 205 F. Supp. 3d at 476.  In MARM

3   III, the MARM Trusts' expert testified that he assumed the

4   truth of a borrower's statements in a bankruptcy filing,

5   even when they were contradicted by other sources that he

6   considered reliable, and he concluded that a bankruptcy

7   filing was a more reliable source of a borrower's income

8   than the stated income on the loan application itself.

9   Noting that a borrower may have an incentive to overstate

10  income on a loan application but also an incentive to

11  understate income in a bankruptcy petition, Judge Castel

12  rejected the notion advanced by the MARM Trusts' expert that

13  a statement in a bankruptcy proceeding "trumps all other

14  available data and per se proves a misstatement" and

15  declined to credit the expert's opinions as to DTI ratio

16  breaches based solely on a borrower's statement in

17  bankruptcy documents.  See id. at 446.

18          Here, the parties disagree on the weight to be

19  given to statements in a borrower's loan application versus

20  statements made by the borrower in bankruptcy filings and in

21  other documents deemed reliable in certain circumstances.

22  The Court declines to establish a per se rule that a

23  particular data source is unreliable but instead observes

24  that, particularly when relying on a sole source of

25  evidence, the Trustees failed to exercise a certain degree

CONFIDENTIAL                                                         LBHI-OMNI_7689635

1  of caution with respect to its use.  As Judge Castel

2  observed, when statements in bankruptcy documents were

3  consistent with other information in the loan file, in those

4  instances, such statements "are properly considered as part

5  of the total mix of information that goes toward a

6  borrower's income."  Id.  Instead of taking into account the

7  "total mix of information in the loan file," including

8  either corroborative or contrary evidence, however, the

9  Trustees oftentimes relied on a sole type of evidence

10  "accepted in the industry" as dispositive and sufficient

11  proof of breach.

12       2.   The Trustees' Proof at Trial Was Insufficient

13  to Meet their Burden

14            a.   Discussion of Several Exemplar Loans

15            At trial, each side offered approximately a dozen

16  "exemplar loans" into evidence in connection with the direct

17  testimony of its expert or the cross-examination of the

18  other side's expert, presumably selecting the strongest

19  exemplar loans they could find from the universe of 72,500

20  disputed loans.  As counsel for the Plan Administrator

21  pointed out in closing argument, the breach claims in the

22  exemplar loans presented by the Trustees at trial by all

23  accounts should have been "slam-dunk winners."  This was not

24  the case.  Rather, as counsel observed, some of them "were

25  at best jump balls."  The Plan Administrator successfully

CONFIDENTIAL                                                    LBHI-OMNI_7689636

 1    challenged the Trustees' breach claims on many of their

 2    exemplar loans, raising serious doubts about the extent to

 3    which the Trustees' loan review process could generally be

 4    trusted.  The exemplar loans presented by the Plan

 5    Administrator during Mr. Aronoff's cross-examination

 6    revealed (i) the subjective nature of the Trustees' loan

 7    review and the assumptions made by the Loan Review Firms

 8    during their review, (ii) the Trustees' frequent reliance on

 9    one, often insufficient, piece of data as support for their

10    claims, and (iii) at times, the loan reviewers' disregard of

11    contradictory evidence or evidence that raised questions

12    regarding the Trustees' breach claims.  Here are some

13    specific examples of exemplar loans that did not withstand

14    close scrutiny.

15              Loan Number 2979

16              The Trustees asserted a misrepresentation of

17    income breach claim for Loan Number 2979, which loan was

18    presented as an exemplar loan during Mr. Aronoff's direct

19    examination.  The borrower's 2006 loan application stated

20    income of almost $8,000 per month, or approximately $96,000

21    per year, earned as a self-employed HVAC contractor.  The

22    Trustees used the borrower's tax returns from 2006, 2007,

23    and 2008 to assert that the borrower allegedly earned

24    between $2,166 and $4,000 per month for those years, less

25    than half the amount stated in his loan application.  Mr.

CONFIDENTIAL                                                      LBHI-OMNI_7689637

1    Aronoff explained at trial that, because the borrower was

2    self-employed, the Loan Review Firm made certain of its own

3    calculations using the numbers on the borrower's tax returns

4    in order to come up with a monthly income amount for the

5    borrower.  The Court was presented with minimal explanation

6    of the methodology employed and thus has no basis on which

7    to conclude that such calculations reflect accurate monthly

8    income amounts for this borrower.  From the evidence

9    presented, it was clear that the Loan Review Firms made

10   mistakes, errors, and unsupported assumptions in deriving

11   income levels from tax returns, particularly in the case of

12   self-employed borrowers such as the borrower on this loan as

13   to whom the concept of "monthly income" is murky at best.

14        In addition, the loan file for Loan Number 2979

15   also contains a 2008 hardship letter from the borrower

16   stating that business was excellent until late 2007 but, due

17   to (i) a difficult customer who monopolized his time and

18   (ii) emergency surgery, the borrower had fallen behind in

19   his payments after that.  The Trustees do not appear to have

20   considered this letter.  Given that the Trustees elected to

21   use this loan as one of their exemplar loans at trial, one

22   would have expected the breach claims asserted to be

23   virtually flawless and backed by solid, uncontroverted

24   evidence.  Not so here.  The fact that the Trustees elected

25   to present this particular exemplar loan causes the Court

CONFIDENTIAL                                              LBHI-OMNI_7689638

1   concern, highlighting as it does the subjective and

2   conclusory manner in which the Trustees' loan review process

3   appears to have proceeded with respect to this loan.

4            Loan Number 1955

5           The Trustees asserted a misrepresentation of

6   income breach claim for Loan Number 1955, another exemplar

7   loan presented during Mr. Aronoff's direct examination at

8   trial.  For this loan, the borrower listed income of $10,750

9   per month on his loan application in July 2006.  The

10   Trustees based their breach claim on (i) the borrower's 2006

11   tax return, which listed monthly income of $4050 per month

12   and (ii) the borrower's 2006 W-2 form, which corroborated

13   such amount.  The borrower's tax returns, W-2s, and paystubs

14   from 2007-2010 showed similar income of between $4055 and

15   $4682 per month. The Plan Administrator disagreed with the

16   Trustees' claim of breach.  After re-reviewing this evidence

17   from the loan file at trial, Mr. Aronoff testified that he

18   was certain that it was more likely than not, given the

19   evidence in the file, that monthly income of $10,750 was a

20   misrepresentation.

21           The evidence presented on this exemplar loan

22   included the clear and striking admission by Mr. Aronoff

23   that the Trustees made no attempt to determine a borrower's

24   actual income; rather, it was enough to find evidence that

25   made it more likely than not that the borrower's represented

CONFIDENTIAL                                       LBHI-OMNI_7689639

1    income was inaccurate.  Notwithstanding, as previously

2    discussed, the Trustees presented as exhibits to Mr.

3    Aronoff's expert report summary charts of (i) the magnitudes

4    of income breaches by borrowers and (ii) recalculations of

5    DTI as compared with origination DTI in order to show

6    seemingly staggering magnitudes of breach.  All of the

7    calculations reflected in these magnitude of breach

8    summaries are based on what the Trustees referred to as

9    "actual" borrower income, a term that Mr. Aronoff declined

10   to adopt when examined at trial.

11           Loan Number 1643

12           For Loan Number 1643, the borrower, a registered

13   nurse, stated monthly income of $13,783 on her loan

14   application in July 2006, which translates to annual income

15   of $165,400.  The Trustees claimed that the borrower

16   misrepresented her income on her loan application, citing as

17   the sole support for their claim BLS Data that indicated

18   that registered nurses at the 90th percentile of income in

19   the same geographic area at the same time earned annual

20   income of $95,300.  No other evidence was presented by the

21   Trustees in support of their breach claim on this loan.

22   During his direct examination, Mr. Aronoff testified to the

23   existence of several "red flags" in the loan file that he

24   stated would indicate that it is "more likely than not" that

25   the borrower misstated her income.  The red flags he

CONFIDENTIAL                                                    LBHI-OMNI_7689640

1    identified were (i) that the borrower had $41,000 of credit

2    card debt, which Mr. Aronoff opined should be unlikely if

3    the borrower had over $11,000 of free cash every month that

4    she could have used to pay off the debt, and (ii) that the

5    borrower's bank account held $25,000, which was only

6    approximately two months of free cash (based on her stated

7    income).

8            When questioned about this loan file, Mr. Aronoff

9    defended the Trustees' use of "red flags" to support BLS

10   Data (as was done here), stating that their presence would

11   indicate to the loan reviewer that the borrower's stated

12   income "doesn't make sense for other reasons" and such red

13   flags would be used "in reference to the totality of the

14   file to support, based on a BLS income number, that it's

15   more likely than not that income is misstated."  (Dec. 14,

16   2017 Hr'g Tr. at 2478:7-20).  But there was no testimony

17   whatsoever indicating that the loan reviewer had actually

18   identified these red flags, on this file or any others.  In

19   response to questioning during cross-examination, Mr.

20   Aronoff conceded that such "red flags" would be based on the

21   loan reviewer's subjective interpretation.  He also

22   acknowledged that BLS Data does not take into account

23   overtime, bonuses, or other sources of income that may add

24   to a borrower's total earnings.  Indeed, on this particular

25   loan, Mr. Aronoff was also shown a hardship letter from the

CONFIDENTIAL                                    LBHI-OMNI_7689641

1   borrower which the Trustees had not included in the Claim

2   Package which revealed that the borrower had been supporting

3   family members, her brother had been paying half the

4   mortgage, and because he was moving out she was no longer

5   able to pay the monthly payment in full.  Based on the

6   entirety of the evidence presented on this loan, it seems

7   clear that the Trustees failed to prove that it is more

8   likely than not that the borrower misrepresented her income

9   in her loan application.

10          Loan Number 9621

11          The Trustees alleged a misrepresentation of income

12   breach for Loan Number 9621.  On the borrower's 2004 loan

13   application, he listed income of $12,000 per month (or

14   $144,000 per year) from his occupation as a self-employed

15   realtor.  The loan was issued in December 2004.  As support

16   for their claim of breach based on the borrower's alleged

17   misrepresentation of income on his 2004 loan application,

18   the Trustees relied on the borrower's 2005 tax return, which

19   indicated income of $1923 per month for 2005.  The Trustees

20   did not include in the Claim Package any evidence of the

21   borrower's income in 2004, and Mr. Aronoff testified at

22   trial that he did not know how much the borrower earned in

23   any month in 2004.  Because there was no evidence in the

24   file of the borrower's 2004 income, Mr. Aronoff stated that

25   the Trustees elected to assert their breach claim based on

CONFIDENTIAL                                                    LBHI-OMNI_7689642

1    information from the subsequent year.  Relying on the

2    borrower's subsequent year tax returns and on BLS Data

3    indicating that the 90th percentile of realtors in his

4    geographic area earn $93,000 per year, Mr. Aronoff testified

5    that the Trustees concluded that it was more likely than not

6    that the borrower had misrepresented his income on his loan

7    application.  When questioned at trial, Mr. Aronoff

8    acknowledged, however, that ten percent of realtors in the

9    area covered by BLS Data would in fact earn more than

10   $93,000, and he also conceded that he did not know why the

11   borrower had a decrease in income in 2005.  The Trustees'

12   conclusion as to misrepresentation of income for this loan

13   is far too speculative to be sustained.  It is not based on

14   any evidence of the borrower's 2004 income, and it fails to

15   acknowledge the variable nature of the income earned by the

16   self-employed, particularly a self-employed realtor like the

17   borrower on Loan Number 9621.

18        Loan Number 2963

19        The Trustees asserted a misrepresentation of

20   employment breach claim for Loan Number 2963.  They cited as

21   the support for their claim (i) a VOE conducted at the time

22   of origination of the loan and (ii) BLS Data.  On the loan

23   application, the borrower had listed his job title as

24   "Senior Project Manager / Litigation."  The VOE form, based

25   on a phone call made at the time of origination, states that

CONFIDENTIAL                                                LBHI-OMNI_7689643

1   the borrower's position was "EDD Manager." At trial, the

2   VOE form was introduced during Mr. Aronoff's cross-

3   examination; it included what Mr. Aronoff conceded appeared

4   to be a typed notation by the loan reviewer that the

5   borrower's position was "Employment Development Dept (Human

6   Resources/Recruiter)." No evidence was introduced as to why

7   the loan reviewer appears to have concluded that the

8   borrower worked in a human resources position other than

9   speculation that "EDD" is an acronym for, among other

10  things, a state agency in California, the Employment

11  Development Department. Nevertheless, the Trustees, in

12  support of their breach claim, cited BLS Data for a human

13  resources position indicating that the 90th percentile of

14  earners in the borrower's geographic area earned $89,400.

15          During his cross-examination, Mr. Aronoff

16  reluctantly conceded that the Loan Review Firm had made a

17  mistake on this loan with respect to its breach finding of

18  misrepresentation of employment, the only claimed breach

19  finding for this loan. This error was not caught during QC1

20  or QC2. When presented with evidence indicating that it was

21  more likely than not that the borrower did not work in human

22  resources, Mr. Aronoff testified that he had not been aware

23  of such information. Among other things, however, the loan

24  file contained a financial statement listing the borrower's

25  occupation as "Director Data Services." A simple "Google"

CONFIDENTIAL                                   LBHI-OMNI_7689644

1   search for the name of the borrower's employer (which was

2   listed in the loan file) revealed that the firm was a

3   litigation consulting firm, and the term "EDD" likely meant

4   "Electronic Data Discovery."  In addition, the loan file

5   contained a letter from the borrower's employer stating

6   that, before raises, the borrower earned $120,000 per year.

7   Notwithstanding all of this information, the Loan Review

8   Firm selected an incorrect category of BLS Data for the

9   borrower (human resources) and, based on the $89,400 number

10  generated for a human resources position, asserted a claim

11  of breach, ignoring the letter from the borrower's employer.

12  At trial, Mr. Aronoff acknowledged that this loan was

13  included on at least one of the exhibits to his expert

14  report which purported to summarize categories of breach

15  findings.  The subjective and variable nature of the breach

16  conclusions reached by the Loan Review Firms is highlighted

17  by this exemplar loan and reveals that the Trustees' process

18  was, at times, a daisy chain of unfounded inferences and

19  faulty assumptions.

20          Although there were additional exemplar loan

21  presented at trial that survived scrutiny by the Plan

22  Administrator, the conclusion is inescapable that the

23  exemplar loans were not, on the whole, exemplary.  Moreover,

24  as articulated in MARM III, while an exemplar loan "may have

25  been selected to illustrate a single, isolated point," there

CONFIDENTIAL                                              LBHI-OMNI_7689645

1    is "no basis to conclude that the exemplar loans . . . are

2    representative of the universe of loans" at issue.  205 F.

3    Supp. 3d at 477.

4              b.    The Withdrawn Claims

5              The Withdrawn Claims were the subject of countless

6    disputes and discussions in the months leading up to the

7    Estimation Proceeding and continuing into the Estimation

8    Proceeding.  Why, asks the Plan Administrator, were some

9    72,000 breach claims withdrawn from those presented for

10   consideration to the Court?  What is the difference between

11   those claims that were withdrawn and those claims that were

12   presented at trial?  The Trustees have declined to provide

13   direct answers to these questions, instead selectively

14   revealing information to the Court regarding the withdrawal

15   of certain claims.  For example, the Trustees presented

16   information to the Court which indicated that a majority of

17   the breach claims that were withdrawn were "missing

18   document" claims; however, there was no explanation of (i)

19   why all missing document claims were not withdrawn and (ii)

20   what distinguished those claims that were withdrawn from

21   those that were not.  These unanswered questions cast

22   further doubt on the nature of the Trustees' loan review

23   process and leave the Court with difficulty in understanding

24   how the withdrawal of certain claims from the Estimation

25   Proceeding fits into the larger picture.

CONFIDENTIAL                                          LBHI-OMNI_7689646

1        All of this matters.  The Withdrawn Claims have

2    left a gaping hole in the landscape of the Trustees' claims,

3    and their withdrawal on such a massive scale does little to

4    support the proposition that the Trustees' loan review

5    process should essentially be accepted, virtually without

6    question, by the Court.

7        For all of the foregoing reasons, the Court finds

8    that the Trustees have failed to meet their burden to

9    demonstrate, by a preponderance of the evidence, the

10    existence of a breach of a representation and warranty for

11    each loan at issue in this proceeding.

12        B.    The Plan Administrator's Breach Review

13    Process Also Suffered from Flaws

14        The Trustees have criticized the Plan

15    Administrator and its experts as "largely rel[ying] on

16    claims of insufficiency of evidence and lack of 'certainty'

17    predicated on speculation about what might have happened to

18    a borrower after the loan was made."  (Trustees' Post-

19    Hearing Brief at 2.)  Although this criticism is overstated,

20    the Court nevertheless finds that, in many respects, the

21    Plan Administrator's process of reviewing breach claims

22    submitted by the Trustees was, at times, overly strict in

23    evaluating breach claims and overly speculative in favor of

24    the borrower.  The "pass/fail" numbers provide support for

25    this conclusion (i.e., the Plan Administrator only "passed"

CONFIDENTIAL                                          LBHI-OMNI_7689647

1    1,263 loans out of the approximately 94,000 loans that went

2    through Step 2 of the Protocol).

3        The parties have taken polar opposite views.  The

4    Plan Administrator criticizes the Trustees for, at times,

5    ignoring corroborative evidence or giving more weight to

6    third party evidence than to information in the loan

7    application itself, essentially assuming that a borrower

8    lied on his or her loan application.  The Trustees fault the

9    Plan Administrator for, at times, presuming the accuracy of

10   loan applications that were filled out during a historic

11   housing bubble that was due in no small part to the

12   proliferation of so-called "liar loans."  (Trustees' Post-

13   Hearing Brief at 9.)  There is some validity to both sides'

14   positions.

15       As to the Plan Administrator's breach review

16   process, the Court observes that the Plan Administrator

17   relied too heavily on speculative alternative hypotheses

18   that did not always provide a basis for discrediting the

19   Trustees' proof of a breach.  In addition, when rejecting

20   the Trustees' breach claims, the Plan Administrator often

21   responded with generalized, stock statements that did not

22   provide particularized reasons for the rejection.

23   Additional clarity surrounding the Plan Administrator's

24   "fail" determinations may have led the Trustees to conduct

25   additional review or may have fostered further dialogue

CONFIDENTIAL                                                    LBHI-OMNI_7689648

1    regarding the Trustees' alleged claims.

2           During his cross-examination, Mr. Grice was shown

3    several loan files he had reviewed and as to which he agreed

4    with the Plan Administrator's determination to "fail" a

5    breach claim asserted by the Trustees because he believed

6    that the Threshold Fact giving rise to the alleged breach

7    was supported by insufficient evidence.  After examining the

8    evidence again, he conceded that, upon further

9    consideration, he would be inclined to change his conclusion

10   on at least one of the files he was shown.  Here are a few

11   examples.

12           Loan Number 7599

13           The Trustees asserted a misrepresentation of

14   occupancy claim for Loan Number 7599.  In applying for a

15   loan in 2005 to purchase an Arizona property, the borrower

16   had represented that it would be his primary residence.  The

17   Trustees alleged that it was more likely than not that the

18   borrower did not use the Arizona property as his primary

19   residence.

20           At trial, Mr. Grice reluctantly conceded that,

21   while it may be possible that a borrower employed in

22   Washington, D.C. continued to tele-work for his Washington,

23   D.C.-based employer from his new residence in Arizona, the

24   evidence of (i) a 2012 letter in the loan file stating that

25   the borrower used the Arizona property as a rental property

CONFIDENTIAL                                                    LBHI-OMNI_7689649

1    and (ii) the Washington, D.C. address on his 2010 W-2

2    suggests that it is more likely than not that the borrower

3    did not use the Arizona property as his primary residence

4    between the time of origination in 2005 and 2012, as he had

5    represented at origination.  Notwithstanding this evidence

6    in the Claim Package, however, Mr. Grice continued to raise

7    hypotheses and possibilities that he had raised during his

8    original review of the file, including (a) that the

9    borrower's Washington D.C. employer could have had an

10   Arizona office (a fact he admitted he had not investigated)

11   and (b) the observation that there was no solid evidence put

12   forth by the Trustees regarding 2005, the year of the

13   borrower's alleged misrepresentation.  On redirect

14   examination, Mr. Grice was shown a letter from the

15   borrower's Washington D.C. employer indicating that the

16   borrower would be retaining his position upon his move to

17   Arizona.  Thus, as Mr. Grice observed, no one piece of

18   evidence is necessarily dispositive.  Nonetheless, Mr.

19   Grice's analysis of this particular misrepresentation of

20   occupancy claim seems overly aggressive.

21              Loan Number 3301

22              In another example shown to Mr. Grice on cross-

23   examination, Loan Number 3301, the Trustees had asserted a

24   misrepresentation of income claim.  On his 2005 loan

25   application, the borrower, a respiratory therapist, had

CONFIDENTIAL                                                       LBHI-OMNI_7689650

1    stated income of $8900 per month (approximately $106,000 per

2    year). In 2015, during the Protocol, a loan reviewer had

3    conducted a telephonic VOE, and had written on the VOE form

4    that the borrower's income "in 2005?" was $50,318. The

5    borrower's tax returns for 2008 and 2009 indicated annual

6    income of $70,000 and $78,000, respectively, and a paystub

7    from 2010 indicated annual income of $80,000. The 2015

8    VOE, the 2008 and 2009 tax returns, and the 2010 pay stub

9    were introduced as evidence supporting the Trustees'

10   assertion that it was more likely than not that the borrower

11   had misrepresented his income in his 2005 loan application.

12   The Plan Administrator had rejected the Trustees' income

13   breach claim, and, during his review, Mr. Grice stated in

14   his written narrative that "there is nothing in the file

15   that points to a misrepresentation of income."

16          At trial, Mr. Grice again questioned (i) the

17   reliability of the tax returns included in the Claim Package

18   because they were unsigned (even after conceding that it is

19   common for paid preparers to e-file tax returns, in which

20   case the returns would be unsigned), (ii) the reliability of

21   the telephonic audit VOE conducted ten years after

22   origination (which VOE included a handwritten question

23   mark), and (iii) the Trustees' use of post-2005 documents to

24   attempt to prove what the borrower's actual income may have

25   been in 2005. Notwithstanding, Mr. Grice conceded that the

CONFIDENTIAL                                                    LBHI-OMNI_7689651

1   Trustees' evidence was sufficient to cast doubt upon the

2   Plan Administrator's rejection of the Trustees' breach claim

3   here and he reconsidered his prior determination on this

4   file.

5        Mr. Esses was also questioned about this loan

6   during his cross-examination, particularly with respect to

7   questions surrounding the audit VOE conducted ten years

8   after origination, which VOE included a question mark

9   handwritten next to the borrower's alleged income.  Mr.

10  Esses testified that he did not know whether each of the

11  five Loan Review Firms utilized a standard script to conduct

12  telephonic VOEs.  It is clear to the Court that there was

13  little, if any, uniformity employed by the five different

14  Loan Review Firms when they conducted audit VOEs, let alone

15  evidence that they used a rigorous or standardized process.

16  In addition to being an example of the flaws inherent in the

17  use of audit VOEs by the Loan Review Firms, this exemplar

18  loan also illustrates the overly stringent standards applied

19  by the Plan Administrator, who rejected the Trustees' breach

20  claim on this loan notwithstanding the presence of evidence

21  which established by a preponderance of the evidence that it

22  is more likely than not that this borrower misrepresented

23  his income.

24        Overall, the Court concludes that the Plan

25  Administrator's breach review process was rigorous to a

CONFIDENTIAL                                                    LBHI-OMNI_7689652

1    fault.  It seems clear that far more than 1263 loans should

2    have been "passed" by the Plan Administrator's team and that

3    the $300 million claim amount touted by the Plan

4    Administrator in its pre-trial brief is considerably off the

5    mark.

6                C.   Analysis of the Requirement That a Breach

7    "Adversely and Materially Affects" the Value of the Loan

8                Because the Court has concluded that the Trustees

9    failed to meet their burden of proof to demonstrate that

10   each of the loans presented by the Trustees in the

11   Estimation Proceeding contains a breach, the Court need not

12   reach the second step of the claim analysis – whether each

13   of the alleged breaches adversely and materially affects the

14   value of the subject loan.  Notwithstanding, the AMA

15   analysis necessitates a certain amount of discussion, as the

16   Court finds that the Trustees' proof failed there as well.

17   Even assuming the Trustees had proven, for each loan at

18   issue, the existence of a breach of a representation and

19   warranty in the Governing Agreements, the Trustees failed to

20   demonstrate that each breach had a material and adverse

21   effect on the value of the subject loan.

22                As a threshold matter, the parties disagree on

23   certain legal issues embedded in the AMA analysis.  First,

24   the Plan Administrator asserts that the time as of when AMA

25   is assessed is the time notice of a breach is provided.  The

CONFIDENTIAL                                                   LBHI-OMNI_7689653

1   Trustees, relying on the opinion of Mr. Aronoff and sharply

2   disagreeing with Judge Castel's holding in **MARM III**, contend

3   that AMA should be assessed as of the time of origination of

4   the subject loan.  The Court agrees with Judge Castel; the

5   timing of the AMA inquiry is, as the Plan Administrator

6   argues, unquestionably as of the time of notice or discovery

7   of a breach.  As Judge Castel stated **MARM III**,

8          [I]t is reasonable for the parties to bargain for

9   a limitation on the representations and warranties such that

10  the repurchase obligation is triggered only where a material

11  breach at the time of contracting continues to have a

12  material adverse effect at the time the breach is noticed or

13  discovered and a remedy is sought.  To conclude otherwise

14  would give the Trusts a unilateral ability to put back loans

15  that, after many years of performance, may have breaches

16  even if those breaches no longer affect the

17  Certificateholders' interests.

18          205 F. Supp.3d at 466.

19          In addition, in **MARM III**, Judge Castel clarified

20  that the materiality requirement contained in individual

21  representations and warranties should be analyzed separately

22  from AMA.  While it is undisputed that the Governing

23  Documents require that AMA be demonstrated for each and

24  every material breach asserted, the Trustees in the instant

25  case presented no proof whatsoever on this point.  As

CONFIDENTIAL                                          LBHI-OMNI_7689654

1     previously discussed, Mr. Aronoff testified that every

2     breach had an adverse material effect on the value of the

3     subject loan.  Therefore, once a material breach was

4     discovered, the Trustees concluded that the AMA requirement

5     was met without any additional analysis being conducted.

6          The Court agrees with the Plan Administrator that,

7     by conflating the question of whether a misrepresentation

8     was "material" with the separate determination of whether

9     the breach, if proven, adversely and materially affects the

10    value of the loan, the Trustees effectively write the AMA

11    requirement out of the Governing Agreements and render

12    meaningless the requirement that AMA be assessed at the time

13    of notice of the breach.  In MARM III, Judge Castel

14    criticized the MARM Trusts' expert for explaining breaches

15    on a loan-by-loan basis while omitting any discussion of the

16    resulting effect on certificateholders, finding as a fact

17    that the Trusts' expert "looked at the materiality of the

18    breach but made no systematic and separate assessment of

19    whether the breach had affected the interests of the

20    Certificateholders at the time the cure or repurchase

21    obligation was triggered."  MARM III, 205 F. Supp. 3d at

22    473. The Trustees' approach here was no different.

23          As previously discussed, the Trustees grouped

24    similar types of breaches into categories and asserted AMA

25    based on breach type.  In Mr. Aronoff's view, because a

CONFIDENTIAL                                     LBHI-OMNI_7689655

1   certain breach type "will always have the same effect with

2   respect to an investor," it will therefore "always, absent

3   specific circumstances, have the same [AMA] with respect to

4   that type of breach finding." (Dec. 13, 2017 Hr'g Tr. at

5   2313:18-2314:7.)   Mr. Aronoff testified that, because the

6   overarching premise of securitization is homogeneity –

7   enabling investors to assess risk by looking at a pool of

8   loans – representations and warranties serve as the primary

9   source of promises providing homogeneity and one can thus

10  reach breach and AMA conclusions across groups of loans.

11  The Court observes that Mr. Aronoff's views in this regard

12  highlight the conflict between the premise of securitization

13  and the need for loan-by-loan determinations to support

14  putback claims.

15          Despite continuing to acknowledge that they were

16  not relieved of their burden of proof on a loan-by-loan

17  basis, the Trustees based their AMA proof on Mr. Aronoff's

18  views and attempted to present exemplar loans for their

19  largest "breach type" categories in order to provide the

20  Court with the ability to extrapolate from the exemplar

21  loans to the breach categories and then to the greater pool

22  of Covered Loan Claims.   Approximately $9.1 billion of the

23  $11.4 billion claimed by the Trustees has been attributed to

24  one of what the Trustees refer to as the "Big Four" breaches

25  – borrower breaches of income, debt, occupancy, and DTI.

CONFIDENTIAL                                              LBHI-OMNI_7689656

1    Exhibits annexed to Mr. Aronoff's expert report purported to

2    demonstrate, in summary form, that the borrowers on the

3    72,500 loans at issue here made considerable

4    misrepresentations regarding their income, debt,

5    and/occupancy on their loan applications and that the

6    magnitude of these massive misrepresentations could be

7    quantified utilizing percentage amounts.

8           This "breach type" approach to AMA was

9    unsuccessful.  First, as the Court has found, the Trustees'

10    exemplar loans were far from exemplary and, even if the

11    Court were to determine that each such exemplar loan was a

12    breaching loan, the Court has been provided with no basis on

13    which it could apply a finding of breach on an exemplar loan

14    to each of the loans in an entire breach category.

15    Moreover, the summary analysis of breach type by magnitude

16    (presented by the Trustees through the exhibits to Mr.

17    Aronoff's expert report) is inadequate to prove intentional

18    misrepresentations or misstatements by a borrower.  This

19    failure of proof is fatal to the Trustees' approach to AMA.

20           In MARM III, Judge Castel held that proof of a

21    borrower's intentional misstatement of information, i.e.,

22    proven borrower deceit, suffices to prove AMA.  205 F. Supp.

23    3d at 470.  The Trustees attempt to apply this holding to

24    the instant case, arguing that

25           The facts here support the inference that the vast

CONFIDENTIAL          LBHI-OMNI_7689657

1      majority of the misrepresentations in the Trustees' core

2      claims were intentional.  A borrower does not mistakenly

3      overstate her income by 20% of more; and a full 90% of the

4      misrepresentation of income claims involves [stet]

5      overstatements of that amount or greater.  Nor does a

6      borrower just happen to forget the existence of a mortgage

7      on a property the borrower didn't bother to mention in his

8      loan application.  Whatever the motivations and concerns

9      behind them, these sorts of misstatements are intentional,

10     not innocent.

11             (Trustees' Pre-Trial Brief at 37.)  The Trustees'

12     position, in essence, is that for certain magnitudes of

13     misrepresentation by a borrower, the Court should assume

14     borrower deceit.  The Trustees refer to such loans as "liar

15     loans."  As support for this view, the Trustees point to the

16     "general understanding" that there was massive institutional

17     wrongdoing by sponsors and pervasive lying by borrowers

18     during the housing bubble that was created prior to the

19     subprime crisis.

20             Intentional misstatements or deceit by particular

21     borrowers, however, cannot be proven either by providing

22     statistics as to the magnitude of breaches or by pointing to

23     macroeconomic conditions and general behavior at the time of

24     issuance of the subject loans.  It is more complicated than

25     that.  First, the Court observes that, at the time of

CONFIDENTIAL                                          LBHI-OMNI_7689658

1    origination of the loans at issue here, the standard loan

2    application contained no definitions or directions for the

3    applicant.   The ambiguities inherent in the loan application

4    could easily contribute to a blurring of the line between

5    intentional and unintentional misstatements by a borrower.

6    It is also possible to conceive of situations in which a

7    borrower had no intent to make a misrepresentation at the

8    time of origination but, due to changed circumstances, the

9    information stated in his or her loan application proves to

10   be "untrue."   In yet other instances, intent to deceive

11   indeed may be inferred, but even in those cases, the

12   criteria for evaluating intent is imprecise.

13   Notwithstanding the court's holding in MARM III with respect

14   to intent and AMA, proof of a borrower's intentional

15   misstatement of information may not, in this Court's view,

16   suffice to prove AMA in all circumstances.   Most

17   importantly, even if borrower intent to deceive can be

18   proven, it would have to be demonstrated on a loan-by-loan

19   basis and not on a category basis for a broad group of

20   loans, as the Trustees attempt to do.

21           In addition, even assuming borrower intent could

22   be inferred by examining magnitudes of alleged

23   misrepresentation by borrowers — which the Court finds it

24   cannot — the Trustees' proof in this regard suffered from

25   significant shortcomings which preclude the Court from being

CONFIDENTIAL                                                   LBHI-OMNI_7689659

1    able to determine the accurate percentage of income, debt,

2    occupancy, and DTI breaches that would fall into this

3    category.  Simply put, the Trustees' "liar loan" theory of

4    satisfying the AMA requirement must be rejected.

5         As the Court has discussed previously in

6    connection with its observations regarding the testimony of

7    Mr. Aronoff and the "breach type" summary exhibits to his

8    expert report, the summary figures calculated by the

9    Trustees and listed on such exhibits were computed based in

10   part on flawed methodologies utilizing incomplete,

11   incorrect, or subjective data.  These exhibits purported to

12   (i) summarize the claims asserted by the Trustees in each of

13   their twelve major breach categories and (ii) demonstrate,

14   through such summaries, the validity and materiality of each

15   breach type, with particular emphasis in certain exhibits on

16   the magnitudes of the alleged breaches.  During his

17   examination, Mr. Aronoff (a) conceded he did not prepare

18   such exhibits, (b) was unable to explain the source of the

19   data included, (c) admitted that the information came from a

20   database (later identified as "TeamConnect") that had not

21   been provided to the Plan Administrator, and (d) was

22   presented with myriad examples of data included in the

23   exhibits that were inconsistent with data in the Claims

24   Tracking Spreadsheet.  Additionally, the testimony raised

25   serious questions regarding the reliability of the Trustees'

CONFIDENTIAL                                                    LBHI-OMNI_7689660

1    breach category exhibits because certain data reflected in

2    the exhibits was not accurately presented or was used in a

3    misleading or incorrect manner.  For example, Mr. Aronoff

4    admitted that the "Actual Monthly Income" of a borrower

5    listed was not actual income at all and that "Represented

6    Monthly Income" may mean different things depending on the

7    loan, such as (i) income from one job alone or (ii) income

8    from multiple sources.  The Trustees failed to lay a

9    foundation through any witness that such exhibits were

10   reliable.  The Trustees attempted to utilize the exhibits to

11   demonstrate the excessive nature of certain of the alleged

12   breaches but, as a result of the exhibits' confirmed

13   weaknesses, this "magnitude of breach" data cannot support

14   the "liar loan" inference on which the Trustees rely to

15   satisfy the AMA requirement for the vast majority of alleged

16   breaches.

17               D.    The Trustees' Calculator

18               Perhaps in an attempt to bridge some of the gaps

19   in their proof, the Trustees presented at closing (over the

20   objection of the Plan Administrator) a series of summaries

21   pursuant to Federal Rule of Evidence 1006 which they urge

22   the Court to utilize to "calculate" a damage amount based on

23   whatever conclusions the Court reaches as to dozens of types

24   and categories of proof.  As described by the Trustees, "the

25   calculator tool applies a series of filters on the Excel

CONFIDENTIAL                                                            LBHI-OMNI_7689661

1   versions of the Aronoff exhibits submitted during the

2   hearing." (Trustees' Post-Hearing Brief at 44.)

3        As an initial matter, the Court observes that the

4   Trustees' suggested method of "subtracting" certain claim

5   categories to end up with a proposed claim amount bears

6   striking similarity to the methodology that the Trustees

7   criticized in their pretrial brief. There, they stated that

8   "Lehman also suggests that the Court could just apply

9   various discounts to reach its proposed $2.3 billion

10  estimate." (Trustees' Pre-Trial Brief at 43.) Yet, this is

11  exactly how the Trustees, in closing argument, propose that

12  the Court arrive at a damage claim, via the use of a so-

13  called calculator. In essence, they urge the Court to apply

14  various discounts based on the weight of the evidence and

15  make a reasonable guess on an aggregate claim amount.

16       There are a variety of reasons that the so-called

17  "calculator" cannot be used to sustain the Trustees' burden

18  to prove breaches on a loan-by-loan basis. First and

19  foremost, summaries of the sort contemplated by Rule 1006

20  are typically limited to a universe of objective data.

21  Here, the Trustees' use of a "summary" to present the

22  millions of pieces of data contained in some 72,500 loan

23  files is not an appropriate use of Rule 1006. Next, as

24  previously discussed, the summaries were prepared using the

25  exhibits to Mr. Aronoff's expert report and the data

CONFIDENTIAL                                     LBHI-OMNI_7689662

1    therein; such summaries have been afforded little weight by

2    the Court due to their reliance on incomplete, incorrect, or

3    subjective data.  In sum and substance, the Trustees have

4    asked to Court to make significant leaps of faith to arrive

5    a conclusion that the Trustees' loan process is entitled to

6    an extraordinary degree of deference and that therefore, in

7    essence, the Trustees can be relieved of the burden to prove

8    their claim on a loan by loan basis.  Neither the record nor

9    applicable law supports such an approach.  The Court

10   declines the Trustees' invitation to use the calculator to

11   guess at an allowed claim amount.

12           Because the Court has found that the Trustees have

13   failed to meet their burden to demonstrate, by a

14   preponderance of the evidence, the existence of a material

15   breach of a representation and warranty for each loan at

16   issue which materially and adversely affects the value of

17   such loan, the Court does not reach the issue of purchase

18   price calculation nor will it be addressed herein.

19           E.    Estimating and Allowing the RMBS Claims at

20   $2.38 Billion is Fair and Reasonable

21           While the stated purpose of the Estimation

22   Proceeding was for the Court to estimate the allowed claim

23   amount of the Trustees' RMBS Claims as if the parties had

24   completed the Protocol, the Court was not presented with any

25   methodology during the Estimation Proceeding which would

CONFIDENTIAL                                                    LBHI-OMNI_7689663

1    enable it to estimate such amount on a loan-by-loan basis.

2    As a result, the Court has determined that it must look to

3    (i) the Institutional Investors Settlement and (ii) the

4    Comparable Settlements in order to inform its determination

5    of the allowed amount of the Trustees' RMBS Claims.

6         1.   The Institutional Investors Settlement

7              The Institutional Investors Settlement in October

8    2015 encompassed a settlement of both the Covered Loan

9    Claims and the Transferor Loan Claims (which, at the time,

10   comprised a portion of the RMBS Claims) for $2.44 billion.

11   Here, only the Covered Loan Claims are at issue, which

12   results in a downward adjustment of the amount to $2.38

13   billion.  There is no serious dispute that the Institutional

14   Investors are all sophisticated economic actors.  As such,

15   with enormous amounts of their own capital and that of

16   others at stake, they have strong incentives to maximize

17   their returns and, conversely, minimize their losses.  The

18   Institutional Investors' willingness to settle their RMBS

19   Claims against Lehman for $2.44 billion in 2015 is entitled

20   to substantial weight in this proceeding.

21             While the Trustees attempted to demonstrate during

22   the Estimation Proceeding that the behavior of the

23   Institutional Investors is not aligned with the economic

24   interests of the certificateholders represented by the

25   Trustees herein, the Court finds otherwise.  The

CONFIDENTIAL                                              LBHI-OMNI_7689664

1   Institutional Investors collectively hold approximately

2   $10.9 billion, or 24 percent, of the outstanding unpaid

3   principal balance of all the Covered Loans.  Although the

4   Trustees attempted to suggest that the Institutional

5   Investors' interests are not aligned with those of other

6   certificateholders here because of the waterfall payment

7   provisions, there was no evidence introduced that

8   distinguishes the interests of the Institutional Investors

9   from the interests of the other certificateholders.  As the

10  group holding the largest collective interests in this

11  proceeding, the Institutional Investors unquestionably have

12  an enormous incentive to seek the best possible economic

13  outcome for themselves and their stakeholders.  As the

14  Trustees' expert Judge Smith conceded, the Institutional

15  Investors are highly sophisticated financial institutions

16  that collectively own or manage nearly $11 trillion in

17  assets.

18          Moreover, as Judge Smith also acknowledged, the

19  interests of the Trustees and the interests of the

20  Institutional Investors are not aligned in certain respects.

21  While it is true that the Trustees are indeed charged with

22  protecting the economic interests of the certificateholders,

23  they also act in their own economic interests, which

24  interests may include concerns about exposure to liability.

25  In contrast, the sole focus of the Institutional Investors

CONFIDENTIAL                                              LBHI-OMNI_7689665

1   is maximizing the return to their investors, and in so

2   doing, preserving the value of the capital they have at risk

3   and safeguarding their reputations as careful stewards of

4   trillions of dollars of portfolios.  The Court views their

5   conduct as the single best barometer of the reasonableness

6   of the Proposed Lehman Claim Amount here.

7           Finally, it bears noting that a number of the

8   Institutional Investors have previously been involved in the

9   Comparable Settlements analyzed by Professor Fischel, and

10  that the trustees in such Comparable Settlements utilized

11  Professor Fischel's analyses in those cases to arrive at the

12  settlement amounts thereunder.

13          Accordingly, the Court concludes that the

14  Trustees' RMBS Claims should be allowed in the amount of

15  $2.38 billion, the adjusted amount of the Institutional

16  Investors Settlement for the Covered Loans at issue in the

17  Estimation Proceeding.

18          2.   The Comparable Settlements

19          The Plan Administrator, through the testimony of

20  Professor Fischel, demonstrated that the Lehman Proposed

21  Claim Amount of $2.38 billion is well within the range of

22  comparable settlements of RMBS put-back litigation.  As

23  previously discussed, Professor Fischel calculated the

24  Recovery Ratios for five Comparable Settlements that

25  involved sizeable put-back claims arising from similar legal

CONFIDENTIAL                                                LBHI-OMNI_7689666

1    and macroeconomic circumstances.  The Recovery Ratios

2    represent the ratio of the settlement consideration to the

3    expected lifetime losses on the loans in the trusts that

4    were releasing claims.  The Recovery Ratios for the

5    Comparable Settlements ranged from 6.9% to 17.1%, as

6    follows: 7.1% for the JPMorgan settlement; 8.3% for the

7    Citigroup settlement; 6.9% for the ResCap settlement; 13.2%

8    for the Washington Mutual settlement; and a range of 7.9% to

9    17.1% for the Countrywide settlement.  The 11.2% Recovery

10   Ratio for the Lehman Proposed Claim Amount of $2.38 billion

11   falls within the high end of the range of the Comparable

12   Settlements.  By contrast, the 55% Recovery Ratio for the

13   Trustees' Proposed Claim Amount of $11.4 billion is more

14   than three times greater than the highest Recovery Ratio of

15   the Comparable Settlements.  The Court is persuaded that the

16   Comparable Settlements confirm the reasonableness of the

17   Lehman Proposed Claim Amount of $2.38 billion.

18          To refute Professor Fischel's opinions, the

19   Trustees attempted to (i) distinguish the Comparable

20   Settlements from this case and (ii) establish that the

21   Comparable Settlements do not accurately reflect RMBS put-

22   back recovery rates.  Although Professor Fischel conceded

23   that the Comparable Settlements were achieved prior to full

24   litigation of the claims in those cases and, in certain

25   cases, there were statute of limitation defenses asserted,

CONFIDENTIAL                                                    LBHI-OMNI_7689667

1   the Trustees did not meaningfully challenge the

2   comparability of the Comparable Settlements to the RMBS

3   Settlement.  The Trustees argue that the Comparable

4   Settlements are not comparable because they were entered

5   into early in litigation and/or prior to a full loan review

6   process, and the Trustees posit that, had the settlements

7   occurred later in those cases, the settlement amounts would

8   have been much larger.  This argument must be rejected as a

9   matter of common sense.  To accept the Trustees' proposition

10  would be tantamount to concluding that the trustees involved

11  in the Comparable Settlements, many of whom are serving as

12  Trustees herein, made decisions in those cases to abandon

13  litigation claims that would have been worth three times

14  more had they proceeded, at a minimum, through discovery, or

15  to judgment.  The Court finds this proposition wholly

16  incredible.  And while Judge Smith characterized the

17  trustees in the Comparable Settlements as being

18  "uninformed," this too flies in the face of common sense.

19  Whatever else one might say about Goldman Sachs or

20  BlackRock, "uninformed" is not a word that comes to mind.

21          Through the testimony of Judge Smith and Mr.

22  Finkel, the Trustees also attempted to establish that the

23  Comparable Settlements do not accurately reflect RMBS put-

24  back recovery rates.  Judge Smith criticized Professor

25  Fischel's report because, in his opinion, it "contains

CONFIDENTIAL                                                      LBHI-OMNI_7689668

1    virtually no analysis of the facts underlying, or the law

2    applicable, to the Covered Loan Claims." (Smith Expert

3    Report, ¶ 10.)  With all due respect to Judge Smith, aspects

4    of his report suffered from the same deficiencies – he

5    provided no specific factual or legal bases on which to

6    differentiate this case from the Comparable Settlements, nor

7    did he provide any meaningful specific details about the

8    cases he cited that purportedly demonstrate that settlement

9    amounts are not predictive of case outcomes.

10          It is unremarkable and indeed not surprising that

11   the Trustees found and presented, through the Finkel

12   Comparable Settlements, other RMBS settlements that had

13   Recovery Ratios greater than 11.2%.  But, as previously

14   discussed, the flaws in the Trustees' approach with respect

15   to the Finkel Comparable Settlements were manifest, and

16   many.  The six RMBS put-back settlements presented to Mr.

17   Finkel for calculation were selected, one might say "cherry-

18   picked," by counsel to the Trustees; their Recovery Ratios

19   ranged from 23% to 23.75% and counsel for the Trustees had

20   represented the plaintiffs in each matter.  The testimony

21   revealed that Mr. Finkel did not review any settlements

22   other than those provided to him by counsel.  He was not

23   provided with settlements with lower Recovery Ratios, such

24   as the HSBC settlement introduced at trial, which had a

25   Recovery Ratio of 12.7% and in which the Trustees' counsel

CONFIDENTIAL                                                           LBHI-OMNI_7689669

1   had represented HSBC.

2           Moreover, as previously discussed, Mr. Finkel did

3   no qualitative analysis of the Finkel Comparable

4   Settlements; he did not analyze the default rates, the types

5   of collateral, the vintage of the loans, who originated the

6   loans, what portion of the settlement amount was allocated

7   to attorneys' fees, or what motivated the settlement in each

8   matter.  Mr. Finkel also offered no opinion on how the

9   Finkel Comparable Settlements did or did not compare to the

10  Comparable Settlements and/or the Recovery Ratios for those

11  settlements.  Finally, the magnitude of the litigation

12  involved in each of the Finkel Comparable Settlements was

13  hardly akin to this multi-billion dollar case, and Mr.

14  Finkel did not even attempt to draw a comparison.

15          If anything, Mr. Finkel's testimony demonstrated

16  that the Recovery Ratios for the carefully curated Finkel

17  Comparable Settlements did not approach the 55 percent

18  Recovery Ratio sought by the Trustees here.  The Trustees

19  presented the Court with no basis upon which to conclude

20  that the Finkel Comparable Settlements were the better set

21  of comps, or why the Court should select a 23 percent

22  Recovery Ratio when the Trustees seek an allowed claim that

23  reflects a 55 percent Recovery Ratio.

24          Simply put, the Trustees have not only failed to

25  demonstrate any basis on which the Court can conclude that

CONFIDENTIAL                                                  LBHI-OMNI_7689670

1    the Comparable Settlements are not indeed comparable to the

2    RMBS Settlement, but they have also failed to provide any

3    evidence of any instance in the history of RMBS put-back

4    litigation in which the Recovery Ratio has been anything

5    approaching 55 percent.  In their Post-Trial Brief, the

6    Trustees noted that "the $2.38 billion figure proposed [by

7    the Plan Administrator] is not a cash recovery — it is a

8    claim allowance subject to the distribution percentage for

9    allowed claims."  (Trustees' Post-Trial Brief at 49.)  As

10   previously stated, that this case adjudicates a claim in a

11   bankruptcy proceeding which will be paid in discounted

12   dollars does not provide a basis for allowing the Trustees'

13   RMBS Claims in an unsupportable inflated amount.

14          VI.  CONCLUSION

15          For all of the foregoing reasons, the Court

16   concludes that the Trustees' RMBS Claims at issue in the

17   Estimation Proceeding shall be allowed in the amount of

18   $2.38 billion.  The parties are directed to submit an order

19   consistent with the foregoing.

20

21

22

23

24

25

CONFIDENTIAL                                      LBHI-OMNI_7689671